# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

Rebecca K. Wilson, Dennis Houtz,
James Dunn, Robert Wong, Kenneth
Wong, Mike Hampshire, Lions Fan, LLC
Linda Saenz and Abby Creek Investment, LLC,

        Plaintiffs

v.

5 Choices, LLC, American Cash Funding, LLC,
BuyPD, LLC, DLS Properties, LLC,
EZ Street Properties, LLC, FrontSide Properties, LLC,
Green Apple Homes, LLC, Insiders Cash, LLC,
Malibu Breeze Properties, LLC, Max Ultra, LLC,
Patriot Homes, LLC, Property Direct, LLC,
Ready Prop, Red List Homes, LLC,
Screaming Eagle Properties, LLC,
Silver Tie Homes, LLC, Investors Financial Education, LLC,
Yancey Events LLC, and various John Does,

        Defendants

_____/

## COMPLAINT AND JURY DEMAND

    For their Complaint against the Defendants, the Plaintiffs Rebecca K. Wilson,

Dennis Houtz, James Dunn, Robert Wong, Kenneth Wong, Mike Hampshire, Lions

Fan, LLC, Linda Saenz and  Abby Creek Investments, LLC (collectively "Plaintiffs"),

through counsel, state as follows:

1

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Rebecca K. Wilson resides in Grosse Pointe Park, Michigan and attended Defendants' introductory and "training" sessions" in southern Oakland County, Michigan.  She also purchased her package to attend the "Buying Summit" for $39,997.00 at such a training session located in southern Oakland County, Michigan.  Further, she received an introductory email from Defendants promising access to purchasing real estate properties for "pennies on the dollar" while residing in Grosse Pointe Park, a fact which was known at the time by Defendants.

2.  Plaintiff Dennis Houtz resides in Pennsylvania and purchased from Defendants, *inter alia*, three residential properties which are located in Warren, Michigan.

3.  Plaintiff Robert Wong resides in New York, New York and purchased from Defendants, *inter alia*, a residential property located in Detroit, Michigan.

4.  Plaintiff Kenneth Wong resides in New York, New York and purchased from Defendants, *inter alia,* a residential property located in Eastpointe, Michigan from Defendants.

5.  Plaintiff Mike Hampshire resides in Texas and purchased from Defendants, *inter alia,* eleven residential properties located in Detroit, Michigan, four properties located in Eastpointe, Michigan, three properties located in Warren, Michigan, one property located in Harper Woods, Michigan and one property located in Taylor, Michigan all of which were conveyed by Defendants at Mr. Hampshire's direction to

his wholly owned limited liability company, Plaintiff Lions Fan, LLC. a limited liability company organized and existing under the laws of the State of Texas

6.  Plaintiff Linda Saenz resides in Texas and purchased from Defendants, *inter alia,* a residential property located in Warren, Michigan from which was conveyed by Defendants at her direction to her wholly owned limited liability company, Plaintiff Abby Creek Investment LLC., a limited liability company organized and existing under the laws of the State of Texas.

7.  Plaintiff James Dunn resides in Georgia and purchased from Defendants, *inter alia,* a residential property located in Warren, Michigan.

8.  Defendant 5 Choices LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

9.  Defendant American Cash Funding is a Utah "DBA" existing under the laws of the State of Utah with its registered office located in the State of Utah.

10.  Defendant BuyPD, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.


11.  Defendant DLS Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  The State of Utah describes its status as "expired".

3

12.   Defendant EZ Street Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

13.   Defendant FrontSide Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

14.   Defendant Green Apple Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

15.   Defendant Insiders Cash, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

16.   Defendant Malibu Breeze Properties LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

17.   Defendant Max Ultra, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

18.   Defendant Patriot Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

19.   Defendant Property Direct, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Purchasers of properties at the Buying Summit often are provided documentation stating that they have purchased their properties from "Property Direct".

20.   Defendant Ready Prop is a Utah "DBA" and existing under the laws of the State of Utah with its registered office located in the State of Utah.

21.   Defendant Red List Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

22.   Defendant Screaming Eagle Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

23.   Defendant Silver Tie Homes LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.

24.   Defendant Investors Financial Education, LLC is the entity identified on each of the written contractual agreements (except for Plaintiffs Robert Wong and Kenneth Wong) as the party from whom each Plaintiff purchased "training" and Buying Summit packages and to whom consideration was paid.  Plaintiffs have been unable to identify the "corporate" or organizational registration or existence of

Investors Financial Education, LLC despite requesting such information from Defendants' attorneys.  Agents of Defendant BuyPD, LLC have negotiated complaints made by purchasers of "training" and Buying Summit packages on behalf of Investors Financial Education, LLC.

25.  Defendant "Yancey Events LLC" is or was a "Utah DBA of Edge 2 Real Estate LLC", a purported Utah based limited liability company whose registration in Utah has expired. It is the entity identified on the written contractual agreements with Plaintiffs Robert Wong and Kenneth Wong as the party from whom those Plaintiffs purchased "training" and Buying Summit packages and to whom consideration was paid.

26.  Pursuant to Fed. R. Civ. P. 20, these plaintiffs may join in this one action as plaintiffs because they assert a right to relief with respect to or arising out of the same series of transactions or occurrences and because questions of law or fact common to all plaintiffs will arise in the action.

27.  Venue is proper in this judicial district pursuant to 18 US.C. §1965 and 28 US.C. §1391 as one or more of the defendants have agents, transact their affairs and conduct and have conducted their fraudulent scheme within this judicial district. Further, this is a judicial district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, and is where a substantial part of property that is the subject of the action is situated.

6

28.  Pursuant to 28 US.C. §1331, this Court has original jurisdiction over the subject matter of this case because all of part of the claims arise from the defendants' violations of the United States Code, including, inter alia, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 US.C. §1961, et. seq. It appears that this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

29.  At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 US.C. §1961 and used in 18 US.C. §1962.

30.  This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 US.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

31.  This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) as each regularly transacts business in Michigan or has minimum contacts with Michigan, through their involvement with, management of, or receipt of funds from the Buying Summit Fraudulent Enterprise (mostly by way of wire transfer) including the present ownership of hundreds of residential homes and/or the mortgages on such homes in the metropolitan Detroit area such that it is reasonable for this Court to exercise jurisdiction over them.

## I. INTRODUCTION AND NATURE OF THE CASE

32.  Based upon the Defendants' fraudulent misrepresentations and other illegal actions in connection with Defendants' fraudulent schemes as further described herein while operating in a number of states, including and especially within Wayne County, Oakland County and Macomb County, Michigan, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et. seq., and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators.  The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

33.  These Defendants (together with additional entities and persons whose identity and function will be obtained and disclosed through discovery) comprise an enterprise (hereafter referred to as the "Buying Summit Fraudulent Enterprise") which is demonstrated by their fraudulent activities as described herein.

34.  Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise through a pattern of predicate acts indictable as mail fraud and wire fraud consisting of numerous and repeated use of interstate wires and the mails for the purpose of executing their fraudulent scheme in violation of §1962(c) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

35.  18 U.S.C. §1964(c), RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation," as pertinent here, of 18 U.S.C. §1962(c), which makes it "unlawful for any person

employed by or associated with" a qualifying enterprise "to conduct or participate….in the conduct of such enterprise's affairs through a pattern of racketeering activity," including "mail fraud" and/or "wire fraud"§1961(1)(B).  Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice." §1341. The gravamen of the offense is the scheme to defraud, and any "'mailing….incident to an essential part of the scheme'……satisfies the mailing element."  The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud.

36.  Acting together, over at least the past three years and to the present day, the Defendants have engaged a fraudulent multi-state real estate investment scheme as a vehicle employed to defraud unsuspecting and naïve investors of money by inducing them to purchase from these Defendants residential real estate properties sight unseen in states where the victims do not live which the victims had been led to believe were being offered at below-market prices but which were knowingly sold by Defendants to the Plaintiffs at prices significantly above market value as described in further detail, *infra*.

37.  Initially, Defendants fraudulently induced hundreds of naïve and unsophisticated investors, including these Plaintiffs, to purchase real estate investment "training" programs from and through associated entities entitled "Investor's Financial

Education, LLC" and "Yancey Events, LLC" with the Plaintiffs paying anywhere from $15,000.00 to over $43,000.00 for these programs.

38.   Plaintiffs and hundreds of other victims were fraudulently induced to purchase these "training programs" at "private pre-auction events" by, *inter alia*, express promises via email from Defendants' agent and associate Dean Graziosi (self-described "Author and Millionaire Mentor") that:

> When you attend my private pre-auction event I will show you:
>
> How to buy property for as low as pennies on the dollar just like to large institutional investors!
>
> How to get the best properties before the public has access to them!
>
> How to purchase property at rock bottom prices before they are bid up by hundreds of other investors.  See attached as Exhibit A.

39.   Each such email was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1343 as they facilitated Defendants' Buying Summit Fraudulent Scheme.

40.   These "private pre-auction events" were and are held locally across the United States where attendees were subjected to rounds of motivational speakers proclaiming the ease of attaining "financial security" and "financial freedom" by paying a large fee for investment "training" packages and to attend a "Buying Summit", a large event generally put on by Defendants in Las Vegas, Nevada.  At the Buying Summit, attendees were promised the opportunity to purchase residential rental properties

offered by Defendants at what Plaintiffs and the other victims were led to believe were steeply discounted prices.

41. At these "private pre-auction events" and preliminary training sessions, and as a further fraudulent inducement to purchase additional "training" and Buying Summit packages, Plaintiffs and hundreds of other victims were continuously and fraudulently reassured by agents of Defendants that the properties offered for sale at the Buying Summit were offered at steep discounts before the public had notice of them and that the Defendants a) had performed a full investigation into the condition of each home; b) they had determined that the homes were in good condition so that that neither an inspection nor appraisal was necessary; c) that homes were in good neighborhoods with good quality schools; and d) that each property had a vetted and paying tenant.

42. The bargained-for-consideration which Plaintiffs and thousands of other victims who purchased these "training" and "Buying Summit" packages for tens of thousands of dollars were entitled to receive was expert guidance from Defendants directing them to purchase the types of homes at steep discounts before the public had notice of them as set forth in Paragraph 41, *supra*.

43. To the extent that an attendee at a "private pre-auction event" and/or training session did not agree to purchase a package to attend a Buying Summit, such person was subjected soon thereafter to a "hard sell" telephone call or calls from agents of the Defendants strongly urging them to purchase such a package so that they might

take advantage of the allegedly steeply discounted real estate for sale at the Buying Summit.

44. As part of the Defendants' scheme to defraud as intended by Defendants, Defendants' agents during these "hard sell" telephone calls would forcefully inquire into the state of the victim's personal finances so as to discover how much money and credit the victim might have available to invest in Defendants' fraudulent scheme. Further, these inquiries provided the Defendants with information sufficient to determine how to completely wipe out the life savings of the victim so that a) The victim would not have the resources to retain counsel to file suit against Defendants to recover damages for the fraudulent investment; and b) So that the victim would not have the resources with which to pay their two year 12% interest-only "bridge loans" from Defendants where at the end of such period, Defendants would be in a position to foreclose on the purchased home while retaining all funds previously obtained from the victims. The foreclosed property would then be available for sale to a new naïve victim and the process would be repeated.

45. These aforementioned "hard sell" telephone calls are each an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

46. Upon purchasing a package to attend a Buying Summit, some attendees were sent emails strongly suggesting that they transfer their IRA retirement savings into a "Self Directed IRA" because "the Buying summit in Vegas is a great opportunity to

acquire cash flow properties at steep discounts" and a self-directed IRA could be used to purchase and hold properties purchased at the Buying Summit.  (See email attached as Exhibit B).

47.  The emails described in Paragraph 46 are each an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

48.  Plaintiffs and hundreds of other victims who attended various editions of the Buying Summit were again subjected at the Buying Summit to rounds and rounds of motivational speakers extolling the real estate bargains that could be purchased from their agents in the adjacent area of the event facility.

49.  Prior to or at the Buying Summit, attendees were provided by Defendants with a knapsack labeled "The Buying Summit" which contained, *inter alia*, a copy of "The Buying Summit Workbook" (portions of which are attached as Exhibit C) which contained statements that reinforced and reiterated the prior fraudulent misrepresentations of the Defendants.  On page 27 of a Buying Summit Workbook, Paragraph 15 reinforced the fraudulent misrepresentation that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

50.  While meeting with Defendants' sales agents at the Buying Summit, homes for sale were displayed on internet monitors and generally contained a photograph of the home and a "suggested retail price" for the home.

51.  The "suggested retail price" for each such home would invariably far exceed the true cash value of such home, a fact well known in advance to Defendants and which was, in fact, an essential aspect of their scheme to defraud.

52.  Each such internet display as described in Paragraph 51, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

53.  These internet displays of the homes for sale would also contain a proposed sales price which was also far in excess of the true cash value of the home, a fact well known in advance by Defendants and which was, in fact, an essential aspect of their scheme to defraud.

54.  Virtually all of the homes offered for sale by Defendants at the Buying Summit and otherwise had invariably been recently purchased prior to resale to Plaintiffs by agents of the Defendants for Defendants' own account at below market prices and/or at distress sale prices, a fact well known in advance by Defendants and which was, in fact, an essential aspect of their scheme to defraud.

55.   Plaintiffs and the others victims were encouraged by Defendants' sales agents to purchase homes in states where they did not live so that they would be unlikely to view or inspect the purchased property in advance and thus be apprised in advance of its actual condition and value.  This tactic was an essential aspect of the Defendants' scheme to defraud.

56.  As a further aspect of the Defendants' scheme to defraud, Plaintiffs and the other victims were induced to purchase these overpriced homes with "loans" from Defendants "American Cash Funding" or "Insiders Cash, LLC.

57.   In a typical case, Defendants' sales agents would promote via their internet monitors at the Buying Summit the purchase of a home as having a "Suggested Retail Price" of  (for example) $68,000.00 but which could be purchased from Defendants for the alleged bargain price of $60,000.00.  Such a home would have an actual true cash value of between $25,000 to $35,000 while Defendants would have recently purchased the home for between $20,000.00 to $30,000.00.  The Buying Summit attendee/victim would then be induced to put $13,000.00 to $19,000.00 down on the purchase of the home with the balance (plus "closing costs" of $2,050.00 and a ten percent "origination fee") being financed with a purported "bridge loan" from Defendants' alter ego/associates Defendants Insiders Cash and/or American Cash Funding.

58.  Plaintiffs and the other victims were also induced to enter into these loan agreements as the proximate result of false statements made by Defendants' sales agents

15

that these loans could be easily re-financed at much lower rates with local banks once the victims had returned home from the Buying Summit.

59.   As part of the Defendants' scheme to defraud, Defendants' victims, including Plaintiffs, were told by Defendants' agents at the Buying Summit that these "bridge loans" would be easily refinanced at much lower interest rates if the borrower waited six months to seeking refinancing after completing the home purchase transactions with Defendants.

60.   As part of the Defendants' scheme to defraud, Defendants' victims, including Plaintiffs, were told by Defendants' agents at the Buying Summit that these "bridge loans" would be easily refinanced at much lower interest rates by waiting six months after completing the home purchase transactions with Defendants so that there would be a sufficient interval between each victim's purchase of a home from Defendants and the time they would discover that the homes could not be refinanced (or even sold) at all because their value was significantly lower than the outstanding balance on each "bridge loan" which would then remain owing to Defendants American Cash Funding and/or Insiders Cash.

61.   As the direct and proximate result of the fraudulent inducements of Defendants as described *supra* and *infra:*

a.   Defendants induced Plaintiffs to repose faith, confidence and trust in the Defendants' expert judgment and advice regarding the purchase of their real estate

programs prior to the Buying Summit and the purchase of real property while attending the Buying Summit;

b.  The false statements of the Defendants induced Plaintiffs to relax the care and vigilance they would ordinarily exercise in the purchase of real property;

c.  Defendants were under a duty to act for or give advice for the benefit of Plaintiffs upon the matters which were within the scope of the relation between Defendants and Plaintiffs;

d.  Plaintiffs' confidence in the Defendants and in the Defendants' self-proclaimed expert judgment and advice regarding the purchase of their real estate programs prior to the Buying Summit and real property at the Buying Summit was betrayed by the Defendants

e.  In the relationship between Plaintiffs and the Defendants, there existed a condition of superiority by the Defendants over Plaintiffs;

f.  Both the bargained-for consideration of the agreements between Plaintiffs and the Defendants and the relationship between Plaintiffs and the Defendants placed the interests of Plaintiffs in finding discounted real property for them to purchase in the charge of the Defendants;

g.  In the relationship between Plaintiffs and the Defendants, there existed not only the confidence of Plaintiffs in the expert judgment and advice of the Defendants regarding the purchase of real property, but there existed a dependence and

a profound inequality of business intelligence and knowledge of the facts involved giving to the Defendants an advantage over Plaintiffs.

62.   As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs such that Defendants owed Plaintiffs a fiduciary duty regarding the scope the duties created by their various agreements.

63.   Despite owing Plaintiffs a fiduciary duty to provide them with expert guidance and advice regarding the purchase of discounted and distressed priced homes and after convincing them with rounds of rounds of promises that they would "take care of everything" and that they have performed complete due diligence regarding these homes, Defendants induced Plaintiffs and the other victims to execute the most one-sided sales contracts imaginable.  These contracts contained clauses providing that the purchased homes came with no structural warranty or warranty of value whatsoever, that Plaintiffs and the other victims were allegedly "knowledgeable and sophisticated investors", capable of evaluating the merits and risks of the Property and specifically acknowledging that this was not a "consumer transaction", that all prior promises and inducements of Defendants were irrelevant and providing that all litigation regarding the contracts would be in the courts of the State of Utah (a state which had no relationship to either the location of the Buying Summit, the Plaintiffs' states of residence or the location of the properties they had purchased).  The following are some sample clauses from these sales contracts:

6. **PROPERTY IS SOLD IN "AS IS" CONDITION WITH NO BROKER:** Buyer acknowledges and agrees that Seller has not made and hereby specifically disclaims any warranty, guaranty, or representation, oral or written, past, present, or future, of, as to, or concerning (i) the nature, square footage, features, condition of property including condition of mechanical equipment, built in appliances, and utilities, value, or quality of the geology, the presence of environmental hazards and the suitability thereof and the Property for any and all activities and uses which Buyer may elect to conduct thereon, (ii) the manner, construction, condition, quality, the state of repair or lack of repair of any of the Property, (iii) except for any warranties contained in the deed, the nature and extent of any right of way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise (iv) the compliance of the Property or its operation with any laws, rules, ordinances, or regulations of any government or other body, (v) the current or future performance of the Property, and, (vi) the income to be derived from the Property, Buyer hereby further acknowledges and agrees that Buyer is relying solely upon the inspection, examination, and evaluation of the Property by Buyer and that Buyer is purchasing the Property on an **"AS IS. WHERE IS"** and **"WITH ALL FAULTS"** basis and not on any information provided or to be provided by Seller. Buyer acknowledges he is buying land and any improvements thereon, if any, and accepts all damages, condemnations, hazards, debris, governmental, environmental or health related issues thereon as of the execution date of this contract.

[From Paragraph 8]  Buyer agrees that it is purchasing the Property "AS IS" Buyer waives the opportunity to conduct an investigation to determine the presence of methamphetamine residue or byproducts on the Property. Buyer agrees that Seller will not be liable to Buyer or any third party, and Buyer hereby unconditionally releases Seller from any and all liability, based upon or related to the production of methamphetamine at any time on the Property- Buyer hereby represents and accepts that it is Buyer's responsibility to personally inspect and examine The Property and all improvements thereon. Buyer hereby acknowledges that unless otherwise set forth in writing elsewhere in this contract neither Seller nor Seller's representatives, if any, have made any representations concerning the present or past structural condition of the improvements. Buyer agrees that he will not hold Seller or its representatives responsible or liable for any present or future structural problems or damage to the foundation or slab of said property

20. **INDEMNIFICATION**: Buyer agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from and against any and all losses, claims, demands, liabilities, costs, damages and expenses (including attorney's fees and costs) that Buyer may incur arising from the Seller's actions or failure to act on, respond to or comply with any (1) local, state or federal law, rule or ordinance affecting the Property; and (2) liabilities arising from said property from date of the contract, whether or not insured and the like. Buyer additionally agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from any and all claims, costs, fees, liabilities, or loss incurred after title conveyance to the Buyer. Further, Buyer acknowledges that the Property may be subject to proceedings in law or equity to abate, correct, or otherwise comply with local, state or federal requirements regarding the Property and that this indemnity shall also apply in such instances.

21. **QUALIFIED INVESTOR**: Buyer acknowledges that he is a knowledgeable and sophisticated investor, capable of evaluating the merits and risks of the Property and specifically acknowledges that this is not a "consumer transaction" within the meaning of, or subject to, state or federal consumer protection laws.

22. **REPRESENTATIONS AND AGREEMENT OF PARTIES**: Seller makes no representations, express or implied, as to the fitness of the Property as of the Closing Date or that there will be no liens, assessments, or security interests against the Property. Buyer and Seller agree that no other representations have been made, verbal or otherwise, that are not outlined specifically in writing in this contract. Buyer acknowledges he is buying land and any existing improvements thereon, and is not buying a residential lease, rental agreement, or any other contract in relation to the Property. This contract contains the entire agreement of the parties. Both parties agree that interactions regarding this contract will take place exclusively between the Buyer and the Seller.

23. **THERE ARE NO PRIOR AGREEMENTS, GUARANTEES OR WARRANTEES THAT ARE NOT SPECIFICALLY OUTLINED IN THIS CONTRACT:** This contract incorporates all prior agreements between the parties, contains the entire and final agreement of the parties, and cannot be changed except by their written consent. Neither party has relied upon any statement or representation made by the other party or any sales representative bringing the parties together.

27. **GOVERNING LAW AND JURISDICTION**: This contract shall
be governed by the laws of the State of Utah. Jurisdiction shall lie
exclusively with the courts within the State of Utah.

64.   The Defendants inserted the aforementioned clause requiring litigation of

sales contract matters in the State of Utah into the sales agreement as an essential part

of the Defendants' scheme to defraud because by the time most of the

Plaintiffs/Victims realized that they might have been defrauded by Defendants, they

had exhausted their life savings in purchasing the various training/Buying Summit

packages and home purchases from Defendants. At such time, they no longer had the

resources available to litigate these matters in their home state, much less being able

hire attorneys to litigate these matters in the Courts of the State of Utah or travel to

Utah.

65.   Because Defendants owed Plaintiffs and the other victims of the scheme to

defraud a fiduciary duty, Defendants Plaintiffs the opportunity to purchase the

properties Defendants had purchased at discounted and distress sale prices to Plaintiffs

and the other victims of the fraudulent scheme.

66.   The "Commercial Loan Agreements" which Defendants induced the

Plaintiffs/Victims to sign invariably contained language requiring dispute resolution via

arbitration with the American Arbitration Association but only in the State of Utah.

The purpose of this clause was to "split" the causes of action between those which

concerned the sales agreements and those which concerned the "Commercial Loan

21

Agreements" making it even more difficult and expensive (and impossible) for a victim who had exhausted their life savings to litigate these matters. This was all pre-planned by Defendants as an essential part of their scheme to defraud.

67.     As part of their scheme to defraud, Defendants induced many Plaintiffs/Victims to unwittingly sign personal guarantees of their loans which were otherwise only owing to Defendants Insiders Cash and/or American Cash Funding by their limited liability companies. Such personal guarantees induced by Defendants' fraud are unenforceable.

68.   As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held by in a "self-directed IRA" were also induced to pay for the creation of a Utah limited liability company. However, there is no role for a limited liability company when real estate is held in a self-directed IRA and none of the Plaintiffs who conveyed their purchased properties into a self-directed IRA ever conveyed any property into the LLC which Defendants induced them to create.

69.   As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held by in a "self-directed IRA" were also induced to purchase a limited liability company protection service for in excess of $6,000.00 even though their IRAs held no assets and the homes they purchased at the Buying Summit were instead held in a self-directed IRA.

70.  Because the homes that were being purchased by the Plaintiffs at the Buying Summit were not in states where the Plaintiffs/victims lived, it was necessary to hire a property management company to oversee the properties.

71.  Once the Plaintiffs/victims/purchasers returned home from the Buying Summit, they would often discover from their property management company that a home they had purchased had serious physical defects including, for example, a bad roof or non-working furnace.

72.  Defendants would on occasion thereafter provide reimbursement to Plaintiffs/victims for the cost to repair these items, often in the range of $1,500.00 to $3,500.00 but Defendants would also induce the victim to unwittingly sign a full general release regarding any possible future, outstanding and/or potential claims against Defendant BuyPD, LLC and/or Defendant Property Direct, LLC.

73.  The Plaintiffs/Victims who signed such a release were not aware at such time that the homes they had purchased: a) Had recently been purchased by Defendants for their own account at a discounted or distress sale price; b) Were worth far less than what the victim had paid for it; c) Were worth far less that what the victim still owed on the purchase money loan and thus could be refinanced or resold.  Further, at such time, the Plaintiff/victim would be unaware that they were signing a General Release. This procedure was a purposeful and pre-planned aspect of the Defendants' scheme to defraud.

74.  Any such releases signed by any of the Plaintiffs are void a) as against public policy as they would allow a perpetrator of a RICO fraudulent scheme to escape liability by tricking their victims into unknowingly signing releases; b) because these releases are not supported by any new consideration from defendants who merely provided the Plaintiffs and other victims with what was originally promised to all purchasers by Defendants; and most importantly 3) because Plaintiffs are entitled to rescission and revocation *ab initio* of all purchase and loan agreements to which these releases relate due to Defendants' fraud.  Further, Plaintiffs are entitled to restitution of all money paid to these Defendants as further described *infra* due to Defendants' fraud.

75.  As a further aspect of the Defendants' scheme to defraud, the initial contractual agreements between Defendants and the Plaintiffs and other victims regarding the purchase of a "training" or a Buying Summit package were between the individual Plaintiff and a supposed entity entitled "Investors Financial Education LLC" or "Yancey Events, LLC".  The fine print on the back of such contractual agreements provides that all disputes must be resolved in binding arbitration with the American Arbitration Association.  However, Plaintiffs have spent over a year attempting to identify the entity known as "Investors Financial Education LLC" and have specifically requested the identity of such entity from Defendants which Defendants have failed and refused to provide.  Further, upon information and belief, the authority to do business of "Yancey Events, LLC" has expired.

24

76.  Plaintiffs submit that the aforementioned forum selection clauses, whether for binding arbitration and/or for litigation in the courts of the State of Utah are unenforceable because *inter alia*:

    A.  They were not-bargained-for and do not reflect any meeting of the minds between the Defendants and the defrauded Plaintiffs and other victims;

    B.  These various clauses attempt to split a single RICO cause of action into at least three other claims, one regarding the fraudulent training and Buying Summit packages (binding arbitration), the second regarding the fraudulent property sales agreements, and the third regarding the purchase money "loans" which were in excess of the value of the properties purchased (binding arbitration with the hearing in the State of Utah;

    C.  These various clauses are themselves a vital aspect of the Defendants' scheme to defraud and were designed to make it virtually impossible for the Plaintiffs and other victims who have lost their life savings in Defendants' fraudulent scheme to litigate these matters.

    D.  Pursuant to MCL §600.745(3):

        (b) The plaintiffs cannot secure effective relief in the other state for reasons other than delay in bringing the action.

        (c) The other state would be a substantially less convenient place for the trial of the action than this state because, *inter alia*, each Plaintiff either resides in the Eastern District of Michigan or has purchased property at a Buying Summit located in the Eastern

District of Michigan and no Plaintiff or their property has any relationship whatsoever to the State of Utah;

(d) The agreement as to the place of the action was obtained by misrepresentation, duress, the abuse of economic power, or other unconscionable means including the breach of Defendants' fiduciary duties to the Plaintiffs

E.   The Plaintiffs are entitled to rescission and revocation all of agreements they have made with these Defendants *ab initio*.

77.   Plaintiffs are entitled to rescission of all contracts between themselves and the Defendants and their agents and they are entitled to a refund of all money paid to Defendants in exchange for a return of all benefits received from defendants.  As such, the various clauses in all said agreements which include, without limitation, a requirement of binding arbitration, a provision of an alleged general release of a single defendant and/or all defendants, a requirement that litigation to be brought in the courts of the State of Utah, a personal guaranty; a provision providing that homes purchased from defendants were sold "as/is", and/or a provision providing that purchasers of homes from Defendants were sophisticated "Qualified Purchasers" are void *ab initio* and unenforceable.

78.   Plaintiffs are entitled to rescission and revocation of the entirety of each agreement containing these alleged provisions to arbitrate pursuant to 9 U.S.C. §2 *ab initio* due to Defendants' fraud thereby making these agreements unenforceable.

## COUNT I – THE CLAIMS OF REBECCA K. WILSON

The allegations of paragraphs 1 - 78 are incorporated by reference as if fully set forth herein.

79.  Plaintiff Rebecca K. Wilson ("Wilson") is sixty two years old and resides in Grosse Pointe Park, Michigan.

80.   In August, 2012, Mrs. Wilson's husband died of brain cancer and she thereafter received some life insurance proceeds as the result of her husband's death.

81.   She was interested in investing some of the insurance money into investments that would provide a higher return than what was being offered by banks.

82.   In February or March, 2013, she saw an informercial on television in the Detroit, Michigan area which advertised the alleged opportunity to invest in real estate with Dean Graziosi, Defendants' agent and spokesperson.

83.   Mrs. Wilson thereafter inquired of Defendants' agents about this real estate investment offer.

84.   Mrs. Wilson was then provided with free tickets to attend a dinner and introductory seminar in early April, 2013 at a hotel facility in Bloomfield Hills, Michigan where she heard a motivation speaker urge the attendees that signing up with the various investment and training programs that were being offered would be the gateway to financial independence.

85.   Mrs. Wilson thereafter registered for another seminar which was held April 10th, 2013 at 6:00 p.m. at The Met Troy, 5500 Crooks Road Troy, MI 48098.

86.  Confirmation of her registration for this seminar came via email from Dean Graziosi, self-described "Author and Millionaire Mentor" which also expressly promised that:

> When you attend my private pre-auction event I will show you:
>
> How to buy property for as low as pennies on the dollar just like to large institutional investors!
>
> How to get the best properties before the public has access to them!
>
> How to purchase property at rock bottom prices before they are bid up by hundreds of other investors.  See email attached hereto as Exhibit A.

87.  Relying upon the express promises of Dean Graziosi as set forth in Paragraph 86 *supra*, and expecting to be provided with expert guidance in making such real estate purchases as the result of purchasing the various training packages which were offered by Defendants, Wilson attended the aforementioned event held April 10, 2013 where she purchased from Defendant Insiders Financial Education LLC the following packages:

A.  Insider's Financial Enhance Note Network System for $197.00;

B.  Insider's Financial 3-Day Real Estate Workshop Package for $1,997.00; and

C.  Insider's Financial Tax Lien Program for $997.00.

88.  The email described in Paragraph 86, *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1343 as it facilitated Defendants' Buying Summit Fraudulent Scheme.

89.   While subsequently attending the aforementioned 3-Day Real Estate Workshop Package, Mrs. Wilson was induced by the express promises of Defendants' agents to purchase a "Diamond Package" from Defendant Investor's Financial Education LLC and paid $39,997.00 for said package on April 27, 2013 which included additional purported real estate investment training plus airfare to and hotel accommodations in Las Vegas, Nevada plus admittance to the "Buying Summit 3 Day Asset Buying Retreat" held in there in June, 2013.

90.   Shortly before attending the aforementioned "Buying Summit", Mrs. Wilson received an email dated June 12, 2013 from "Shawn Alden", identified as "Shawn (shawn.a@deansadvancedtraining.com)" regarding "Deans Inner Circle" which stated in part:

> I tried to contact you today, I'm sorry that I missed you. I would like to explain who I am and why I'm calling. *MY* role is to support *YOU*……. think of me as your personal concierge.  My goal is to make sure you get the most out of our program. If you have any issues, concerns or if you are frustrated for any reason, I'm your goto person.

91.   The email described in Paragraph 90, *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1343 as it facilitated Defendants' Buying Summit Fraudulent Scheme.

92.   Mrs. Wilson further relied upon the statements of "Shawn Alden" made in Paragraph 12, *supra*, to believe that agents of Defendants would at all times be providing her with expert advice and guidance in finding and purchasing real estate bargains consistent all of the numerous prior representations and promises of Defendants.

93.   Mrs. Wilson did attend the Buying Summit held in Las Vegas held June 21 to June 23, 2013 where the attendees were subjected to rounds of motivational speakers proclaiming the real estate bargains available for purchase at the Buying Summit.

94.   Upon arrival at the Buying Summit, Mrs. Wilson received a copy of a "Buying Summit Workbook" as described in Paragraph 49, *supra*.

95.   Further relying upon these additional promises and representations made by Defendants' agents as set forth, *supra,* Mrs. Wilson met with a sales agent of the Defendants at the Buying Summit.

96.   While meeting with Defendants' sales agent, Mrs. Wilson was shown information on an internet screen about a house available for purchase located at 2011 Lynn Street, Cahokia, Illinois, near St. Louis, Missouri.

97.   One such internet screen display stated that the property had a "Suggested Retail Price" of $71,000.00 but could be purchased immediately at the discounted price of $53,900.00.

98.   The internet display as described in Paragraph 97, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1343 as it facilitated Defendants' Buying Summit Fraudulent Scheme.

99.   Relying upon these inducements and material representations by Defendants' agent, Mrs. Wilson agreed to purchase the home for the following terms: A purported sales price of $53,900.00, plus "closing costs" of $2,050.00 to be paid to Defendants' attorneys "Guardian Law" and a ten percent "origination fee" of $3,805.00

to be paid to one of the Defendant lenders, plus an $800.00 annual insurance premium and a $900.00 tax adjustment. Mrs. Wilson was to put down $19,601.00 and finance the balance of $42,400.00 for a total cost to Mrs. Wilson of $62.001.00 ($19,601.00 + $42,400.00). The $42,400.00 balance was to be financed by a "loan" from one of the Defendant lenders pursuant to an interest-only loan agreement at 12% for twenty-four months with all principle due at the end of twenty-four months. Mrs. Wilson wrote a check to Defendants in the amount of the $19,601.00 down payment.

100. As a further inducement to make the purchase, Mrs. Wilson was repeatedly told by Defendants' agents at the Buying Summit that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months.

101. Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was knowingly false when made.

102. Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was made with the specific bad intent by Defendants of precluding Mrs. Wilson as purchaser from learning from such a local bank that the property she had purchased at the Buying Summit was worth far less than even the outstanding loan balance owing to one of the Defendant Lenders until it was too late cancel said fraudulent transaction.

103.   At the Buying Summit, Mrs. Wilson was also induced to create a Utah limited liability company to which the purchased property was to be directly conveyed by Defendants.

104.   At the Buying Summit, Mrs. Wilson was also induced to purchase a lot in Florida, a tax deed in Florida, and a promissory note for $50,000.00 regarding a home in Redford Township.  Mrs. Wilson wrote an additional check to Defendants in the amount of $50,000.00 to purchase the promissory note.

105.   As a further inducement to make the purchase of these properties, Mrs. Wilson was told by representatives of Defendants that there was no need for an inspection or appraisal of the subject properties because "We [Defendants] take care of everything".

106.   Within days of returning home from the Buying Summit, Mrs. Wilson decided that she no longer trusted the advice she had received from Defendants regarding her purchases at the Buying Summit and stopped payment on all checks she had written to Defendants for these purchases effectively cancelling these transactions.

107.   Mrs. Wilson has been demanding a refund of all funds which she has paid to Defendants for "training" and to attend the Buying Summit ever since.  Defendants have failed to respond to these demands.

108.   Mrs. Wilson has demanded of Defendant BuyPD that it identify the legal entity described as Investors Financial Education LLC (to whom she paid all of the fees

for "training" and to attend the Buying Summit) including state of registration of said entity, but such demand has been ignored by Defendant BuyPD.

109.  Many months after cancelling the purchase transactions that she had made at the Buying Summit, Mrs. Wilson discovered that the property located at 2011 Lynn Street, Cahokia, Illinois had an assessed value of only $24,510.00 for the year 2013.

110.  Mrs. Wilson subsequently learned for the first time that on June 18, 2013 (just days before the Buying Summit) that the property located at 2011 Lynn Street, Cahokia, Illinois had been conveyed to Defendant Screaming Eagle Properties LLC by Warranty Deed for the consideration of only $37,800.00.  This conveyance was part of the ubiquitous fraudulent markup process of the Buying Summit Fraudulent Scheme employed by these Defendants regarding all purchasers of properties at the Buying Summit.

111.  The fraudulent markup process of the Buying Summit Fraudulent Scheme was known to Defendants and their attorneys who participated in and facilitated all stages of said fraudulent scheme.

112.  The Utah limited liability company created on behalf of Mrs. Wilson, *supra* has never held any assets and is not a party to this action.

113.  As set forth *supra*, Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise in part to fraudulently obtain money from Plaintiff Wilson who was fraudulently induced to pay Defendants in excess of $43,000.00 in exchange for expert advice and guidance in purchasing real estate bargains while the actual purpose

of the Buying Summit was to defraud the naïve attendees by misleading and guiding them to purchase grossly overpriced real estate from Defendants.

114.  As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Wilson such that Defendants owed Mrs. Wilson a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

115.  Plaintiff Wilson has incurred damages in excess of $43,000.00 as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

116.  Mrs. Wilson is entitled to restitution from all of these Defendants of all money she has paid to Investors Financial Education LLC which is but an alter ego and member of the Buying Summit Fraudulent Enterprise.

## COUNT II –THE CLAIMS OF PLAINTIFF DENNIS HOUTZ

The allegations of paragraphs 1 - 116 are incorporated by reference as if fully set forth herein.

117.  In January, 2013 while living in Richboro, Pennsylvania, Plaintiff Dennis Houtz viewed an infomercial playing on television featuring Dean Graziosi which promoted a free seminar concerning real estate investing such that the attendees would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

118.  The aforementioned infomercial suggested that interested people fill out an online form to obtain further information which Mr. Houtz did.  This online form was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

119.  In response to the aforementioned online form, Mr. Houtz received a postcard in the U.S. Mail as an entrance ticket for Mr. Houtz to attend a free seminar on how to purchase real estate at discounted prices to be later sold for a profit.  This postcard was a use of the mails by Defendants that was incident to an essential part of their scheme to defraud and was thus an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

120.  On March 2, 2013, Mr. Houtz attended the aforementioned seminar which was held at the Four Points Sheraton Hotel in Philadelphia, Pennsylvania where he purchased the "Insider's Financial Tax Lien Program" for $997.00 and the "Insider's Financial Real Estate Workshop Package" for $1997.00, described as a 3-day real estate investing workshop where the attendees would be taught how to purchase real estate properties at deep discounts.

121.  At the free seminar held on March 2, 2013, Defendants had the attendees, including Mr. Houtz fill out a financial questionnaire which sought detailed information

concerning, *inter alia*, the income, debt, credit card balances, 401k, IRA Retirement account balances of the attendees.

122.  Defendants subsequently used this information to their advantage when persuading the attendees, including Mr. Houtz, to buy their Advanced Training Products.

123.  At the seminar held on March 2, 2013, Defendants instructed the attendees, including Mr. Houtz to call all of their credit card companies and seek a credit limit increase. There was actually a script in the training material on what to say verbatim.

124.  Mr. Houtz had purchased the Insider's Financial 3 day Real Estate Workshop Package and paid $1,997.00 on March 2, 2013 with a credit card which was held March 8, 9 & 10 2013 at the Sonesta Hotel at 1800 Market Street Philadelphia, PA 19103.

125.  At the aforementioned "workshop" held March 8, 9 & 10 2013, Mr. Houtz and the other attendees were subjected to rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale to attendees of the Buying Summit.

126.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the opportunities to purchase deeply discounted real estate properties at the Buying Summit, on March 10, 2013, Mr. Houtz purchased "Deans Insider's Financial Advanced Training Diamond Package" for $39,997 ($5,000.00 paid on March

10, 2013 with a credit card and $34,502.00 with a check on March 18, 2013) which included attendance at a Buying Summit. Mr. Houtz took out a $39,850.00 loan from his 401k account to reimburse himself for these expenditure which he is still paying off at the present time.

127.   The aforementioned "training" and Buying Summit packages were purchased by Mr. Houtz from a purported entity entitled "Investors Financial Education LLC".

128.   The written contractual agreements between Mr. Houtz and "Investors Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

129.   None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Investors Financial Education LLC" and Defendants have refused and neglected to so identify said entity.

130.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the alleged necessity of conveying any properties he might purchase from Defendants to a limited liability entity, on March 12, 2013, Mr. Houtz purchased the Veil Corporate Single Entity Setup (for a Utah LLC) for $495.00 with a credit card. This Utah limited liability company has never held any property or assets because Mr. Houtz eventually conveyed the properties he purchased from Defendants to a self-

directed individual retirement account, a procedure which does not utilize a limited liability company.

131. On March 11, 2013, Mr. Houtz received an email from Defendants' agent Julie Garfield (julie.g@deansadvancedtraining.com) which stated:

> (By the way, the Buying summit in Vegas is a great opportunity to acquire cash flow properties **AT STEEP DISCOUNTS** [emphasis added]. A lot of our clients get to the Buying Summit wishing they had moved their retirement funds into a self-directed IRA so they can use it to invest in real estate. Please contact me if you are interested in learning how to do that.). (See email attached as Exhibit B)

132. The email described in Paragraph 131, supra, is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud and there were no properties offered at the Buying Summit at steep discounts to the attendees.

133. In the middle of April, 2013, Mr. Houtz received a telephone phone call at home from an agent of the Defendants asking if he was planning on converting his 401k plan over to a Self -Directed IRA so that Mr. Houtz would have purchasing power at the Buying Summit. During this telephone call, Defendants' agent expressly stated that so many people that attend the Buying Summit wish that they would have done this before arriving.

134. The telephone call described in Paragraph 15, *supra,* is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18

U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud..

135.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz as set forth in the email described in Paragraph 12 *supra*, and the telephone call described in Paragraph 14, *supra*, and throughout the entire relationship with Defendants, Mr. Houtz:

      A.  On May 31, 2013 forwarded a check from his 401k account in the amount of    $73,627.35 payable to American Estate and Trust as the first step in setting up a Self-Directed IRA;

      B.  Purchased three properties in Macomb County, Michigan from Defendants at the Buying Summit using funds from his Self Directed IRA further described *infra*;

      C. Was fraudulently led to believe that these properties were being offered for    sale at steep discounts;

      D.  Had the properties he purchased from Defendants conveyed to his Self -directed IRA.

136.  Mr. Houtz attended the Buying Summit Event # 130530 held in Las Vegas, Nevada at the Mirage Hotel & Casino from May 30, 2013 to June 1, 2013.

137.  Upon arriving at the Buying Summit, Mr. Houtz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [see paragraph 49, *supra*].

138.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Houtz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

139.  Mr. Houtz relied to his detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

140.  Mr. Houtz relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

141.  At the Buying Summit, Mr. Houtz and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

142.  As the result of the promises, inducements, relationships and agreements between Mr. Houtz and Defendants, Defendants owed Mr. Houtz a fiduciary duty

during their relationship concerning the subject matter of their various contractual agreements.

143.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Houtz was induced to attend a sales session with an agent of Defendants at the Buying Summit.

144.   At a sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11055 Jewett Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $67,000.00.  The purported bargain contract price offered by Defendants for this home was $65,000.00 as displayed on this internet monitor.

145.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described in Paragraph 16, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

146.   While attending the Buying Summit in Las Vegas, Mr. Houtz was also induced by the fraudulent statements and represenations of Defendants' agents to purchase from Defendants a worthless "Veil Corporate" protection package for $6,495.00 for the purpose of "protecting" the LLC the was created as described in

41

Paragraph 30, *supra* and which has never held any assets or conducted any business because an LLC is not utilized with the conveyance of properties to a self-directed IRA.

147.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Jewett Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $64,000.00.  However, with various add-ons, including a $3,386.10 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $71,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

148.  The aforementioned Buying Summit Workbook had announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Mr. Houtz, the false impression that the homes he was purchasing were worth in excess of the amount of any "bridge loans" from Defendants when, in fact, the homes he purchased were worth less than the amount of his "bridge loan" and thus could not be refinanced or sold.

149.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $33,861.00 from his IRA savings regarding his purchase of the Jewett Ave. home and his IRA management company signed a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $37,247.00 with interest-only payments of $378.00 per month for 24 months and the balance of $37,247.00 being due August 20, 2015.

150.  At the aforementioned sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 22533 Hillock, Warren, Michigan of $63,000.00. The purported bargain contract price offered by Defendants for this home was $61,000.00 as displayed on this internet monitor.

151.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described in Paragraph 150, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

152.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Hillock Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the

Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $60,000.00. However, with various add-ons, including a $4,233.50 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $67,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

153.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr Houtz made a down payment of $20,044.00 from his IRA savings regarding his purchase of the Hillock Ave. home and his IRA management company signed a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $47,100.00 with interest-only payments of $465.69 per month for 24 months and the balance of $47,100.00 being due July 31, 2015.

154.  At the aforementioned sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 23061 Peters St., Warren, Michigan of $53,200.00. The purported bargain contract price offered by Defendants for this home was $45,000.00 as displayed on this internet monitor.

155.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described in Paragraph 154, *supra*, was

an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

156.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Peters St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $44,300.00. However, with various add-ons, including a $3,191.60 "loan origination fee" and "closing costs" of $1,850.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $51,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

157.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $16,858.24 from his IRA savings regarding his purchase of the Peters Ave. home and his IRA administrator signed  a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $35,700.00 with interest-only payments of $351.08 per month for 24 months and the balance of 35,700.00 being due September 11, 2105.

158.   Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Jewett Ave. home had been available for sale at the distressed sale price of $21,675.00 in September, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on September 6, 2012 for $21,675.00.

159.   Thereafter, in a series of step transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported 35,000.00; John Graham, Inc. then sold it on May 28, 2013 to defendant Frontside Properties, LLC for a purported $54,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $71,000.00.

160.   Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Hillock Ave. home had been available for sale at the distressed sale price of $16,900.00 in October, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on October 23, 2012 for $16,900.00.

161.   Thereafter, in a series of step transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported $33,000.00; John Graham, Inc. sold it on May 29, 2013 to defendant Frontside Properties, LLC for a purported $49,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $67,000.00.

162.   Unbeknownst to Mr Houtz but known to Defendants at the time of purchase, the Peters Ave. home had been available for sale at the distressed sale price of $25,000 in January, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Buy Right Properties LLC on January 9, 2012 for $25,000.00.

163.  Thereafter, in a series of step transactions, Buy Right Properties LLC sold the Peters Ave. property to Defendant Max Ultra LLC on October 18, 2012 for a purported $33,956 and Max Ultra LLC, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $51,000.00.

164.  As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Houtz such that Defendants owed Mr. Houtz a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

165.  Defendants had a contractual and fiduciary duty owing to Mr. Houtz to locate the properties he purchased at such the promised discounted prices, inform him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

166.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Houtz at a prices greatly in excess of their fair market value or true cash value.

167.   Plaintiff Houtz has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

## COUNT III – THE CLAIMS OF PLAINTIFFS
## ROBERT WONG AND KENNETH WONG

168.   The allegations of paragraphs 1 to 167 are incorporated by reference as if fully set forth herein.

169.   Plaintiff Robert Wong received a flyer in the United States Mail at his place of business in New York state in April 2013 which advertised a free seminar with special guest speakers Scott & Aime Yancey from the TV show "Flipping Vegas".

170.   The mailing described in Paragraph 169, *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

171.   The advertisement provided multiple locations for the seminar within the New York City area.  Mr. Wong called to register for an event at "Terrace On The Park" in Flushing Meadows Park, Queens, NY, and attended on May 19, 2013.  He was allowed and encouraged to bring a guest, so he brought along his brother Defendant Kenneth Wong.

172.   At the seminar which Robert and Kenneth Wong attended on May 19, 2013, both of the Yanceys appeared, but only spoke briefly about the "life-changing benefits" of making money through real estate

173.   At the free May 19, 2013 event, the attendees were told by Defendants' agents that in order to receive further training, they should attend the next level seminar, at a cost of $1,997.00 for two attendees.   The written agreement for this package suggests that the entity providing the training services was "Yancey Events LLC", a "Utah DBA of Edge 2 Real Estate LLC", a purported Utah based limited liability company whose registration in Utah has expired.

174.   Robert Wong paid the aforementioned $1,997.00 fee with a credit card, and he and Kenneth attended the seminar from May 29, 2103 through May 31, 2013 at the Brooklyn Marriott Hotel.   This seminar consisted of 3 days of training for 8 hours each day, and led by a trainer named Mark Gonsalves who had a staff of 4 others who were also trained in Defendants' system, but mostly handled the logistics of the seminar.  Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments (title liens, tax deeds, etc).

175.   At the end of the seminar described in Paragraph 174, *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.   However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

176.  Robert and Kenneth Wong chose to purchase the Diamond package and Robert Wong charged $3,000 on his credit card towards the full fee of $39,997.00 and paid the balance through a wire transfer on June 25, 2013.  The written agreement for this package also suggests that the entity providing the training services was "Yancey Events LLC", a Utah DBA of "Edge 2 Real Estate LLC", a purported Utah based limited liability company whose registration in Utah has expired.

177.  Defendants' agents convinced Robert Wong to purchase the Diamond Package by stating that it included further one-on-one training, as well as attendance at the Buying Summit for both brothers.  Further, Defendants' agents expressly stated to Robert Wong that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Mr. Wong that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing with tenants that had at least 1 year left on their lease).  Further, Robert Wong was told that a person could only purchase these properties by attending the Buying Summit.  Attendees could also purchase legal services, insurance, wealth and estate planning and other financial services at the Buying Summit.

178.  Robert and Kenneth Wong relied to their detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due

diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

179.  Robert and Kenneth Wong relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

180.  At the Buying Summit, Robert and Kenneth Wong and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

181.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Robert and Kenneth Wong were induced by Defendants to convey any properties they purchased at the Buying Summit to a Self-Directed IRA.

182.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Robert Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

183.  At a sales session attended by Robert Wong with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11808 Rossiter, Detroit Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $55,000.00.  The purported bargain contract price offered by Defendants for this home was $46,350.00 as displayed on this internet monitor.

184.   Defendants knew at the time of the events described in Paragraph 183, *supra*, that the Rossiter home was not worth $55,000.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

185.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described in Paragraph 183, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

186.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rossiter property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Robert Wong purchased the property from Defendant Screaming Eagle Properties, LLC for $45,350.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $1,850.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $50,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Robert Wong's self directed IRA by Warranty Deed dated August 22, 2013 (Attached as Exhibit F).

187.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Robert Wong made a down payment of $21,459.93

regarding his purchase of the Rossiter St. home and a Non-Recourse loan agreement between Robert Wong and Defendant Insiders Cash was executed by Mr. Wong's IRA service provider to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

188.   Unbeknownst to Robert Wong but known to Defendants at the time of purchase, the Rossiter St. home had been available for sale at the distressed sale price of $24,000.00 on June 18, 2013 and was purchased on behalf of Defendants own account by Defendants' agent Metro Detroit Home Solutions, LLC on said date (see Warranty Deed attached as Exhibit D).  The June 18, 2013 Warranty Deed had been drafted by Defendants' own attorneys in Utah, "Guardian Law, LLC".

189.   Metro Detroit Home Solutions, LLC soon thereafter conveyed the Rossiter St. property to Defendant Screaming Eagle Properties LLC for a purported $31,000.00 by Warranty Deed dated June 19, 2013 prepared by Defendants' attorneys Guardian Law (see Warranty Deed attached as Exhibit E).

190.   Defendant Screaming Eagle Properties, LLC then conveyed the Rossiter St. property to Robert Wong's IRA on November 7, 2013 for the aforementioned effective price of in excess of $50,000.00 (see Warranty Deed attached as Exhibit F).

191.   Defendants had a contractual and fiduciary duty owing to Robert Wong to locate the Rossiter St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Wong at such a discounted price.

192.   Instead, Defendants breached their duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Rossiter St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Robert Wong at a price greatly in excess of its fair market value or true cash value

193.   In further breach of their contractual and fiduciary duties, Defendants induced Robert Wong to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced contrary to what Mr. Wong had been informed by Defendants at the Buying Summit.

194.   On August 23, 2013, Robert Wong also purchased the property located at 2724 Central Ave., Anderson, Indiana from Defendant DLS Properties, LLC pursuant to the Defendants' Buying Summit Fraudulent Scheme.

195.   Further, and as the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Kenneth Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

196.   At a sales session attended by Kenneth Wong with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 22020 Cushing, Eastpointe, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $61,000.00.  The purported bargain

contract price offered by Defendants for this home was $55,950.00 as displayed on this internet monitor.

197.   Defendants knew at the time of the events described in Paragraph 196, *supra*, that the Cushing St. home was not worth $61,000.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

198.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described in Paragraph 196, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

199.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Cushing St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Kenneth Wong purchased the property from Defendant Screaming Eagle Properties, LLC for $54,950.00.   However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $2,050.00 (described as mostly being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $61,000.00 and the property was subsequently conveyed by Defendant Screaming Eagle Properties, LLC to Mr. Kenneth Wong's self directed IRA by Warranty Deed dated September 10, 2013.

200.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Kenneth Wong made a down payment of $29,464.00 regarding his purchase of the Cushing St. home and a Non-Recourse loan agreement  between Kenneth Wong and Defendant Insiders Cash was executed by Mr. Wong's IRA service provider to pay the "loan" balance of $32,464.00 with interest-only payments of $324.00 per month for 24 months and the balance of $32,464.00  being due in 2015.

201.   Unbeknownst to Kenneth Wong but known to Defendants at the time of purchase, the Cushing St. home had been available for sale at a distressed sale price in January, 2013 and was purchased on behalf of Defendants own account by Defendants' agent Buy Right Properties, LLC for $13,000.00 on February 8, 2013.  The property was subsequently conveyed to Kenneth Wong's IRA by Defendant Screaming Eagle Properties, LLC for in excess of $61,928 on September 10, 2013.

202.  Defendants had a contractual and fiduciary duty owing to Kenneth Wong to locate the Cushing St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Kenneth Wong at such a discounted price.

203.  Instead, Defendants breached their duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Cushing St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit

Scheme proceeded to resell the property to Kenneth Wong at a price greatly in excess of its fair market value or true cash value

204.  The City of Eastpointe, Michigan assessed the True Cash Value of the Cushing St. property at $31,740.00 for the year 2013, at 31,400.00 for the year 2014 and at $33,320.00 for the year 2015.

205.  While attending the Buying Summit, Robert and Kenneth Wong were also induced by the fraudulent statements of Defendants' agents to also purchase from Defendants a worthless "Veil Corporate" protection package.  This package included the cost of creating a limited liability company in Utah ("Skyhigh Developments LLC") to which the houses Robert and Kenneth Wong purchased at the Buying Summit would be conveyed along with a corporate "protection package" to "protect" those entities and homes.   However, because the purchased homes were instead conveyed by Defendants to a Self-Directed IRA each on behalf of Robert and Kenneth Wong, no assets have ever been conveyed to "Skyhigh Developments LLC" and the "protection package" was totally unnecessary.

206.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Robert and Kenneth Wong by Defendants and their agents to engender their unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described in Paragraph 63, *supra*.

207.  Both Robert and Kenneth Wong were unaware that the sales agreements they executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

208.   Both Robert and Kenneth Wong were thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

209.  Both Robert and Kenneth Wong were unaware that the training and Buying Summit agreements they signed provided for binding arbitration of disputes.

210.  Both Robert and Kenneth Wong were unaware that the Commercial Loan Agreements they signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

211.  There was and is no relationship whatsoever between either Robert and/or Kenneth Wong, their attendance at the Buying Summit in Nevada nor any aspect of their agreements to purchase the aforementioned properties from Defendants that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

212.  Plaintiffs Robert Wong and Kenneth Wong have each incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to

defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

## COUNT IV – THE CLAIMS OF PLAINTIFFS MIKE HAMPSHIRE AND LIONS FAN, LLC

The allegations of paragraphs 1 - 212 are incorporated by reference as if fully set forth herein.

213. In late January/early February, 2013 while living in Murphy, Texas, Plaintiff Mike Hampshire received a postcard-type piece of mail featuring Dean Graziosi inviting him to a free ½ day seminar on Friday, February 15, 2013 at a hotel in Plano, Texas concerning real estate investing such that the attendees would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

214. The mailing described in Paragraph 213, *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

215. Mr. Hampshire called the telephone phone number on the aforementioned postcard sometime in early February, 2013 and reserved a spot at the ½ day seminar

216. Mr. Hampshire attended the ½ day event on February 15, 2013 and while attending he purchased 3 packages from Defendants:

        a) Insider's Financial Enhance Note Network System at a cost of $497.00;

        b) Insider's Financial Tax Lien Program at a cost of $997.00; and

        c) Insider's Financial Real Estate Workshop Package at a cost of $1997.00.

217.   Mr. Hampshire then attended the 3-day "Real Estate Workshop" (@ $1997.00) which took place on February 22-24, 2013 at a hotel in Dallas, Texas.

218.  At the aforementioned 3-day "Real Estate Workshop", the attendees, including Mr. Hampshire, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

219.  At the aforementioned 3-day "Real Estate Workshop", agents of the Defendants pushed very hard for the attendees, including Mr. Hampshire to purchase one of their "Insider's Financial Deans Advanced Training.com Continuing Education" packages which consisted of the Diamond package (Retail Price $60,000.00; Workshop Price $39,997.00), the Platinum package (Retail Price $43,000.00); Workshop Price $24,997.00) and the Gold package (Retail Price $26,000.00; Workshop Price $18,997.00).

220.  The pressure to buy a package was more subtle the first 2 days.  However, if an attendee had not bought a package by the 3rd day, then the pressure was noticeably firmer.  Mr. Hampshire observed the woman sitting next to him at the "workshop" gamely trying to hold out and she was being harangued strongly by one of the Defendants' agents pushing the packages.

221.  Mr. Hampshire ultimately succumbed to the pressure and bought the Platinum package for $24,997.00 which he paid via credit card.

222.   The day immediately after the 3-day workshop (Monday, February 25, 2013), an agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and harangued him for over an hour about buying an additional $25,000 training program from Dean.  Mr. Hampshire tried to resist and told the caller that he had just spent $25,000.00 two days ago and was in no mood and in no position to spend another $25,000.00.

223.   The very next day a different agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and again harangued him for over an hour about purchasing additional real estate training packages from Defendants.

224.   Again, Mr. Hampshire succumbed and agreed to buy a program called the "PMI (Professional Marketing Institute) Real Estate Success Academy" for another $8,000.00.

225.   Each of these telephone calls to Mr. Hampshire and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

226.   At the "Boots on the Ground" workshop which Mr. Hampshire attended in March, 2013, each of the attendees with which Mr. Hampshire spoke on the topic indicated that they had received the same type of phone call as described in Paragraph 225 *supra*.

227.   The aforementioned "training" and Buying Summit packages were purchased by Mr. Hampshire from a purported entity entitled "Investors Financial Education LLC".

228.   The written contractual agreements between Mr. Hampshire and "Investors Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

229.   None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Investors Financial Education LLC" and Defendants have refused and neglected to so identify said entity.  Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Investors Financial Education LLC" which is nothing other than an alter ego of the Defendants.

230.   Mr. Hampshire attended The Buying Summit in Las Vegas May 29-June 1, 2013 where the attendees, including Mr. Hampshire, were expressly told that the houses offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available at well below market value.  These same express promises and representations were also made at the prior ½ day seminar and the 3-day workshop which Mr. Hampshire attended as described *supra*.

231.   Upon arriving at the Buying Summit, Mr. Hampshire was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [see paragraph 49, *supra*].

232.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Hampshire and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

233.  Mr. Hampshire relied to his detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

234.  Mr. Hampshire relied to his detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

235.  Mr. Hampshire relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

236.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Hampshire was induced to attend a sales session with an agent of Defendants at the Buying Summit.

237.  At the Buying Summit, Mr. Hampshire and the other attendees were not given the option of whether or not they wanted to speak to one of Defendants' sales representatives.   Instead, Defendants' agents came into the seminar room and escorted different people at different times out to the lobby to sit down and look at some of the properties Defendants were selling.

238.  The agent of Defendants' who delivered the seminar presentation each day at the Buying Summit repeatedly and expressly stated to Mr. Hampshire and the other attendees to not try to negotiate with the Defendants' sales representatives because they had already marked down the prices of each property to accommodate the attendees of the Buying Summit.

239.  At the Buying Summit, Defendants' agents also pushed hard to sell to Mr. Hampshire and the other attendees the "Veil Corporate Asset Protection/Tax Plan" and the "Safeguard Business Advantage program.

240.  Relying upon the false and fraudulent statements and representations of Defendants' agents at the Buying Summit, Mr. Hampshire purchased the Veil Corporate plan for $6,095.00 which he was told was a price discount of $400.00 because it was purchased it at the Buying Summit.

241.    Defendants' agents also convinced Mr. Hampshire to purchase the "Safeguard Platinum Tax Package (Veil Corporation)" for $3,795.00.

242.  At a sales session attended by Mr. Hampshire with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 17681 Lenore, Detroit, Michigan 48219, the purported bargain contract price offered by Defendants for this home was $46,600.00 as displayed on this internet monitor.

243.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Lenore property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $46,600.00.   However, with various add-ons, including a $3,362.40 "loan origination fee" and "closing costs" of $4,858.60, the actual sales price was $54,821 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 13, 2013.

244.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $$23,159 regarding his purchase of the Lenore St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay the "loan" balance of $50,000.00 with interest-only payments of $500.00 per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

245.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Lenore St. home.

246.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Lenore St. home had been available for sale at the distressed sale price in May, 2013 and was conveyed directly by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 31, 2013.   Defendant FrontSide Properties, LLC then sold the Lenore St. property to Lions Fan, LLC as described *supra*.

247.   At the aforementioned sales session attended by Mr. Hampshire with an agent of Defendants at the Buying Summit, Defendants' internet monitor displayed various homes for sale including one such home located at 13591 Riverview Street, Detroit, Michigan for which Defendants' internet monitor displayed a "Suggested Retail Price of $59,000.00.  The purported bargain contract price offered by Defendants for this home was $44,800.00 as displayed on this internet monitor.

248.   Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 247, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of

racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

249.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Riverview St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $44,800.00.  However, with various add-ons, including a $3,257.00 "loan origination fee" and "closing costs" of $5,124.00, the actual sales price was $53,181 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated July 8, 2013.

250.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $16,781.00 regarding his purchase of the Riverview St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay the "loan" balance of $36,400.00 with interest-only payments of $358.31per per month for 24 months and the balance of 36,400.00 being due July 16, 2015.

251.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Riverview St. home.

252.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Riverview St. home had been available for sale at the distressed sale price in June, 2013 and had been conveyed by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 31, 2013.   Defendant FrontSide Properties, LLC then sold the Riverview St. property to Lions Fan, LLC as described *supra*.

253.   Upon returning home from the Buying Summit, Mr. Hampshire continued to purchase homes from Defendants by using the internet.   Defendants' internet website displayed various homes for sale including one such home located at 10031 Fielding Street, Detroit, Michigan, Michigan for which Defendants' internet website displayed a "Suggested Retail Price of $56,000.00.  The purported bargain contract price offered by Defendants for this home was $50,950.00 as displayed on this internet monitor.

254.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 253, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

255.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Fielding St. property and the rounds and

rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $$50,950.00.  However, with various add-ons, including a $3,624.80 "loan origination fee" and "closing costs" of $4,498.20, the actual sales price was $59,073.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 11, 2013.

256.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,673.00 regarding his purchase of the Fielding St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $40,400.00 with interest-only payments of $404.00 per per month for 24 months and the balance of $40,400.00 being due September 27, 2015.

257.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Fielding St. home.

258.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Fielding Street property had been available for sale at the distressed sale price of $25,000.00 in June, 2013 and was purchased on behalf of Defendants own

account by Defendants' agent, Metro Detroit Home Solutions, LLC on June 19, 2013 for $25,000.00. The deed had been drafted by Defendants attorneys, Guardian Law.

259. Metro Detroit Home Solutions, LLC soon thereafter conveyed the Fielding St. property directly to Defendant Screaming Eagle Properties LLC for a purported $33,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013. Defendant Screaming Eagle Properties, LLC then sold the Fielding St. property to Lions Fan, LLC as described *supra*.

260. Defendants' internet website also displayed a home located at 12053 Laing Street, Detroit, Michigan, Michigan for which Defendants' internet website displayed a "Suggested Retail Price of $51,500.00. The purported bargain contract price offered by Defendants for this home was $37,000.00 as displayed on this internet monitor.

261. Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 260, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

262. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Laing St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $37,000.00. However, with various

add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $4,666.00, the actual sales price was $44,666.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 4, 2013.

263.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $13,966.00 regarding his purchase of the Laing St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $30,700.00 with interest-only payments of $307.00 per per month for 24 months and the balance of $30,700.00 being due September 18, 2015.

264.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

265.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Laing Street property had been the subject of a tax forfeiture to the Wayne County Treasurer on April 8, 2013 and was conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on June 6, 2013.

266.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Laing St. property directly to Defendant FrontSide Properties LLC for a purported $26,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013.

Defendant FrontSide Properties, LLC then sold the Laing St. property to Lions Fan, LLC as described *supra*.

267.   Metro Detroit Home Solutions, LLC subsequently contracted with Lions Fan, LLC to provide property management services for various homes purchased by Lions Fan, LLC in the Detroit metropolitan area without disclosing their prior role in purchasing properties at distress sale prices for later sale to victims of the Buying Summit.

268.   Defendants' internet website also displayed a home located at 18740 Glenhurst Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.  The purported bargain contract price offered by Defendants for this home was $49,600.00 as displayed on this internet monitor.

269.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 268, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

270.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Glenhurst St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $49,600.00.  However, with various

add-ons, including a $3,613.80 "loan origination fee" and "closing costs" of $5,702.20, the actual sales price was $58,916.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 25, 2013.

271.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,616.00 regarding his purchase of the Glenhurst St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $40,300.00 with interest-only payments of $403.00 per per month for 24 months and the balance of $40.300.00 being due October 11, 2015.

272.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Glenhurst St. home.

273.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Glenhurst Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $19,900.00 on May 9, 2013.

274.   Metro Detroit Home Solutions, LLC soon thereafter conveyed the Glenhurst St. property directly to Defendant FrontSide Properties LLC for a purported $31,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on May

24, 2013.  Defendant FrontSide Properties, LLC then sold the Glenhurst St. property to Lions Fan, LLC as described *supra*.

275.   Defendants' internet website also displayed a home located at 20519 Rosemont Avenue, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,800.00.  The purported bargain contract price offered by Defendants for this home was $53,200.00 as displayed on this internet monitor.

276.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 275, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

277.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rosemont St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $53,200.00.  However, with various add-ons, including a $3,789.70 "loan origination fee" and "closing costs" of $4,733.30, the actual sales price was $61,723.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 7, 2013.

278.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $19,523.00 regarding his purchase of the Rosemont St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $42,200.00 with interest-only payments of $422.00 per per month for 24 months and the balance of $42,200.00 being due October 29, 2015.

279.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rosemont St. home.

280.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rosemont Street property had been conveyed to Defendant Silver Tie Homes, LLC for a purported $33,700.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 6, 2013.  Defendant FrontSide Properties, LLC then sold the Rosemont St. property to Lions Fan, LLC as described *supra*.

281.   Defendants' internet website also displayed a home located at 7666 Vaughan Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $68,000.00.  The purported bargain contract price offered by Defendants for this home was $50,400.00 as displayed on this internet monitor.

282.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 281, *supra*,

was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

283.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Vaughan St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $50,400.00.  However, with various add-ons, including a $3,581.70 "loan origination fee" and "closing costs" of $4,369.30, the actual sales price was $58,351.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 7, 2013.

284.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,451.00 regarding his purchase of the Vaughan St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $39,900.00 with interest-only payments of $399.00 per per month for 24 months and the balance of $39,999.00 being due November 4, 2015.

285.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

76

286.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Vaughan Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $24,750.00 on August 9, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

287.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Vaughan St. property directly to Defendant Silver Tie Homes LLC for a purported $33,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Silver Tie Homes, LLC then sold the Vaughan St. property to Lions Fan, LLC as described *supra*.

288.  Defendants' internet website also displayed a home located at 18500 Dequindre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $48,000.00.  The purported bargain contract price offered by Defendants for this home was $41,300.00 as displayed on this internet monitor.

289.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 288, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

290.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Dequindre St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from

Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $41,300.00. However, with various add-ons, including a $3,011.70 "loan origination fee" and "closing costs" of $4,903.30, the actual sales price was $49,215.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

291. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $15,515.00 regarding his purchase of the Laign St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $33,700.00 with interest-only payments of $337.00 per per month for 24 months and the balance of $33.700.00 being due November 21, 2015.

292. Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Dequindre St. home.

293. Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Dequindre Street property had been conveyed to Sycamore Homes, LLC at a distress sale price on September 5, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie Homes LLC for a purported $28,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 13, 2013.

Defendant Silver Tie Homes, LLC then sold the Dequindre St. property to Lions Fan, LLC as described *supra*.

294.   Defendants' internet website also displayed a home located at 6906 Longacre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $52,000.00.  The purported bargain contract price offered by Defendants for this home was $38,900.00 as displayed on this internet monitor.

295.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 294, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

296.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Longacre St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $38,900.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $5,507.00, the actual sales price was $47,407.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

297.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $14,907.00 regarding his purchase of the Longacre St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $32,500.00 with interest-only payments of $325.00 per per month for 24 months and the balance of $32,500.00 being due November 22, 2015.

298.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Longacre St. home.

299.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Longacre Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $25,000.00 on June 19, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

300.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Longacre St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $27,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 19, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Longacre St. property to Lions Fan, LLC as described *supra*.

301.  Defendants' internet website also displayed a home located at 17511 Westmoreland Road, Detroit, Michigan, for which Defendants' internet website

displayed a "Suggested Retail Price" of $64,500.00.  The purported bargain contract price offered by Defendants for this home was $50,500.00 as displayed on this internet monitor.

302.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 301, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

303.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Westmoreland Road property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $50.500.00.   However, with various add-ons, including a $3,624.00 "loan origination fee" and "closing costs" of $4,945.00, the actual sales price was $59,069.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

304.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,669.00 regarding his purchase of the Westmoreland home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the

"loan" balance of $40,400.00 with interest-only payments of $404.00 per per month for 24 months and the balance of $40,400.00 being due November 21, 2015.

305.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Westmoreland Road home.

306.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Westmoreland Road property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on July 31, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $31,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Screaming Eagle Properties, LLC then sold the Westmoreland Road property to Lions Fan, LLC as described *supra*.

307.  Defendants' internet website also displayed a home located at 6906 Pierson Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $56,100.00.  The purported bargain contract price offered by Defendants for this home was $48,000.00 as displayed on this internet monitor.

308.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 307, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of

racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

309.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Pierson St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $48,000.00.  However, with various add-ons, including a $3,448.30 "loan origination fee" and "closing costs" of $4,815.70, the actual sales price was $56,264.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated November 19, 2013.

310.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $17,764.00 regarding his purchase of the Pierson St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $38,500.00 with interest-only payments of $385.00 per per month for 24 months and the balance of $38,500.00 being due December 11, 2015.

311.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

312.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Pierson Street property had been conveyed to [Defendant?] GLS Props, LLC at a distress sale price on September 21, 2013 pursuant to a Warranty Deed drafted by Guardian Law who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $29,200.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 21, 2013.   Defendant Silver Tie Homes, LLC then sold the Pierson St. property to Lions Fan, LLC as described *supra*.

313.   Defendants' internet website also displayed a home located at 3435 Wasmund Avenue, Warren, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $64,000.00.  The purported bargain contract price offered by Defendants for this home was $59,400.00 as displayed on this internet website.

314.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 313, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

315.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Wasmund St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Patriot Homes, LLC for $59,400.00.  However, with various add-ons,

including a $4,178.70 "loan origination fee" and "closing costs" of $4,447.30, the actual sales price was $68,026.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed dated December 5, 2013.

316.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,526.00 regarding his purchase of the Wasmund St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,500.00 with interest-only payments of $465.00 per per month for 24 months and the balance of $46,500.00 being due December 20, 2015.

317.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Wasmund St. home.

318.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Wasmund Street property had been conveyed to by the Federal Home Loan Mortgage Corp. (Freddie Mac) to John Graham, Inc. at a distress sale price of $35,000.00 on June 7, 2013..

319.  John Graham, Inc., soon thereafter conveyed the Wasmund St. property directly to Defendant Patriot Homes, LLC for a purported $51,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant

Patriot Homes, LLC then sold the Wasmund St. property to Lions Fan, LLC as described *supra*.

320.   Defendants' internet website also displayed a home located at 19960 Kenosha Street, Harper Woods, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.   The purported bargain contract price offered by Defendants for this home was $58,500.00 as displayed on this internet website.

321.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 320, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

322.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Kenosha St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Patriot Homes, LLC for $58,500.00.   However, with various add-ons, including a $4,146.60 "loan origination fee" and "closing costs" of $4,914.40, the actual sales price was $67,561.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed dated December 12, 2013.

323.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,361.00 regarding his purchase of the Kenosha St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,200.00 with interest-only payments of $462.00 per per month for 24 months and the balance of $46,500.00 being due January 7, 2016.

324.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Kenosha St. home.

325.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Kenosha Street property had been conveyed to John Graham, Inc. at a distress sale price of $32,000.00 on June 7, 2013.

326.  John Graham, Inc., soon thereafter conveyed the Kenosha St. property directly to Defendant Patriot Homes, LLC for a purported $48,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Patriot Homes, LLC then sold the Kenosha St. property to Lions Fan, LLC as described *supra*.

327.  Defendants' internet website also displayed a home located at 15324 Semrau Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $69,000.00.  The purported bargain

contract price offered by Defendants for this home was $64,250.00 as displayed on this internet website.

328.   Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 327, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

329.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Semrau St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $64,250.00.   However, with various add-ons, including a $4,495.70 "loan origination fee" and "closing costs" of $4,413.30, the actual sales price was $73,159.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated January 8, 2014.

330.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,159.00 regarding his purchase of the Semrau St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the

"loan" balance of $50,000.00 with interest-only payments of $500.00 per per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

331.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Semrau St. home.

332.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Semrau Street property had been conveyed to John Graham, Inc. at a distress sale price of $27,000.00 on June 5, 2013..

333.   John Graham, Inc., soon thereafter conveyed the Semrau St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $53,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Screaming Eagle Properties, LLC then sold the Semrau St. property to Lions Fan, LLC as described *supra*.

334.   Defendants' internet website also displayed a home located at 11036 Packard Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home was $61,150.00 as displayed on this internet website.

335.   Defendants' internet website display of the fraudulent purported bargain sales price as described in Paragraph 334, *supra*, was an incidence of wire fraud pursuant

to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

336.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Semrau St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $61,150.00.  However, with various add-ons, including a $4,269.30 "loan origination fee" and "closing costs" of $4,073.70, the actual sales price was $69,493.00 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 3, 2014.

337.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,993.00 regarding his purchase of the Packard Avenue home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $47,500.00 with interest-only payments of $475.00 per per month for 24 months and the balance of $47,500.00 being due June 23, 2017. .

338.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Packard Avenue home.

339.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Packard Avenue property had been conveyed to by the Secretary of Veterans Affairs to Benjamin Soloman at a distress sale price of $7,000.00 on July 19, 2013.

340.  On August 19, 2013, Benjamin Soloman conveyed the property to A Plus Technologies for $100.00.

341.  On January 10, 2014, the property was conveyed to John Graham, Inc. for a purported $26,000.00

342.  John Graham, Inc., soon thereafter conveyed the Packard Avenue St. property directly to Defendant EZ Street Properties, LLC for a purported 49,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12 2014. Defendant EZ Street Properties, LLC then sold the Packard Avenue St. property to Lions Fan, LLC as described *supra*.

343.  Defendants' internet website also displayed a home located at 22126 Hayes Avenue, Eastpointe, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $63,350.00.

344.  Defendants' internet website display of the fraudulent purported bargain sales price as described in Paragraph 343, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

345.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Hayes St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,350.00.  However, with various add-ons, including a $4,468.70 "loan origination fee" and "closing costs" of $4,901.30, the actual sales price was $72,720 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 4, 2014.

346.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,020.00 regarding his purchase of the Hayes St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $49,700.00 with interest-only payments of $597.00 per per month for 24 months and the balance of $50,000.00 being due June 23, 2017.

347.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Hayes St. home.

348.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Hayes Street property had been conveyed to John Graham, Inc. at a distress sale price of $30,000.00 on December 27, 2013.

349.   John Graham, Inc., soon thereafter conveyed the Otis Ave. property directly to Defendant EZ Street Properties, LLC for a purported $52,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12, 2014. Defendant EZ Street Properties, LLC then sold the Otis Ave. property to Lions Fan, LLC as described *supra*.

350.   Defendants' internet website also displayed a home located at 2152 Otis Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $61,650.00.

351.   Defendants' internet website display of the fraudulent purported bargain sales price as described in Paragraph 350, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

352.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Otis Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $61,650.00.  However, with various add-ons, including a $4,326.80 "loan origination fee" and "closing costs" of $4,413.20, the actual sales price was $70,390 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 25, 2014.

353.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $22,290.00 regarding his purchase of the Otis Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $48,100.00 with interest-only payments of $481.00 per per month for 24 months and the balance of $48,100.00 being due June 15, 2017.

354.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Otis Ave. home.

355.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Otis Ave. property had been conveyed to John Graham, Inc. at a distress sale price of $28,000.00 on March 20, 2014.

356.   John Graham, Inc., soon thereafter conveyed the Otis Ave. property directly to Defendant EZ Street Properties, LLC for a purported $48,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on March 31, 2014. Defendant EZ Street Properties, LLC then sold the Otis Ave. property to Lions Fan, LLC as described *supra*.

357.   Defendants' internet website also displayed a home located at 22809 Rein Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website

94

displayed a purported bargain contract price offered by Defendants for this home of $63,950.00.

358. Defendants' internet website display of the fraudulent purported bargain sales price as described in Paragraph 357, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

359. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rein Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,950.00. However, with various add-ons, including a $4,509.10 "loan origination fee" and "closing costs" of $4,969.90, the actual sales price was $73,429 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated August 1, 2014.

360. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,229.00 regarding his purchase of the Rein Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $50,200.00 with interest-only payments of $502.00 per per month for 24 months and the balance of $50,200.00 being due July 21, 2017.

361.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rein Ave. home.

362.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rein Ave. property had been conveyed on January 24, 2014 at the distress sale price of $29,000.00 by the Veterans Administration to G-USA, LLC.

363.  On May 30, 2014 G-USA, LLC conveyed the property to GWH Properties, LLC by quit claim deed drafted by Guardian Law for a recited consideration of $10.00.

364.  GWH Properties, LLC soon thereafter conveyed the Rein Ave. property directly to Defendant EZ Street Properties, LLC for a purported $51,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 30, 2014. Defendant EZ Street Properties, LLC then sold the Rein Ave. property to Lions Fan, LLC as described *supra*.

365.  Defendants' internet website also displayed a home located at 23106 Lambrecht Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $67,450.00.

366.  Defendants' internet website display of the fraudulent purported bargain sales price as described in Paragraph 365, *supra*, was an incidence of wire fraud pursuant

to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

367.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Lambrecht Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Malibu Breeze Properties, LLC for $67,450.00.  However, with various add-ons, including a $4,704.50 "loan origination fee" and "closing costs" of $4,381.50, the actual sales price was $76,536.00 and the property was conveyed by Defendant Malibu Breeze Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 4, 2014.

368.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $24,236.00 regarding his purchase of the Lambrecht Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $52,300.00 with interest-only payments of $523.00 per per month for 24 months and the balance of $52,300.00 being due June 23, 2017.

369.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Lambrecht Ave. home.

370.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Lambrecht Ave. property had been conveyed on December 12, 2013 at the distress sale price of $33,000.00 to John Graham, Inc.

371.  John Graham, Inc.soon thereafter conveyed the Lambrecht Ave. property directly to Defendant Malibu Breeze Properties, LLC for a purported $55,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on January 22, 2014. Defendant Malibu Breeze Properties, LLC then sold the Lambrecht Ave. property to Lions Fan, LLC as described *supra*.

372.  On December 2, 2013, Mr. Hampshire purchased the property located at 5877 Buck Street, Taylor, Michigan 48180 from Defendant Silver Tie Homes, LLC for $68,620.00 pursuant to Defendants' fraudulent scheme as described *supra*.

373.  On July 26, 2013, Mr. Hampshire purchased the property located at 4186 N Toronto Street, Milwaukee, Wisconsin 53216 from Defendant Screaming Eagle Properties, LLC for $62,134.00 pursuant to Defendants' fraudulent scheme as described *supra*.  Also on July 26, 2013, Mr. Hampshire purchased the property located at 2037 N 40th Street, Milwaukee, Wisconsin from Defendant Screaming Eagle Properties, LLC for $64,796.00 pursuant to Defendants' fraudulent scheme as described *supra*.

374.  On August 1, 2014, Mr. Hampshire purchased the property located at 3803 Wayne Avenue, Kansas City, Missouri 64109 from Defendant EZ Street Properties, LLC for $58,905.00 pursuant to Defendants' fraudulent scheme as described *supra*..

375.  On September 4, 2014, Mr. Hampshire purchased the property located at 909 Maurice Avenue, Ferguson, Missouri 63135 from Defendant Green Apple Homes, LLC for $55,993.00 pursuant to Defendants' fraudulent scheme as described *supra.*.

376.  On September 4, 2014, Mr. Hampshire purchased the property located at 6912 E 114th Street, Kansas City, Missouri 64134 from Defendant Green Apple Homes, LLC for $63,749.00 pursuant to Defendants' fraudulent scheme as described *supra*.

377.  On October 7, 2014, Mr. Hampshire purchased the property located at 153 Bascom Drive, Ferguson, Missouri 63135 from Defendant Green Apple Homes, LLC for $70,958.00 pursuant to Defendants' fraudulent scheme as described *supra*.

378.  On December 30, 2014, Mr. Hampshire purchased the property located at 2352 Gardner Drive, Saint Louis, Missouri 63136 from Defendant 5 Choices, LLC for $64,497.00 pursuant to Defendants' fraudulent scheme as described *supra*.  On

379.  Mr. Hampshire was unaware that the sales agreements he signed contained language describing the purchased properties as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

380.  Mr. Hampshire was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

381.   Mr. Hampshire was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

382.  Mr. Hampshire was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements or litigation of disputes in the courts of the State of Utah.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

383.  There was and is no relationship whatsoever between Mr. Hampshire, Lions Fan, LLC, and/or his attendance at the Buying Summit in Nevada with the State of Utah nor did any aspect of his agreements to purchase the aforementioned properties in Michigan and other states have any relationship whatsoever with the State of Utah except that all of the Defendant entities are registered in the State of Utah.

384.  As the direct and proximate result of Ms. Saenz investing in Defendants' fraudulent scheme, her life savings have been completely wiped out.

385.  As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs Mike Hampshire and Lions Fan LLC such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

386.   Defendants had a contractual and fiduciary duty owing to Plaintiffs Mike Hampshire and Lions Fan LLC to locate the properties they purchased at the promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

387.   Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Hampshire and his company at a prices greatly in excess of their fair market value or true cash value.

388.   Plaintiffs Mike Hampshire and Lions Fan LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

389.   Plaintiffs Mike Hampshire and Lions Fan, LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

## COUNT V – THE CLAIMS OF LINDA SAENZ AND ABBY CREEK INVESTMENT LLC

The allegations of paragraphs 1 - 389 are incorporated by reference as if fully set forth herein.

390. In March, 2013 while living in Houston, Texas, Plaintiff Linda Saenz viewed an infomercial playing on television featuring Dean Graziosi which promoted a free seminar concerning real estate investing promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

391. The aforementioned television advertisement was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

392. In response to the aforementioned March 2013 television infomercial, Ms. Saenz called the advertised telephone number and spoke with an agent of the Defendants during which her attendance at such a free seminar was scheduled for April 28, 2013 at a nearby hotel.

393. At the free seminar held on April 28, 2013, Ms. Saenz was induced by agents of Defendants to purchase the "Insider's Financial 3-Day Real Estate Workshop Package" for $1,997.00 and the "Insider's Financial Tax Lien Program" for $997.00 based upon express promises and inducements that by taking these courses, she would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

394. The "Insider's Financial 3-Day Real Estate Workshop" was held May 3-5, 2013 at the Techniplex Conference Center, Stafford, Texas.  At this "workshop", the attendees, including Ms. Saenz, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

395. Ms. Saenz did as instructed and called her credit card company and obtained an increase in her credit limit.

396. At the aforementioned "Insider's Financial 3-Day Real Estate Workshop", Ms. Saenz was induced by the fraudulent statements of Defendants agents on May 5, 2013 to purchase "Dean's Advanced Training – silver package – Boots on the Ground" for $11,997.00 but which did not include attending the Buying Summit.  The purported purpose of this course as repeatedly expressed by Defendants' agent was so that Ms. Saenz could obtain expert training and guidance from Defendants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

397. While at home on June 4, 2013, Ms. Saenz received a telephone call from an agent of Defendants identified as a member of "Dean's Inner Circle" who forcefully and relentlessly inquired about Ms. Saenz' financial status.  During this "hard sell" telephone call, Ms. Saenz was promised, *inter alia*, the opportunity to purchase rental

housing properties at steeply discounted prices if she would purchase the Buying Summit package and attend the Buying Summit.

398. When Defendants' agent discovered during the aforementioned telephone call how much credit was available on Ms. Saenz' credit cards, she was induced on June 4, 2013 by the various aforementioned promises and inducements of Defendants to purchase "Dean's Advanced Training Inner Circle" package (which included attendance at the Buying Summit) for an additional $15,075.00.

399. Each of these telephone calls made Defendants' agents to Ms. Saenz and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

400. The aforementioned "training" and Buying Summit packages were purchased by Ms. Saenz from a purported entity entitled "Investors Financial Education LLC".

401. The written contractual agreements between Ms. Saenz and "Investors Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

402. None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Investors Financial Education LLC" and Defendants have refused and neglected to so identify said entity. Thus, is has been impossible for any of

the Plaintiffs to initiate an arbitration proceeding against "Investors Financial Education LLC" which is nothing other than an alter ego of the Defendants.

403.  Ms. Saenz attended a Buying Summit in Las Vegas, Nevada from July 11, 2013 to July 13, 2013.

404.  Upon arriving at the Buying Summit, Ms. Saenz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [see paragraph 49, *supra*].

405.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Ms. Saenz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

406.  Ms. Saenz relied to her detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

407.   Ms. Saenz relied to her detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

408.   At the Buying Summit, Ms. Saenz and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

409.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Ms. Saenz was induced to attend a sales session with an agent of Defendants at the Buying Summit.

410.   At a sales session attended by Ms. Saenz with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 21920 Elroy Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $75,000.00.  The purported bargain contract price offered by Defendants for this home was $60,350.00 as displayed on this internet monitor.

411.   Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 410, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

106

412.  Defendant's agents attempted to induce Ms. Saenz to create a Utah based limited liability company ("LLC") and to which the homes she purchased at the Buying Summit were to be conveyed.  However, Ms. Saenz instead created a Texas-based LLC entitled "Abby Creek Investment, LLC" for such purpose.

413.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Elroy Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $59,350.00.  However, with various add-ons, including a $4,203.00 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $68,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed dated October 29, 2013.

414.  The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Saenz, the false impression that the homes she was purchasing were worth in excess of the amount of her "bridge

loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

415.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $21,459.93 regarding her purchase of the Elroy Ave. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

416.  Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC for the purchase of the Elroy St. home.

417.   Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Elroy Ave. home had been available for sale at the distressed sale price of $26,000.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent, John Graham Inc. on June 6, 2013 for $26,000.00.

418.   John Graham Inc. soon thereafter conveyed the Elroy Ave. property directly to Defendant Screaming Eagle Properties LLC by Warranty Deed prepared by Defendants attorneys Guardian Law on July 3, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Elroy Ave. property to Abby Creek Investment, LLC on November 7, 2013 for the aforementioned effective price of in excess of $68,000.00.

419.   Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Elroy Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

420.   Instead, Defendants breached its duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Elroy Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

421.   In further breach of their contractual and fiduciary duties, Defendants induced Ms. Saenz to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Ms. Saenz had been informed by Defendants at the Buying Summit.

422.   The City of Warren, Michigan assessed the Elroy Ave. property as having a True Cash Value of $ 37,820.00 for the year 2013 and a True Cash Value of $35,000.00 for the year 2014.

423.   In 2015, Ms. Saenz ordered a professional appraisal of the Elroy Ave. property and the property was appraised at $44,000.00.

424.   In 2015, Ms. Saenz attempted to find a local lender to refinance the $46,800.00 "bridge loan" with Insiders Cash but was unable to do so because the property was worth less than what she owed on the loan.

425.   Ms. Saenz is and has been unable to sell the Elroy Ave. property because the property is not worth what she owes on said bridge loan.

426.   Also at the aforementioned sales session at the Buying Summit, Defendants' internet monitor displayed a home located at 3901 49th Way, Birmingham, AL.  For this home, Defendants' internet monitor displayed a "Suggested Retail Price" of $45,000.00.  The purported bargain contract price offered by Defendants for this home was $36,800.00 as displayed on this internet monitor.

427.   Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in Paragraph 426, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

428.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Birmingham, AL property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $35,800.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $1,850.00, the actual sales price

110

was in excess of $42,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed dated September 6, 2013.

429.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $19,494.00 regarding her purchase of the Birmingham, AL. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $23,000.00 with interest-only payments of $230.00 per month for 24 months and the balance of $23,000.00 being due October 8, 2015.

430.  Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC.

431.  Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Birmingham, AL home had been available for sale at the distressed sale price of $24,000.00 in June 2013 and was purchased by Defendant Screaming Eagle Properties, LLC on June 27, 2013 for $24,000.00 pursuant to a Warranty Deed drafted by Defendants' counsel, Jeff R. Palmer.  Defendant Screaming Eagle Properties, LLC thereafter sold the property to Abby Creek Investment, LLC on September 6, 2013 for the aforementioned effective price of in excess of $42,000.00.

111

432.  Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Elroy Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

433.  Instead, Defendants breached its duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Elroy Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

434.  In 2015, Ms. Saenz ordered a professional appraisal of the Birmingham, AL property and the property was appraised at $28,000.00.

435.  The aforementioned professional appraisal of the Birmingham, AL property states that "ROTTEN WOOD WAS OBSERVED IN NUMEROUS PLACES ON THE EXTERIOR OF THE DWELLING".

436.  Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Ms. Saenz by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts Ms. Saenz executed to purchase the Elroy St. and Birmingham, AL properties contained language identical and/or similar to that described in Paragraph

49, *supra*.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

437.  Ms. Saenz was unaware that the sales agreements she signed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

438.  Ms. Saenz was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

439.  Ms. Saenz was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

440.  Ms. Saenz was unaware that the Commercial Loan Agreements she signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

441.  There was and is no relationship whatsoever between Ms. Saenz, Abby Creek Investment, LLC, her attendance at the Buying Summit in Nevada with the State of Utah nor did any aspect of her agreement to purchase the aforementioned properties

in Michigan and Alabama have any relationship whatsoever with the State of Utah except that all of the Defendant entities are registered in the State of Utah.

442.   While attending the Buying Summit in Las Vegas on July 13, 2013, Ms. Saenz was also induced to also purchase from Defendants a worthless "Veil Corporate" protection package for $6,495.00 and a worthless "Safe Guard Tax Program" for $2,295.00 based upon Defendants fraudulent statements that these purchases were necessary to protect the real estate investments of Ms. Saenz.

443.   As the direct and proximate result of Ms. Saenz investing in Defendants' fraudulent scheme, her life savings have been completely wiped out.

444.   As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs Saenz/Abby Creek Investment LLC such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

445.   Defendants had a contractual and fiduciary duty owing to Plaintiffs Saenz/Abby Creek Investment LLC to locate the properties they purchased at the promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

446.   Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme

proceeded to resell the properties to Ms. Saenz and her company at a prices greatly in excess of their fair market value or true cash value.

447.  Plaintiffs Linsa Saenz and Abby Creek Investment LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

## **COUNT VI – THE CLAIMS OF PLAINTIFF JAMES DUNN**

The allegations of paragraphs 1 - 447 are incorporated by reference as if fully set forth herein.

448.  Plaintiff James Dunn received a flyer in the United States Mail in the State of Georgia in May, 2013 which advertised a free seminar on how to purchase real estate at deeply discounted prices.  Mr. Dunn and his wife attended this seminar in May 2013.

449.  At this free seminar, was induced by the statements and promises of Defendants to purchase a three day training course for $1997.00 where the attendees would allegedly be taught how to purchase real estate at deeply discounted prices.

450.  Mr. Dunn then attended the seminar which consisted of 3 days of training for 8 hours each day where Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments.

451.  At the end of the seminar described in Paragraph 450, *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to

start buying properties at steeply discounted prices. However, attendees were told that if they wanted to get further training, it would be necessary to sign up for an addition training package which were designated "Diamond, Platinum and Gold".

452. Mr. Dunn chose to purchase the Diamond package which included more "training" and attendance at the Buying Summit. On June 2, 2013, Mr. Dunn charged $22,000 on his credit card and took $12,997.00 from his 401k account towards the full fee of $39,502.00 and subsequently paid the balance due. The written agreement for this package also suggests that the entity providing the training services was "Insider's Financial Education, LLC".

453. Mr. Dunn agreed to attend the Buying Summit because Defendants' agents expressly stated to Mr. Dunn that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars. As such, Defendants' agents expressly stated to Mr. Dunn that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and were presently income-producing with tenants that had at least 1 year left on their lease. Further, Mr. Dunn was told that a person could only purchase these properties by attending the Buying Summit.

454. Mr. Dunn relied to his detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding

each property they offered for sale and about which the Plaintiffs need not be concerned.

455.  Mr. Dunn relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

456.  At the Buying Summit, Mr. Dunn and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

457.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced by Defendants to convey any properties he purchased at the Buying Summit to a Self-Directed IRA.

458.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced to attend a sales session with an agent of Defendants at the Buying Summit.

459.  At a sales session attended by Mr. Dunn with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 8030 Studebaker, Warren, Michigan, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $50,500.00.

460.   Defendants knew at the time of the events described in Paragraph 459, *supra*, that the Studebaker St. home was not worth $50,500.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

461.   Defendants' internet screen display of the fraudulent purported bargain sales price as described in Paragraph 459, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme..

462.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Studebaker property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Red List Homes, LLC for $50,500.00.   However, with various add-ons, including a $3,572.00 "loan origination fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $58,000.00 and the property was conveyed by Defendant Red List Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed dated October 25, 2013..

463.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $18,406.00 regarding his purchase of the Studebaker St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by Mr. Dunn's IRA service provider to pay the "loan" balance of $39,900.00 with interest-only payments of

$399.00 per month for 24 months and the balance of $39,900.00 being due November 14, 2015.

464.   Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Studebaker St. home had been available for sale at the distressed sale price shortly before he purchased it.  On November 2, 2012, Melissa Allor and Kenneth Honkanen sold the property to Fast Cash for Homes LLC for $5,000.00.  On October 24, 2013, Fast Cash for Homes LLC sold the property to Buy Right Properties LLC for $7,506.00 (note that the chain of title is not in chronological order - - also note that this is one day prior to the sale of the property to Mr. Dunn for $58,000.00).  On January 4, 2013, Buy Right Properties LLC sold the property to defendant Red List Homes, LLC for $36,076.00, a conveyance made by a Warranty Deed drafted by Guardian Law.

465.   Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Studebaker St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

466.   Instead, Defendants breached their duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Studebaker property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value

467.   In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle

amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

468.  At the aforementioned sales session attended by Mr. Dunn with an agent of Defendants at the Buying Summit, an internet monitor displayed a home for sale located at 2001 Woodlawn, Middletown, Ohio, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $62,135.00.

469.  Defendants knew at the time of the events described in Paragraph 468, *supra*, that the Woodlawn St. home was not worth $62,135.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit so that it could be resold to unaware victim at a Buying Summit for a price far in excess of its Fair Market Value or True Cash Value.

470.  Defendants' internet screen display of the fraudulent purported bargain sales price as described in Paragraph 468, *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme..

471.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Woodlawn property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Patriot Homes, LLC for $62,135.00.  However, with various add-ons, including a $4,379.50 "loan origination

120

fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $70,000.00 and the property was conveyed by Defendant Red List Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed dated October 25, 2013, 2013. .

472.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $22,575.00 regarding his purchase of the Woodlawn St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by Mr. Dunn's IRA service provider to pay the "loan" balance of $38,612.16 with interest-only payments of $386.00 per month for 24 months and the balance of $38,612.16 being due October 7, 2015.

473.   Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Woodlawn St. home had been purchased by Patriot Homes, LLC on August 29, 2013 for $38,000.00 but was resold to Mr. Dunn in October, 2013 for in excess of $70,000.00.  The "Statement of Value" was executed by Roger Reynolds, CPA, Butler County, Ohio auditor and listed the "Total Value" of the Woodlawn St. property as $20,660.00.

474.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Woodlawn St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

121

475.   Instead, Defendants breached their duties as described in Paragraph 61, *supra*, and absconded with the opportunity to purchase the Woodlawn St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value

476.   In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

477.   While attending the Buying Summit, Mr. Dunn was also induced by the fraudulent statements of Defendants' agents to also purchase from Defendants a worthless "Veil Corporate" protection package.  This package included the cost of creating a limited liability company in Utah to which the houses Mr. Dunn purchased at the Buying Summit would be conveyed along with a corporate "protection package" to "protect" those entities and homes.  However, because the purchased homes were instead conveyed by Defendants to a Self-Directed IRA on behalf of Mr. Dunn , no assets have ever been conveyed to this LLC and the "protection package" was totally unnecessary.

478.   Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Mr. Dunn by Defendants and their agents to

engender his unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contract contained language identical and/or similar to that described in Paragraph 63, *supra*.

479.   Mr. Dunn was unaware that the sales agreement he signed contained language describing the purchased property as being sold "AS IS", and/or that it repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

480.   Mr. Dunn was thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

481.   Mr. Dunn was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.

482.   Mr. Dunn was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

483.   There was and is no relationship whatsoever between Mr. Dunn, his attendance at the Buying Summit in Nevada nor any aspect of his agreement to purchase the aforementioned properties that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

484.   As the result of the facts alleged in Paragraph 61, *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Dunn such that Defendants

owed Mr. Dunn a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

485.   Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the properties he purchased at such the promised discounted prices, inform him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

486.   Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Dunn at a prices greatly in excess of their fair market value or true cash value.

487.   Plaintiff Dunn has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by him to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

## COUNT VII - VIOLATIONS OF 18 US.C. §1962(A), (C) AND (D) IN CONNECTION WITH THE BUYING SUMMIT FRAUDULENT ENTERPRISE

488.   The allegations of paragraphs 1 - 487 are incorporated by reference as if fully set forth herein.

489.   At all times relevant to the Complaint, all of the defendants and various agents of those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 US.C. §1961(4) and used in 18 US.C. §1962 (hereinafter the "Buying Summit Fraudulent Enterprise").  The Buying Summit Fraudulent Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

490 . Each of the defendants identified in this Complaint was associated with or employed by the Buying Summit Fraudulent Enterprise and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of the Buying Summit Fraudulent Enterprise through engaging in a pattern of racketeering activity.  Such conduct constituted a violation of 18 US.C. §1962(c) and (d).

491.  Each of the defendants identified in this Complaint conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the Buying Summit Fraudulent Enterprise, enabling the Buying Summit Fraudulent Enterprise to defraud plaintiffs as set forth herein.  Such conduct constituted a violation of 18 US.C. §1962(a) and (d).

492.  As a whole, the defendants identified in this Complaint acted in concert, with specific, well-defined roles in the Buying Summit Fraudulent Enterprise, as described in the preceding allegations, to achieve the common goal of defrauding

participants such as the Plaintiffs into making payments for the misrepresented

"training" and residential property purchase programs.  Further, these defendants

consensually engaged in decision making relating to the programs, through the roles

described herein. Further detail about their specific roles in perpetuating the

fraudulent scheme will be disclosed through discovery.


493.  These acts, including the conduct of the affairs of the Buying Summit

Fraudulent Enterprise through a pattern of racketeering activity, took place over a

period of at least three years and included multiple acts of mail and wire fraud.

494.  The defendants identified in this Complaint have continuously engaged in

criminal activities including, but not limited to, mail and wire fraud, as part of their

overall scheme and as a regular part of the conduct of the business of the enterprise

for at least three years and will continue indefinitely unless prevented as evidenced by

their past and continued activities.

495. This pattern of racketeering activity, including acts of mail fraud and wire

fraud, have occurred within the relevant time periods outlined in 18 US.C. §1961(5).

496.  Through their conduct of the Buying Summit Fraudulent Enterprise, the

defendants identified in this Complaint have made or caused to be made or

distributed communications by United States mail which included misrepresentations

of material fact regarding their training and sales programs and have made or caused

to be made interstate wire transfers as a result of such misrepresentations.  Examples

of such communications and transfers in furtherance of the fraudulent schemes are described throughout the preceding paragraphs.

497.  By virtue of these and similar communications occurring over at least the past three years, the defendants identified in this Complaint have engaged in, and are continuing to engage an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

498.  As a direct and proximate result of these defendants' conduct as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent Enterprise by the defendants identified in this Complaint, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

499. Pursuant to 18 US.C. §1964(c), Plaintiffs are entitled to recover from the defendants identified in this Complaint treble damages, their costs and reasonable attorney fees.

## COUNT VIII - MISCELLANEOUS MATTERS

500.  The allegations of paragraphs 1 - 499 are incorporated by reference as if fully set forth herein.

501.  As the result of being victims of the Buying Summit Fraud Scheme perpetuated by the Buying Summit Fraudulent Enterprise, the life savings of Plaintiffs Linda Saenz and Dennis Houtz have been exhausted.  Similarly, much of the life savings of Mike Hampshire has been exhausted.

502.  Except for Plaintiff Kenneth Wong, all Plaintiffs are in default on all of their loan agreements with Plaintiffs American Cash Funding and Insiders Cash, LLC.

503.  Plaintiff Robert Wong has sufficient funds to pay his non-recourse loans on the homes he purchased through the Buying Summit, but these funds are outside of his Self-Directed IRA and are thus unavailable to pay those loans.  He is therefore in default on these loans.  This eventuality was known and understood in advance by Defendants and was an aspect of their fraudulent scheme so that all or most purchasers of homes from them would ultimately default on their loans and Defendants would thereafter recover through foreclosure or otherwise all homes sold at the Buying Summit to again be sold to another round of potential victims.

504.  To the extent this is necessary to effectuate a rescission and revocation of all agreements between Plaintiffs and Defendants, Plaintiff hereby tender to Defendants the benefits they received from Defendants, including title to the properties they purchased.

505.  To the extent that the Court requires any additional reasons to hear this matter in this judicial district, note that these Defendants continue to this very day to perpetuate their fraudulent scheme within our local community.  An online search of the Macomb County Register of Deeds on February 19, 2016 shows 848 mortgages held by Defendant Insiders Cash, LLC in Macomb County alone.  There are fifteen such mortgages to date in 2016, 533 in 2015 and 383 in 2014.  In Oakland County, Defendant Insiders Cash, LLC is the grantee of 48 total mortgages for the years 2014

and 2015 which were given by American Estate and Trust of Las Vegas, Nevada for the benefit of Buying Summit purchasers employing a self-directed IRA. An online search of the Wayne County Land Records indicates that Defendant Insiders Cash, LLC holds over 1,200 mortgages in Wayne County, Michigan. The perpetuation of this scheme in our community completely distorts the real estate market for lower priced homes that would otherwise be available for purchase by members of the community at much lower fair market value prices. Further, this scheme has the potential to lead to a collapse of Defendants' artificially-induced price bubble and these homes may end up abandoned because there is no market for them at the prices reflective of the outstanding loan balances owing by the various victims of the Buying Summit Fraudulent Scheme including these Plaintiffs.

WHEREAS, Plaintiffs respectfully demand as follows:

1. Judgment upon their complaint against all defendants;

2. Compensatory damages;

3. Rescission and revocation of all agreements between Plaintiffs and Defendants and restitution to Plaintiffs of all benefits paid by Plaintiffs to Defendants;

4. Punitive damages;

5. Treble damages and attorney fees where authorized;

6. Injunctive relief;

7. A constructive trust of assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

8.      Trial by jury on all issues so triable; and

9.      Any and all other relief to which Plaintiffs appear entitled.

/s/ Robert W. Roddis
424 Madison
Grosse Pointe Farms, MI 48236
(313) 319-5045
bobroddis@gmail.com
P32145

February 23, 2016