# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

Rebecca K. Wilson, Dennis Houtz,
James Dunn, Robert Wong, Kenneth
Wong, Mike Hampshire, Lions Fan, LLC
Linda Saenz, Abby Creek Investment, LLC,
Pascal Vohradnik, Simone Vohradnik,
13607 Virgil St., LLC, Joanne Beldotti,
Ramona Lorraine Solano-Owen,
Greiner 11831, LLC, Coyle 12071, LLC
and Sarsfield 12460, LLC, and various John Does

Hon. Robert H. Cleland

v.                    Plaintiffs,          Case No. 2:16-cv-10659

5 Choices, LLC, American Cash Funding,
BuyPD, LLC, DLS Properties, LLC,
EZ Street Properties, LLC, FrontSide Properties, LLC,
Green Apple Homes, LLC, Insiders Cash, LLC,
Malibu Breeze Properties, LLC, Max Ultra, LLC,
Patriot Homes, LLC, Property Direct, LLC,
Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC,
Scree 44, LLC, Screaming Eagle Properties, LLC,
Silver Tie Homes, LLC, Investors Financial Education, LLC, Insiders Financial
Education, LLC, Yancey Events LLC, Yancey LLC
and various John Does,

                    Defendants.
_____/

# PLAINTIFFS' BRIEF IN RESPONSE TO MOTIONS TO DISMISS, TO COMPEL ARBITRATION AND TO ENFORCE SETTLEMENT AGREEMENTS

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.........................................ii

QUESTIONS PRESENTED..........................................iv

INTRODUCTION.................................................1

COUNTERSTATEMENT OF FACTS....................................2

ARGUMENT....................................................6

CONCLUSION.................................................25

## <u>QUESTIONS PRESENTED</u>

1.  Whether the claims asserted by Plaintiffs Kenneth Wong and Robert Wong against Defendant Yancey Events, LLC should be dismissed or stayed?

Plaintiffs answer: No

2. Whether this Court should dismiss Plaintiffs' claims in this action for lack of jurisdiction?

Plaintiffs answer:  No

3. Whether the multiplicity of contradictory forum selection and arbitration clauses indicate a lack of a meeting of the minds between the parties on that issue and fraud on the part of Defendants?

Plaintiffs answer:  Yes

4.  Whether the multiplicity of contradictory forum selection and arbitration clauses demonstrate distinct roles for the various entities within their fraudulent enterprise?

Plaintiffs answer:  Yes

4. Whether the claims asserted by Plaintiffs should be dismissed because Defendants claim that Plaintiffs have failed to plead their fraud claims with particularity?

Plaintiffs answer: No

## <u>INDEX OF AUTHORITIES</u>

### <u>CASES</u>

*46th Circuit Trial Court v. County of Crawford,*
    476 Mich. 131, 719 N.W.2d 553, 568 (2006)............... 20

*AT&T Mobility LLC v. Concepción*, 131 S.Ct. 1740, 1745 (2011)  16

*Bradford v. Moench*, (D. Utah 1987), 670 F. Supp. 920
    (D. Utah 1987) .........................................12

*Bucklew v. Hawkins, Ash, Baptie & Co.,*
    329 F.3d 923, 934 (7th Cir.2003) .........................7

*Doctor's Associates, Inc. v.*
    *Casarotto,* 517 U. S. 681, 687 (1996) ....................16

*Fassihi v Sommers, Schwartz, Silver, Schwartz*
    *& Tyler, PC,* 107 Mich App 509, 515; 309 NW2d 645 (1981)..12

*Hume v. United States*, 132 U. S. 406, 411, 414 (1889) .......16

*In re Rosa Louise Parks Trust*, 2014, Unpublished Michigan
    Court of Appeals opinion, Case No. 310948................12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*
    *Kean-Argovitz Resorts*, 383 F.3d 512 @520 (6th Cir. 2004).15

*Morgan Stanley Capital Group Inc. v. Public Util. Dist.*
    *No. 1 of Snohomish Cty.*, 554 U. S. 527, 547 (2008) ......16

*M/S Bremen v. Zapata  Off-Shore Co.*, 407 U.S. 1, 15 (1972) ...19

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,*
    388 U.S. 395 (1967) .....................................14

*Romero v. Buhimschi*, 396 Fed.Appx. 224 (6th Cir. 2010) .......20

*Securitron Magnalock Corp. v. Schnabolk,*
    65 F.3d 256, 263-64 (2d Cir.1995) .......................7

*Smith v Saginaw Savings Loan Ass'n,*
    94 Mich. App. 263, 274; 288 N.W.2d 613 (1979)...........12

*Shapero v. Kentucky Bar Ass'n,* 486 US 466 (1988) ............23

*Tradecomet.com LLC v. Google, Inc.* (S.D.N.Y. 3-5-2010),
    693 F. Supp.2d 370 (S.D.N.Y. 2010) ......................18

*Van Tassell v. Lewis*, 118 Utah 356;
    222 P.2d 350 @ 355 (Utah 1950) .........................20

*West Hills Farms, LLC v. Classicstar Farms, Inc.*
    727 F.3d 473 (6th Cir. 2013) ......................7, 8, 9

*Yerkovich v. AAA*, 461 Mich. 732, 610 N.W.2d 542, 546 (2000)...20

**STATUTES**

MCL §600.745..................................................18

28
U.S.C.§1331...................................................25

28
U.S.C.§1391...................................................25

18 U.S.C. §1961, et.seq.......................................25

18
US.C.§1965....................................................25

**RULES**

Mich. R. Prof. Cond 7.3(a)....................................22

v

## **INTRODUCTION**

Both sets of Defendants in their Motions to Dismiss pretend as if the Plaintiffs have not alleged voluminous and detailed RICO claims in their Complaint. Defendants have employed this tactic because they have no defenses to those RICO claims with either statutory law, case law, facts or admissible evidence.  They have ignored all of the detailed factual allegations set forth in the complaint regarding the massive series of frauds undertaken by the Defendants which provide a sound basis for the rescission of each of the parties' agreements.  They have even gone so far as to defame Plaintiffs' counsel with false accusations of ethical misconduct.

Further, Defendants make no claim that the Plaintiffs knew or understood the content of the documents they were signing or that they understood those documents to contain various, contradictory (and numerous) forum selection and arbitrations clauses regarding the very same subject matter and transactions. Defendants make no allegation that these various, contradictory (and numerous) forum selection and arbitrations clauses reflect a meeting of the minds between the parties such no such meeting of the minds regarding contradictory forum selection regarding the same subject matter and transactions is even conceivable.  The entire basis for the Defendants' motion is this: It does not matter if the Plaintiffs understood or knew what they were signing or if they were misled by Defendants. They signed.  Tough luck.  End of story.  Case dismissed.  And let's not talk about those RICO claims.

1

<u>**COUNTERSTATEMENT OF FACTS**</u>

**a. Defendants failed to mention in their motions numerous important, essential and undeniable facts.**

In their Motions, Defendants failed to mention that Plaintiffs alleged in their Complaint that Defendant "Yancey Events, LLC" was a member of a RICO Enterprise (Paragraph _____) which included all of the so-called "property defendants".

Further, in the Complaint there is a Defendant mis-identified as "Investor's Financial Education, LLC". There is no such entity and Defendants know that this was due to an unintentional typographical error. The correct name of this entity is either "Insider's Financial Education, LLC" and/or "Insider's Financial Education". One of their emails was attached to the Complaint as Exhibit A. It is also attached hereto Exhibit A. Defendants' counsel was informed of this error in the complaint and of the correct name of this entity on March 18, 2016, seventeen days prior to the filing of Defendants' instant Motions. Plaintiffs Wilson, Saenz, Houtz and Dunn each paid tens of thousands of dollars to this entity for "training" and to attend a Buying Summit. Defendant's counsel was informed by Plaintiff's counsel way back on May 7, 2015 that neither he nor Plaintiff Wilson could determine the corporate or other business identity of "Insider's Financial Education, LLC" and demanded that Defendants' counsel so identify this entity. Defendants' counsel have continued to ignore this request. On April 15, 2016, Plaintiffs' counsel again informed

2

Defendants' counsel that Plaintiffs could not identify this business entity. The Complaint explains in great detail how the agents of this entity misled them into attending a Buying Summit at great expense. In addition, Defendants failed to mention that the contracts for "Insider's Financial Education, LLC" and/or "Insider's Financial Education" ("Insider's Financial") are virtually identical to the contracts for Yancey Events, LLC and/or Yancey, LLC and that all of those entities performed a similar or identical function within the fraudulent enterprise. The telephone number listed on the back of the Insider's Financial contract appears to be the same live line where one can still schedule "workshops" with the Yanceys (See exhibits B and C).

As will be further developed below, the documents which Defendants induced the Plaintiffs to sign contain various, contradictory (and numerous) forum selection and arbitrations clauses which, by their very existence, demonstrate a complete lack of a "meeting of the minds" on this issue.

Finally, Defendants failed to mention Plaintiffs' allegations that the essence of their entire fraudulent scheme was to induce a sense of trust and dependence in their victims, then endlessly lie to them that by attending the Buying Summit they would be provided expert guidance in purchasing recently rehabbed rental housing at discount prices with a vetted and paying tenant. With malice aforethought, these Defendants then tricked the naïve and unsuspecting victims, including these Plaintiffs, to execute the documents they did. Indeed, Defendants' counsel, William

Knowlton filed baseless ethics grievances against Plaintiffs' counsel based upon his allegation that Buying Summit purchasers are so naïve and helpless that they would be invariably "confused (at minimum" by the use of the Michigan term "state equalized value".

> **b.  The Defendants failed to mention that the various agreements provide for a multiplicity of forums to resolve what in essence are singular transactions.**

As Defendant Yancey Events, LLC has pointed out, their "Buying Summit" contracts provide for binding arbitration:  However, it is unclear which entity performed which role at the Buying Summit.  Victims attending the Buying Summit met with sales people who showed them properties for sale on computer screens displaying overly inflated "Suggest Retail Prices" [see for example, Exhibit D].  Are those people and their transactions covered by the Yancey arbitration clause?  For each of the instant Plaintiffs, numerous documents associated with a purchase of property identify the seller as "Ready Prop" and for whom there is no forum selection or arbitration clause (see for example Exhibit E).  Once a sale is completed, the seller is generally identified as one of scores of limited liability companies, which includes most of the "property defendants".  Those agreements are found within Exhibit A to the "Property Defendants" brief.

Each victim who attended the local "training" seminars put on by the Yanceys or Insiders Financial were all promised that by attending the Buying Summit, they would be provided expert guidance in purchasing rental properties at steep discounts

which were fully rehabbed in good condition and which had a vetted and paying

tenant (see Affidavits of Robert Wong [Exhibit F] and Mike Hampshire [Exhibit G]).

These contracts contained the following language:

> GOVERNING LAW AND JURISDICTION: This contract shall be
> governed by the laws of the State of Utah. Jurisdiction shall lie exclusively
> with the courts within the State of Utah.

These sales people also induced their victims to borrow the unpaid sales price

balance from either American Cash Funding or Insider's Cash, LLC pursuant to a

12% interest-only loan which the victims were promised could be easily refinanced

upon returning home from the Buying Summit.  This proved impossible because the

actual value of the properties was always far below the balance on these loans.

Unmentioned by the Defendants is that these loan agreements provide two

additional (and alternative) methods of dispute resolution:  One method appears to

provide for mandatory binding arbitration for disputes "concerning this Agreement

or any of the terms of this Agreement, or that concern any aspect of the relationship

between the Borrower and Lender" [for example, see Exhibit H][1]  Other loan

---

[1] See page 6: *This agreement will be governed by, construed and enforced in accordance with the laws of the State of Utah.  This Agreement has been accepted by Lender in the State of Utah.  By execution of this Agreement Borrower hereby consents and agrees that any and all disputes that may arise concerning this Agreement or any of the terms of this Agreement, or that concern any aspect of the relationship between the Borrower and Lender, shall be decided exclusively in binding arbitration conducted by the American Arbitration Association (hereinafter the "AAA").  Borrower and Lender further consent and agree Borrower may file its complaint with the AAA in its state of residence, but that all AAA arbitration hearings shall be conducted in Utah County, Utah where is headquartered and located, before a single AAA arbitrator.  The arbitrator shall be appointed in accordance with the Section R-13, Appointment of Panel, of AAA's Commercial Arbitration*

agreements drafted by the Defendants provide for court litigation of disputes regarding "any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement".[2] [See Exhibit I]  Plaintiffs submit that the instant action is not an "action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement" and that this provision therefore does not apply to the instant action.

Further, Plaintiffs Hampshire and Saenz were tricked into signing personal guarantees for the loans taken out by their LLCs.  Note that these personal guarantees do not have a forum selection or arbitration clause so there is no reason why those issues cannot be heard in this Court (see Exhibit J).

---

*rules. Borrower and Lender consent and agree that the AAA arbitrator shall exclusively apply Utah State law to the dispute, regardless of and without giving any consideration to choice of law principles.  Borrower and Lender further consent and agree that the AAA arbitrator shall award costs and attorney's fees to the prevailing party.*

[2]*As stated on page 6:  This Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Utah without regard to its conflict of laws rules.  This Agreement has been accepted and funded by Lender in the State of Utah.  As for venue, ANY ACTION OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS AGREEMENT shall be brought against any of the parties in the courts of the State of Utah, or alternatively, IN THE COURT OF THE STATE AND COUNTY WHERE THE REAL PROPERTY SECURING THE LOAN IS LOCATED, at the sole discretion of the Lender. And Borrower hereby waives any objection to the venue laid therein and agrees no to plead or claim in any such courts that such proceeding brought therein has been brought in any inconvenient forum* [emphasis added].

Finally, the releases signed by the various parties also have a multiplicity of forum selection clauses while most have no such clause at all.

## ARGUMENT

## I.  THE SO-CALLED "PROPERTY DEFENDANTS" ALONG WITH INSIDER'S FINANCIAL AND YANCEY HAVE JOINED TOGETHER TO FORM A RICO "ENTERPRISE".  BECAUSE EACH OF THE DEFENDANTS IS DISTINCT FROM THE RICO ENTERPRISE, EACH OF THEM IS INDIVIDUALLY LIABLE TO EACH OF THE PLAINTIFFS UNDER RICO

### A.  The various distinct Defendant entities have formed a RICO Enterprise

In the case of *West Hills Farms, LLC v. Classicstar Farms, Inc. (In re Classicstar Mare Lease Litig.),* 727 F.3d 473 (6th Cir. 2013), the 6th Circuit upheld the trial court's grant of a RICO judgment on a Summary Judgment motion.  The Court analyzed the so-called "distinctness" requirement when dealing with corporate affiliates who carry out a fraudulent scheme:

> Typically, a parent corporation and its subsidiaries do not satisfy the distinctness requirement because they cannot form an enterprise distinct from the parent. See, e.g., *Riverwoods*, 30 F.3d at 344. However, the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme. See *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934  (7th Cir.2003) (finding that a corporate defendant is distinct from an enterprise consisting of itself and its subsidiaries when "the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitate[s] its unlawful activity"); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263–64 (2d Cir.1995) (finding that related corporations with distinct markets and roles in the scheme were distinct from the RICO enterprise comprised of each of them together). It would be strange indeed to absolve a parent corporation of liability for doing precisely what RICO was designed to prevent: the use of an association of legally distinct entities

7

"as a vehicle through which unlawful ... activity is committed." *Cedric Kushner*, 533 U.S. at 164, 121 S.Ct. 2087 (internal quotation marks omitted).

GeoStar and each of its subsidiaries performed distinct roles that helped facilitate the fraudulent scheme. GeoStar's role was that of an external, financially stable guarantor that stood behind the various conversion opportunities, including FEEP, that were presented to investors to help conceal the overselling of mare lease interests and to encourage the flow of cash through the Mare Lease Program to other investments. According to uncontroverted expert testimony provided by Plaintiffs, ClassicStar's role was to "provide a funding source for GeoStar that was attractive to investors."… Because the enterprise successfully carried out its fraudulent scheme by enlisting the participation of GeoStar and its separately incorporated subsidiaries, with each playing a key role, we conclude that the enterprise was sufficiently distinct from GeoStar itself.   [at page_____]

In the instant case, Defendants have produced no evidence of the ownership and/or structure of the various Defendant entities or their relationships. Discovery is necessary to resolve such issues definitely.  However, Defendants insinuate that the Yancey entity is not an affiliated company of the "property defendants".  This alone should satisfy the "distinctness" requirement for a RICO enterprise. The instant RICO enterprise successfully carried out its fraudulent scheme by enlisting the distinct and separate Yancey Events, LLC entity[3], with each component entity playing a key and distinct role.  Therefore, it is clear that the "property defendants" aspect of the enterprise is sufficiently distinct from Yancey and Insider's Financial. As the 6th Circuit said in *West Hill Farms*, supra, at 493-494:

_____

[3]  Note also that this same analysis must be applied to the mysterious and still unidentified Insider's Financial Education, LLC in terms of its relationship to the other participants in the enterprise.

8

NELC's ostensible status as an independent third-party lender was used to convince investors that Classic-Star's financing scheme was legitimate. As with ClassicStar and Gastar, NELC's separate corporate existence and purported independence were key aspects of the fraudulent scheme. On this basis alone, the district court properly concluded that the enterprise and GeoStar were distinct.

Because the district court correctly found that each of the Defendants was distinct from the alleged RICO enterprise, it properly held each of them liable under RICO, either as individually culpable RICO "persons," or by holding the corporations vicariously liable for the RICO violations of their employees. See *Davis*, 6 F.3d at 379–80 (applying standard vicarious liability principles in the RICO context, provided that the corporate defendants are distinct from the RICO enterprise). Defendants have introduced no evidence that would create a genuine dispute about any material facts, and the district court properly concluded that Plaintiffs were entitled to judgment as a matter of law.

Certainly, both Yancey and Insider's Financial along with each of the "property

Defendants" made decisions on behalf of the enterprise or knowingly carried them

out. As the 6th Circuit said in *West Hill Farms*:

> Footnote 6 In its reply brief, Defendants assert that NELC and other unaffiliated entities were not part of the "operation or management" of the enterprise's affairs. However, Defendants misread (or cherry-picked quotes from) our case law to arrive at that conclusion. Following the Supreme Court's decision in Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), we have held that a defendant "participates" in an enterprise's affairs "either by making decisions on behalf of the enterprise or by knowingly carrying them out." United States v. Fowler, 535 F.3d 408, 418 (6th Cir.2008). Given the evidence, no reasonable factfinder could conclude that NELC did not knowingly carry out the enterprise's fraudulent scheme. [emphasis added]

There is no question that both the distinct Yancey entities and Insider's Financial

Education carried out their distinct roles in the fraudulent scheme.

9

**b.  The various, contradictory (and numerous) forum selection and arbitrations clauses for each entity themselves provide an additional level of distinctness necessary to find that these Defendants have together formed a RICO enterprise.**

When one pays $39.977.00 to attend The Buying Summit and signs an agreement with either Yancey or Insider's Financial, one has been promised that Buying Summit attendees will have access to rehabbed rental properties for sale at steep discounts with vetted paying tenants.  However, the parties with the ultimate duty to perform these promises are one or more of the "property defendant" entities.  "Ready Prop" is first identified as the property seller (see exhibit E).  The Offer and Contract for Sale states that the seller is one of the various other "Property Defendants" and contains the "Jurisdiction shall lie exclusively with the courts within the State of Utah" language.[4]

All of the Defendants involved at this point in the fraudulent scheme are aware that all of the properties sold at the Buying Summit have been recently purchased at distress sale prices for the account of the Defendants and that all of those properties were being sold to victims at the Buying Summit for prices

---

[4] This language, drafted by the Defendants, does not mean what Defendants claim it means.  It says that THE CONTRACT shall be governed by the laws of the state of Utah.  Further, the language does not provide for venue within the State of Utah or jurisdiction in the state courts of Utah.  It merely states that jurisdiction (over what?) shall lie exclusively with "the courts within the state of Utah".  There are Federal courts located within the geographical confines of the State of Utah where venue is determined by Federal law and the Federal Rules of Civil Procedure.  Plaintiffs submit that the language is unambiguous and does not require filing suit within the geographical confines of the State of Utah.

10

substantially above fair market value.  They also know that most of the properties

come with substantial defects and with no tenant or an unreliable tenant at best.

They know that most of the victims of their scheme will have exhausted their life

savings by the time they discover the fraud.  This is also when the victims will learn

they must bring an arbitration action against Yancey and/or Insider's Financial but

must sue their actual seller in the courts of State of Utah regarding the very same

purchase transaction.  The victims will have made a significant down payment on the

purchase of each property and will then be induced to take out a loan from an in

house lender, either American Cash Funding or Insider's Cash for two years interest-

only at 12% interest.  They are induced to do this because they unaware that the

amount of their loan is in excess of the value of their property which has been

undisclosed by Defendants and after having been repeatedly told at the Buying

Summit that it will not be difficult to refinance at a lower rate upon returning home.

Those loan agreements provide additional alternative forum selection and arbitration

clauses (see Exhibits H and I).  Finally, none of the Personal Guarantees contain a

forum selection clause and neither do most of the various alleged releases.

  These purposefully confusing, contradictory (and numerous) forum selection

and arbitration clauses[5]. are an essential part of the Defendants' fraudulent scheme to

---

[5]Plaintiffs also submit that they demonstrate a TOTAL lack of a meeting of the minds on the issue of forum selection and arbitration on the part of ALL of the Plaintiffs with the Defendants sufficient to create a contractual obligation.

preclude their victims from seeking justice  However, for purposes of demonstrating

the requisite distinctness of the various entities as participants in the RICO

enterprise, these various clauses demonstrate the distinct roles that each of these

Defendants have played in their participation in the RICO enterprise.

## II.  PLAINTIFFS HAVE PLEADED FACTS DEMONSTRATING THE EXISTENCE OF A FIDUCIARY RELATIONSHIP WITH THE DEFENDANTS WHICH PRECLUDE ENFORCEMENT OF THE PARTIES' AGREEMENTS

In the case of *Fassihi v Sommers, Schwartz, Silver, Schwartz & Tyler, PC,* 107 Mich

App 509, 515; 309 NW2d 645 (1981), the Michigan Court of Appeals held:

> A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial. *Smith v Saginaw Savings Loan Ass'n,* 94 Mich. App. 263, 274; 288 N.W.2d 613 (1979). **Furthermore, whether there exists a confidential relationship apart from a well defined fiduciary category is a question of fact**. See *In re Wood Estate*, 374 Mich. 278; 132 N.W.2d 35 (1965). Based upon the pleadings, we cannot say that plaintiff's claim is clearly unenforceable as a matter of law.  [emphasis added]

*Fassihi* is still good law.  See *In re Rosa Louise Parks Trust*, 2014, Unpublished Michigan

Court of Appeals opinion, Case No. 310948. In *Bradford v. Moench*, (D. Utah 1987),

670 F. Supp. 920 (D. Utah 1987), the District Court held:

> Further, the claims of the plaintiffs are not allegations of complete silence, but half truths and concealments. This type of misrepresentation is a traditional basis for recovery *926 for fraud.  The plaintiffs' RICO and securities actions are joined for the purposes of the legal theory of these actions. The defendants' omissions argument must be rejected as to the RICO and securities claims.  As to plaintiffs' common law fraud claims, the observations made with reference to concealments and partial disclosure will support the claims in this case as against a motion to dismiss.****However,

12

to the extent that as fiduciary duty may be required under Utah law, *Hal Taylor Associates v. Union America Inc.,* 657 P.2d 743, 749 (Utah 1982); *Von Hake v. Thomas,* 705 P.2d 766 (Utah 1985), the facts as alleged in the plaintiffs' complaint show the alleged making of representations to secure investments. The facts if shown could well support an inference of "trust and reliance" by plaintiffs on defendants special knowledge of the thrift industry and its financial markets and activities. See *Hal Taylor Associates v. Union America, Inc,* supra p. 749.

The Utah Supreme Court held similarly in *First Security Bank v. Banberry Development*, 786 P.2d 1326 (Utah 1990).

In *Barrett v. Breault*, 275 Mich. 482, 267 N.W. 544 (Mich. 1936), the Michigan Supreme Court found that where the Plaintiff had relied implicitly on the representations made to her by defendants that she placed them in a position of especial trust and confidence.  It therefore became and was the duty of defendants to exercise the highest degree of fairness and integrity in their dealings with plaintiff, and required of them that they make full disclosure to her of their secret knowledge, intents and purposes regarding the whole affair.  The facts of the Barrett case are much like those of the instant case where the defendants wilfully and deceitfully withheld important information about the property they were selling:

> The defendants Breault, at the time they represented to plaintiff that the property could be bought from the owner at a price of $650 an acre, already had entered into a contract to purchase the same for $500 an acre, *489 yet they wilfully and deceitfully withheld this knowledge from the plaintiff. They were, because of their fiduciary relationship with the plaintiff, under an affirmative obligation to make full disclosure of this fact to her, and their failure to do so, under the circumstances, was a fraud upon her.****Because of the aforementioned fraudulent concealments and misrepresentations,

13

defendants Breault secured from plaintiff $15,064. Plaintiff therefore had a cause of action for that amount against them.

Similarly, outside of the RICO claims, Plaintiff have demonstrated they have a cause

of action against Defendants for fraud.

## III.  DEFENDANTS' INCLUSION IN THEIR MULTIPLE AGREEMENTS OF A MULTIPLICITY OF CONTRADICTORY FORUM SELECTION AND ARBITRATIONS CLAUSES REGARDING WHAT AMOUTS TO A SINGLE TRANSACTION DEMONSTRATES A TOTAL LACK OF A MEETING OF THE MINDS ON THE ISSUE OF FORUM SELECTION AND ARBITRATION ON THE PART OF ALL OF THE PLAINTIFFS.

### a.  Pursuant to §4 of the FAA, the facts of the instant case demonstrate that the court cannot be satisfied that the MAKING of the agreement for arbitration is not in issue

Defendant Yancey poses the issue as follows:

To succeed on a fraud in the inducement claim requiring a court to set aside an arbitration provision, the "party alleging fraud in the inducement must prove by <u>clear and convincing evidence</u> that she entered into the arbitration agreement, not the overall agreement, <u>based on another party's intentional, false and material misrepresentation</u>

Yancey relies primarily upon the U.S. Supreme Court case of *Prima Paint Corp. v.*

*Flood & Conklin Manufacturing Co.*, 388 U.S. 395 (1967) where the Court held that an

arbitration provision in an agreement is not void based on a party's claim that it was

fraudulently induced to enter into the overall agreement IF THE ARBITRATION

CLAUSE WAS SEPARATELY NEGOTIATED AND AGREED TO WITHOUT

FRAUD ON EITHER SIDE.   That is what occurred where the parties were

corporations represented by attorneys in the negotiation of their agreement.

14

The facts of the instant case are different.  There was no negotiation of either the Yancey/Insider's Financial arbitration clause, the "Utah Courts" clause of the sales agreements or the "Utah Courts or Utah Arbitration" clauses of the various loan agreements.  These various and distinct clauses were intended to require a multiplicity of alternative forums for resolution of what is essentially a single transaction.  These distinct clauses cannot possibly reflect a meeting of the minds on the part of the Plaintiffs.  Without a meeting of the minds, there is no contract.  As Judge Cleland stated in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Kean-Argovitz Resorts*, 383 F.3d 512 @520 (6th Cir. 2004):

> The Federal Arbitration Act's policy favoring arbitration cannot compel an agreement to arbitrate where no contract exists.

Alternatively, with contradictory provisions applying to what in essence is a single transaction or occurrence, the clauses become, at best, ambiguous, and at worst, incomprehensible.  When contract language is ambiguous, we attempt to determine the intent of the parties.  The intent of the Defendants here was to flummox the Plaintiffs and severely impair their ability to seek justice as the result of Defendants' fraudulent scheme.  The Plaintiffs had no intent whatsoever regarding these provisions which they did not understand, did not know existed and to which no rational person would agree.

Justice Thomas explained the broader statutory scheme of the Federal Arbitration Act in the context of examining the MAKING or an arbitration

15

agreement in his concurring opinion to *AT&T Mobility LLC v. Concepción*, 131 S.Ct.

1740, 1745 (2011):

> Examining the broader statutory scheme, §4 can be read to clarify the scope of §2's exception to the enforcement of arbitration agreements. When a party seeks to enforce an arbitration agreement in federal court, §4 requires that "upon being satisfied that the MAKING of the agreement for arbitration or the failure to comply therewith is not in issue," the court must order arbitration "in accordance with the terms of the agreement."

> Reading §§2 and 4 harmoniously, the "grounds…for the revocation" preserved in § 2 would mean grounds related to the MAKING of the agreement. This would require enforcement of an agreement to arbitrate unless a party successfully asserts a defense concerning the **FORMATION OF THE AGREEMENT TO ARBITRATE, SUCH AS FRAUD, DURESS,** or mutual mistake. See *Prima Paint Corp. v. Flood Conklin Mfg. Co.,* 388 U. S. 395, 403-404 (1967) (interpreting § 4 to permit federal courts to adjudicate claims of "fraud in the inducement of the arbitration clause itself" because such claims "g[o] to the `making' of the agreement to arbitrate"). Contract defenses unrelated to the making of the agreement — such as public policy — could not be the basis for declining to enforce an arbitration clause. [emphasis added]

In a footnote to his concurring opinion, Justice Thomas wrote:

> Moreover, every specific contract defense that the Court has acknowledged is applicable under §2 relates to contract formation. In *Doctor's Associates, Inc. v. Casarotto,* 517 U. S. 681, 687 (1996), this Court said that fraud, duress, and unconscionability "may be applied to invalidate arbitration agreements without contravening §2." All three defenses historically concern the making of an agreement. See *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.,* 554 U. S. 527, 547 (2008) (describing fraud and duress as "traditional grounds for the abrogation of [a] contract" that speak to "unfair dealing at the contract formation stage"); *Hume v. United States,* 132 U. S. 406, 411, 414 (1889) (describing an unconscionable contract as one "such as no man in his senses and not under delusion would make" and suggesting that there may be "contracts so extortionate and unconscionable on their face as to raise the presumption of fraud in their inception" (internal quotation marks omitted)).

16

Even a cursory examination of the "making" of these various agreements will not

withstand scrutiny.  Every one of the Plaintiffs' agreements is an unconscionable

contract as one "such as no man in his senses and not under delusion would make"

and should be considered "contracts so extortionate and unconscionable on their

face as to raise the presumption of fraud in their inception".

      For this Court to order arbitration, §4 requires that the court must be satisfied

that the MAKING of the agreement for arbitration is not in issue.  Plaintiff submits

that such a determination is impossible.

## b.  Both Yancey and Insider's Financial are members of a RICO enterprise, and therefore they are each individually liable to all of the Plaintiffs as individually culpable RICO "persons."

      Let us assume *arguendo* that all of these various arbitration and forum selection

clauses are enforceable[6]. This would have little or no impact upon the Plaintiffs'

RICO claims. Suppose the Court were to dismiss the Wongs' claims against Yancey

due to the arbitration clause.  The Wong's RICO claims against all of the other

Defendants would still be viable in this Court, including their claims against Insider's

Financial because all of the other Defendants are members of the RICO enterprise

and are individually liable.  Likewise, if the other Plaintiffs' claims against Insider's

Financial were dismissed due to the arbitration clause, their RICO claims against all

---

[6] This presumes that perpetrators of an actual RICO scheme (such as these
Defendants) can trick their victims into agreeing to arbitration of the very existence
of the RICO scheme itself under the "you signed it, too bad" doctrine, something
these Defendants have failed to allege, much less demonstrate.

of the other Defendants would still be viable in this Court, including their claims

against Defendant Yancey.

**c. Alternatively, pursuant to MCL §600.745, Plaintiff may bring their claims in courts within the State of Michigan**

As Plaintiffs alleged in Paragraph 76 of their Complaint:

D. Pursuant to MCL §600.745(3):

(b) The plaintiffs cannot secure effective relief in the other state for reasons other than delay in bringing the action.

(c) The other state would be a substantially less convenient place for the trial of the action than this state because, *inter alia*, each Plaintiff either resides in the Eastern District of Michigan or has purchased at a Buying Summit property located in the Eastern District of Michigan or has personally guaranteed a loan to Defendants regarding property located in the Eastern District of Michigan and no Plaintiff or their property has any relationship whatsoever to the State of Utah;

(d) The agreement as to the place of the action was obtained by misrepresentation, duress, the abuse of economic power, or other unconscionable means including the breach of Defendants' fiduciary duties to the Plaintiffs

**d.  The Defendants, the parties seeking enforcement of the various forum selection clauses, must demonstrate that the clauses were reasonably communicated to the parties resisting enforcement which they cannot do**

In the case of *Tradecomet.com LLC v. Google, Inc.* (S.D.N.Y. 3-5-2010), 693 F.

Supp.2d 370 (S.D.N.Y. 2010), the Court ruled:

"The scope of the forum selection clause is a contractual question that requires the courts to interpret the clause and, where ambiguous, to consider

the intent of the parties[7]." *New Moon Shipping*, 121 F.3d at 33. "Plaintiff's choice of forum in bringing his suit in federal court in New York will not be disregarded unless the contract evinces agreement by the parties that his claims cannot be heard there." *Phillips*, 494 F.3d at 387. Thus, the court must "examine the substance of [a plaintiff's] claims as they relate to the precise language" of the specific clause at issue. Id. at 389.  To obtain dismissal based on a forum selection clause, the party seeking enforcement of the clause must demonstrate that: **(1) the clause was reasonably communicated  to the party resisting enforcement,** (2) the clause was mandatory and not merely permissive, and  (3) the *8 claims and parties involved in the suit are subject to the forum selection clause. Id. at 383-84. After the party seeking enforcement has established  these three conditions, the burden shifts to the party resisting enforcement to rebut the presumption of enforceability by "making a sufficiently strong showing  that `enforcement would be unreasonable or unjust,  or that the clause was invalid for such reasons as fraud  or overreaching.'" Id. (quoting *M/S Bremen v. Zapata  Off-Shore Co.*, 407 U.S. 1, 15 (1972)). [emphasis added]

There is no evidence that the multiple contradictory arbitration and forum selection

clauses were communicated to the Plaintiffs or that there was a meeting of the minds

sufficient to establish a contractual agreement regarding them.

**IV. ALL OF THE ALLEGED "RELEASES" UPON WHICH THE "PROPERTY DEFENDANTS" RELY WERE THE SUBJECT OF REIMBURSEMENTS RESULTING FROM DEFENDANTS' BREACH OF THEIR PRE-EXISTING DUTIES TO PROVIDE PLAINTIFFS WITH REHABBED PROPERTIES WITH PAYING TENANTS.  INDEED, MOST OF THE "RELEASES" ACTUALLY RECITE THOSE PRE-EXISTING DUTIES.  FURTHER, THE ONLY DEFENDANT <u>MENTIONED IN ANY OF THEM IS "PROPERTY DIRECT".</u>**

All of the Plaintiffs allege that they were induced to purchase property from

the Defendants based upon repeated promises that the properties had been

---

[7]  Again, the intent of the Defendants was to flummox the Plaintiffs. The Plaintiffs, unaware of the inclusion of these clauses or their meaning, had no intent regarding them whatsoever.  There was no meeting of the minds on this issue.

rehabbed, had vetted and paying tenants and were being sold at steep discounts.

Under both Michigan and Utah law, performance of a pre-existing duty will not

support a new contract[8].  Defendants, knowing that most of the houses they sold

were defective and had an unreliable or no tenant, used this to trick their victims,

including Plaintiffs, into signing purported releases in exchange for reimbursement

for what amounted to Defendants pre-existing duties. Further, all of these purported

releases are between "the customer or client" and a single identified Defendant,

"Property Direct"[9]

---

[8] In the case of *Romero v. Buhimschi*, 396 Fed.Appx. 224 (6th Cir. 2010) 233-234, the Court ruled:

> Under Michigan law, consideration is an essential element of any contract. *Yerkovich v. AAA*, 461 Mich. 732, 610 N.W.2d 542, 546 (2000). The preexisting duty rule states that a contract fails for lack of consideration where the party promises something that he is already legally bound to do. *46th Circuit Trial Court v. County of Crawford,* 476 Mich. 131, 719 N.W.2d 553, 568 (2006). This rule applies whether the preexisting duty is based on statute or contract and whether the promise at issue is a modification to an existing agreement or whether it is a new agreement. *Kassab v. Dennis*, No. 283394, 2009 WL 763433 at *1 (Mich.Ct. App. Mar.24, 2009). Michigan courts have applied this rule to nullify contracts in a variety of contexts. See, e.g., *46th Circuit Trial Court*, 719 N.W.2d at 568

In the case of  *Van Tassell v. Lewis*, 118 Utah 356; 222 P.2d 350 @ 355 (Utah 1950), the Utah Supreme Court held:

> Under no conceivable theory can the doing of an act which a party is already obligated to do, constitute the consideration for a new promise on the part of the other party.

[9]  These documents state:  This agreement (the "Agreement') is entered into by and between the Client, who is identified above, and Property Direct, its subsidiaries, affiliates, successors, assigns and related entities (collectively, the Company"). The Company and Client are individually referred to as "Party" and collectively as "Parties."

The "Property Defendants" attached 34 purported "releases" to their motion. The first, for Plaintiff Houtz, states that it is for "three months of rent" and permits (but does not require) lawsuits in Utah.  The second for Plaintiff Robert Wong states that it is for "Rent guaranty to cover three months of missing rents" and has no forum selection provision.  The third through the twenty-seventh document are between Property Direct and Michael Hampshire individually (but NOT Plaintiff Lions Fan, LLC).  On their face, they all concern reimbursements for serious property defects.  Items 2 and 5-27 are entitled "**RELEASE OF FUNDS TO CLIENT**" and contain language which clearly references the Defendants' pre-existing duties to provide rehabbed properties and paying tenants[10]:

At worst, it remains a question of fact whether these alleged "releases" are enforceable and against whom.  Further, Defendants have provided no authority to support the allegation that an actual RICO enterprise is able escape RICO liability by tricking their victims into signing releases regarding the RICO claims while the victims were unaware of the ongoing racketeering scheme.

## V.  DEFENDANTS' BASELESS ALLEGATIONS OF UNETHICAL BEHAVIOR ON THE PART OF PLAINTIFFS' COUNSEL ARE FALSE AND WERE KNOWN TO BE FALSE WHEN MADE

---

[10] "We recognize, however, there is a potential that additional unforeseen issues may arise from time to time related to the property you purchased.  **In the event something does come up that should have been caught during the transfer process or while we navigated the issues addressed below, please rest assured we will do what is possible to address those issues with you in a timely manner and work resolve them if they do arise.**"

In their brief in support of their instant motion, the "Property Defendants"

regrettably alleged:

> In April 2015, legal counsel for BuyPD, LLC received five (5) unauthorized[11]
> attorney solicitation letters from Plaintiffs' legal counsel, Robert Roddis, to
> many of Property Defendants' real estate buyers. True and correct copies of
> these solicitations[12] are attached here as Exhibit C. Upon information and
> belief, Roddis directed these solicitations to the specific recipient real estate
> buyers in Utah, Nevada, New Mexico (including detailed and specifically
> tailored legal information about their property addresses and alleged
> valuations) with whom he had no prior business relationship, nor any prior
> familial relationship. Id.; see also, Mich. R. Prof. Cond. 7.3(a). On April 29,
> 2015, legal counsel for BuyPD, LLC sent a cease and desist demand letter to
> Roddis regarding the same. However, apparently some of the unauthorized
> solicitation letters reached customers outside of Michigan, who in turn
> contacted Roddis[13].

The truth is much more interesting: At the same time that Mr. Knowlton sent his

"cease and desist" letter to Mr. Roddis, he also filed official ethics grievances against

Mr. Roddis in the states of New Mexico[14], Nevada and Utah which are virtually

---

[11]There was nothing "unauthorized" or unethical about sending correspondence
seeking information from other victims of Defendants' fraudulent scheme for the
benefit of existing clients who were also victims of Defendants' fraudulent scheme.
[12]These are not "true and correct" copies of the correspondence.  The second pages
of the city printouts for 20824 Elroy, 21749 Schroeder and 8323 Chapp (which
contain the sales history) were conveniently omitted.  See Exhibit M for the full sales
history of those properties.
[13]In fact, Plaintiffs' counsel subsequently sent out actual solicitations pursuant to the
ethics rules of the state of the recipient and as required in many states, provided that
state's bar with an example of the AUTHORIZED and permitted correspondence
pursuant to their ethics rules.  For an example, see Exhibit N.  .
[14] Knowlton's Nevada grievance and Mr. Roddis's response are included in Exhibit
L.  Filing this is necessary to set the record straight on these matters.

identical.  The gist of the grievances is a) By sending his letters to property buyers in other states, Mr. Roddis is practicing law in those states; b) Those letters are unethical solicitations; c) Those solicitations were allegedly unethical PRIMARILY because, in explaining the low values of the properties the purchasers had bought, Mr. Roddis used "the County assessor's valuations", and the "County assessor's valuation of the property is <u>not</u> the same as the fair market value" because "'assessed value' the same as 'equalized value', which is, "one-half (1/2) of your property's true cash value".  Because Mr. Roddis employed terms such as "assessed value", Knowlton claimed that "There is a substantial likelihood that a non-lawyer would be confused (at minimum) by Mr. Roddis's mischaracterization of the fair market values of their property" and the letters therefore violated the requirements for truthfulness of *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988).[15]  The outcomes of the grievances are attached as Exhibit K[16]

---

[15] However, in each of Mr. Roddis's letters, the listed state equalized value was indeed doubled, such as here in the letter to Lynda Angell: "Please note that the Warren, Michigan city assessor's office assessed the 2014 State Equalized Value of the property at $11,990.00 meaning that the True Cash Value was deemed to be only $23,980.00."  Neither Mr. Knowlton nor any of the Property Defendants have ever provided any evidence to dispute the city assessments upon which Plaintiffs rely.

[16] **New Mexico**:  In any case, we agree that his letters appear to be evidence-gathering attempts, rather than solicitation.

**Nevada:**  A grievance file has not been opened at this time.  However, should a file be opened, you will be notified and given a full opportunity to respond.

**Utah:**  After reviewing the correspondence, the OPC does not believe there is evidence that he has engaged in conduct which amounts to a violation of rule 5.5 of the Rules of Professional Conduct regarding the unauthorized practice of law in Utah.

Further, in his response letter to Mr. Knowlton's "Cease and Desist" letter, Mr. Roddis asked Mr. Knowlton: "Which 'Company' do you represent other than BuyPD?  What is their relationship to Buy PD?"  See Exhibit L.  Further, Mr. Roddis asked Mr. Knowlton to identify the state of registration and the resident agent for Insiders Financial Education LLC.  He also asked Mr. Knowlton to provide a detailed description of the affiliations of Insiders Financial Education LLC with BuyPD and its associated companies.  See Exhibit L.  Mr. Knowlton has yet to respond to these inquiries.

Finally, contained within Mr. Knowlton's baseless grievances is an exceptionally important admission by the Defendants: He claims that the graduates of the various Insider's Financial and Yancey workshops who then attended the Buying Summit after having paid in excess of $40,000.00 are so naïve and helpless as to be confused by Mr. Roddis's use of the term "state equalized value" (even where Mr. Roddis identified the true cash value as double the state equalized value) because it means ½ of true cash value.  As a result, claims Mr. Knowlton, "There is a substantial likelihood that a non-lawyer would be confused (at minimum)".  These are the same people who Defendants will insist be bound by the language of the various sales agreements which stated:

> QUALIFIED INVESTOR: Buyer acknowledges that he is a knowledgeable
> and sophisticated investor, capable of evaluating the merits and risks of the
> Property and specifically acknowledges that this is not a "consumer

transaction" within the meaning of, or subject to, state or federal consumer protection laws.

## VI – VENUE IS PROPER IN THIS DISTRICT

Venue is proper in this judicial district pursuant to 18 US.C. §1965 and 28 US.C. §1391 as one or more of the defendants have agents, transact their affairs and conduct and have conducted their fraudulent scheme within this judicial district. Further, this is a judicial district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, and is where the vast majorities of properties at issue are located. Pursuant to 28 US.C. §1331, this Court has original jurisdiction because all of part of the claims arise from the defendants' violations of RICO" 18 US.C. §1961, et. seq.

## VII PLAINTIFFS' FRAUD CLAIMS WERE PLEADED WITH SPECIFITY

Further, Plaintiffs have clearly stated all of their claims.

## CONCLUSION

Defendants' two Motions are actually Rule 56 Motions without affidavits and which have ignored the significant factual issues and allegations set forth in the Complaint. Further, please note Defendants have held several new local "workshops" See Exhibit O.  For the reasons set forth above, Plaintiffs request that these Motions be Denied and civil discovery be allowed as soon as possible.

/s/ Robert W. Roddis (P32145)
424 Madison
Grosse Pointe Farms, MI 48236
(313) 319-5045
Dated: April 25, 2016          bobroddis@gmail.com

## **PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties in the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on April 25, 2016.

By:     ☐ U.S. Mail          ☐ FAX

          ☐ Hand Delivered     ☐ E-mail

          ☐ Overnight          ☒ ECF

I declare that the statements above are true to the best of my information, knowledge, and belief.

By: /s/ Robert W. Roddis _____

26