## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Rebecca K. Wilson, Dennis Houtz,
James Dunn, Robert Wong, Kenneth
Wong, Mike Hampshire, Lions Fan, LLC
Linda Saenz, Abby Creek Investment, LLC,
Pascal Vohradnik, Simone Vohradnik,
13607 Virgil St., LLC, Joanne Beldotti,
Ramona Lorraine Solano-Owen,
Greiner 11831, LLC, Coyle 12071, LLC , Sarsfield 12460,
LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom,
and Invicta Legato Investments, LLC

and various John Does

|  |  | Hon. Robert H. Cleland |
|---|---|---|
| v. | Plaintiffs, | Case No. 2:16-cv-10659 |

5 Choices, LLC, American Cash Funding,
BuyPD, LLC, DLS Properties, LLC,
EZ Street Properties, LLC, FrontSide Properties, LLC,
Green Apple Homes, LLC, Insiders Cash, LLC,
Malibu Breeze Properties, LLC, Max Ultra, LLC,
Patriot Homes, LLC, Property Direct, LLC,
Ready Prop, Red Apple Homes, LLC, Red List Homes, LLC,
Scree 44, LLC, Screaming Eagle Properties, LLC,
Silver Tie Homes, LLC, Investors Financial Education, LLC, Insiders Financial
Education, LLC, Yancey Events LLC, Yancey LLC
John Graham Inc., Income Property USA, LLC,
Interactive Homes, LLC, Improvement Homes, LLC,
and Expansion Properties, LLC and various John Does,

                    Defendants.
_____/

## SECOND AMENDED COMPLAINT AND JURY DEMAND

For their Second Amended Complaint against the Defendants, the Plaintiffs Rebecca K. Wilson, Dennis Houtz, James Dunn, Robert Wong, Kenneth Wong, Mike Hampshire, Lions Fan, LLC, Linda Saenz, Abby Creek Investment, LLC Pascal Vohradnik, Simone Vohradnik, 13607 Virgil St., LLC, Joanne Beldotti, Ramona Lorraine Solano-Owen, Greiner 11831, LLC, Coyle 12071, LLC, Sarsfield 12460, LLC, Eva Thode, Layne Lundstrom, Audrey Lundstrom, and Invicta Legato Investments, LLC, (collectively "Plaintiffs"), through counsel, state as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Rebecca K. Wilson resides in Grosse Pointe Park, Michigan and attended Defendants' introductory and "training" sessions" in southern Oakland County, Michigan.  She also purchased her package to attend the "Buying Summit" for $39,997.00 at such a training session located in southern Oakland County, Michigan.  Further, she received an introductory email from Defendants promising access to purchasing real estate properties for "pennies on the dollar" while residing in Grosse Pointe Park, a fact which was known at the time by Defendants.

2. Plaintiff Dennis Houtz resides in Pennsylvania and purchased from Defendants, *inter alia*, three residential properties which are located in Warren, Michigan.

3. Plaintiff Robert Wong resides in New York, New York and purchased from Defendants, *inter alia*, a residential property located in Detroit, Michigan.

2

4.   Plaintiff Kenneth Wong resides in New York, New York and purchased from Defendants, *inter alia,* a residential property located in Eastpointe, Michigan from Defendants.

5.   Plaintiff Mike Hampshire resides in Texas and purchased from Defendants, *inter alia,* eleven residential properties located in Detroit, Michigan, four properties located in Eastpointe, Michigan, three properties located in Warren, Michigan, one property located in Harper Woods, Michigan and one property located in Taylor, Michigan all of which were conveyed by Defendants at Mr. Hampshire's direction to his wholly owned limited liability company, Plaintiff Lions Fan, LLC. a limited liability company organized and existing under the laws of the State of Texas.

6.   Plaintiff Linda Saenz resides in Texas and purchased from Defendants, *inter alia,* a residential property located in Warren, Michigan which was conveyed by Defendants at her direction to her wholly owned limited liability company, Plaintiff Abby Creek Investment LLC., a limited liability company organized and existing under the laws of the State of Texas.

7.   Plaintiff James Dunn resides in Georgia and purchased from Defendants, *inter alia,* a residential property located in Warren, Michigan and two residential properties located in the State of Ohio.

8.   Pascal Vohradnik and Simone Vohradnik, reside in the State of New York and purchased from Defendants, *inter alia,* a residential property located in Detroit,

3

Michigan which was conveyed by Defendants at their direction to their wholly owned limited liability company, Plaintiff 13607 Virgil St., LLC, a limited liability company organized and existing under the laws of the State of Utah.   Pascal Vohradnik was induced by Defendants to purchase from them two residential properties located in East St. Louis, Illinois which were conveyed to his Self-Directed IRA.

9.   Plaintiff Joanne Beldotti resides in Connecticut and purchased from Defendants, *inter alia*, two residential properties which are located in Warren, Michigan and St. Louis, Missouri.

10.   Plaintiff Ramona Lorraine Solano-Owen ("Owen"), resides in Hawaii, and purchased from Defendants, *inter alia,* two residential property located in Detroit, Michigan and one property located in Warren, Michigan and which were conveyed by Defendants at her direction to her three wholly owned limited liability companies, Plaintiffs Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460 which are limited liability companies organized and existing under the laws of the State of Utah.

11.   Plaintiff Eva Thode resides in Myrtle Beach, South Carolina and purchased, *inter alia,* numerous residential properties from Defendants within this judicial district which were conveyed to her Self-Directed IRA.

12. Plaintiffs Layne Lundstrom and Audrey Lundstrom reside in Cedar Park, Texas.

13. Plaintiff Invicta Legato Investments, LLC is a Utah limited liability company owned and controlled by Layne and Audrey Lundstrom. Its creation and registration in Utah is due solely to allegedly expert advice provided to the Lundstroms by agents of the Defendants as part of the Buying Summit Fraudulent Enterprise for the purpose of eliminating the possibility of their victims being able to file a diversity of citizenship action against the Utah-based Defendants in U.S. District Court.

14. Defendant 5 Choices LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiffs Robert Wong, Eva Thode, and Lions Fan, LLC are in contractual privity with Defendant 5 Choices LLC. None of the other Plaintiffs are in contractual privity with Defendant 5 Choices, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

15. Defendant BuyPD, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the

State of Utah. It is an affiliate of all of the other Defendants in this action and is an active and controlling member of the Buying Summit Fraudulent Enterprise. It actively operates many of the other Defendants who conduct substantial business in this judicial district. None of the Plaintiffs are in contractual privity with Defendant BuyPD, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of the Plaintiffs.

16. Defendant Green Apple Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiffs Eva Thode and Lions Fan, LLC are in contractual privity with Defendant Green Apple Homes, LLC. None of the other Plaintiffs are in contractual privity with Defendant Green Apple Homes, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

17. Defendant Insiders Cash, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it

purportedly "lends" purchase money to victims of the scheme to facilitate the purchase of real property within this judicial district and in other areas and it holds hundreds of mortgages attached to real properties located within this judicial district.

18.   Defendant Yancey, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  It is the entity identified on the written contractual agreements with Plaintiffs Thode, Lundstrom and Beldotti as the party from whom those Plaintiffs purchased "training" and Buying Summit packages and to whom consideration was paid.  None of the other Plaintiffs are in contractual privity with Defendant Yancey, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

19.   Defendant Yancey, LLC conducts business in this judicial district including acting as a sales agent for all of the other Defendants in this action.  It has acted in this judicial district as such a sales agent for the other Defendants as recently as April, 2016 and November, 2016. Exhibits A and B.

20.   Defendant John Graham Inc. is a Michigan corporation with its home office located in Shelby Township, Michigan within this judicial district.  As part of the Buying Summit Fraudulent Enterprise, it purchases rental properties within this judicial district and in the State of Illinois at distressed prices and then conveys those

7

properties to the other Defendants to be resold to victims of the Buying Summit Fraudulent Enterprise at prices far in excess of Fair Market Value.  It has also purchased properties within this district at discount prices and soon thereafter sold them for far in excess of Fair Market Value to final buyers of the Buying Summit Fraudulent Enterprise.  None of the Plaintiffs are in contractual privity with Defendant John Graham, Inc. and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of the Plaintiffs.

21.  Expansion Properties, LLC is a Utah limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district Defendants and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Eva Thode is in contractual privity with Expansion Properties, LLC.  None of the other Plaintiffs are in contractual privity with Defendant Expansion Properties, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

22.  Defendant Improvement Properties, LLC is an Illinois limited liability company organized and existing under the laws of the State of Illinois but whose managers are Robert Lewis and Steve Leighty in Utah, central players in the Buying

Summit Fraudulent Enterprise.   As part of the Buying Summit Fraudulent Enterprise, it buys and sells properties located in the State of Illinois often from Defendant John Graham Inc. which are funded by Defendant Insider's Cash, LLC. Defendant Yancey, LLC acts as its agent within this judicial district.

23.   Interactive Properties, LLC is an Illinois limited liability company organized and existing under the laws of the State of Illinois but whose manager is BuyPD, LLC in Utah, central player in the Buying Summit Fraudulent Enterprise. As part of the Buying Summit Fraudulent Enterprise, it buys and sells properties located in the State of Illinois and Defendants Insider's Cash, LLC and Yancey, LLC act as its agents within this judicial district.

24. Defendant American Cash Funding, Inc. does not exist.  "American Cash Funding" was formerly a "DBA" of "American Cash Fund, LLC" existing under the laws of the State of Utah with its registered office located in the State of Utah and which has expired.  Pursuant to Utah statutes, an LLC is not permitted to use the term "LLC" in the title of a DBA.  Nevertheless, Defendants Houtz, Hampshire and Lions Fan, executed loan agreements with "American Cash Funding, LLC".  None of the other Plaintiffs are in contractual privity with "American Cash Fund", "American Cash Funding, LLC" and/or "American Cash Funding" and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

9

25.  Defendant DLS Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  The State of Utah describes its status as "expired".

26.  Defendant EZ Street Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Lions Fan, LLC is in contractual privity with EZ Street Properties, LLC.  None of the other Plaintiffs are in contractual privity with Defendant EZ Street Properties, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

27.  Defendant Frontside Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Lions Fan, LLC, Houtz and Pascal Vohradnik are in contractual privity with Frontside Properties, LLC.  None of the other Plaintiffs are in contractual privity with Defendant Frontside Street Properties, LLC and there is thus no purported forum selection or arbitration clause

10

upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs

28.   Defendant Green Apple Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiffs Thode and Lions Fan, LLC are in contractual privity with Green Apple Homes, LLC.   None of the other Plaintiffs are in contractual privity with Defendant Green Apple Homes, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

29.   Defendant Insiders Cash, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Several Plaintiffs presently owe substantial sums to Defendant Insider's Cash, LLC, pursuant to loan agreements which do not have an applicable forum selection or arbitration clause.   Defendant Insider's Cash, LLC holds hundreds of mortgages on properties located within Macomb County and Wayne County, Michigan and, along with "American Cash Funding", lends purchase money

for almost all purchases of real property made by victims of the Buying Summit Fraudulent Enterprise.

30. Defendant Malibu Breeze Properties LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiff Lions Fan, LLC is in contractual privity with Malibu Breeze Properties LLC. None of the other Plaintiffs are in contractual privity with Defendant Malibu Breeze Properties LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

31. Defendant Max Ultra, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiff Houtz is in contractual privity with Max Ultra, LLC. None of the other Plaintiffs are in contractual privity with Defendant Max Ultra, LLC and there is thus no purported forum selection or arbitration clause

upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs

32. Defendant Patriot Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiffs Lions Fan, LLC, Dunn and Sarsfield 12460, LLC are in contractual privity with Patriot Homes, LLC. None of the other Plaintiffs are in contractual privity with Patriot Homes, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

33. Defendant Property Direct, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. Purchasers of properties at the Buying Summit often are provided documentation stating that they have purchased their properties from "Property Direct". Despite repeated promises of Defendants' agents before and at the Buying Summit that all properties offered for sale have been fully "re-habbed" and are tenanted, Property Direct fraudulent induced many Plaintiffs to execute a Release in exchange for Defendants pre-existing duty to provide fully "re-habbed" and are tenanted properties and said purported releases are unenforceable.

34.  Defendant Ready Prop is a Utah "DBA" of Core Capital Property, LLC and existing under the laws of the State of Utah with its registered office located in the State of Utah.  Purchasers of properties at the Buying Summit often are provided documentation stating that they have purchased their properties from "Ready Prop" and such documents do not contain either a forum selection or arbitration clause.

35.  Defendant Red List Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Dunn is in contractual privity with Red List Homes, LLC.  None of the other Plaintiffs are in contractual privity with Red List Homes, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

36.  Defendant Red Apple Homes, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiff Coyle 12071, LLC is in contractual privity with Red Apple Homes, LLC.  None of the other Plaintiffs are in

contractual privity with Red Apple Homes, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

37.   Defendant Scree 44, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.  As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.   Only Plaintiff Greiner 11831, LLC is in contractual privity with Scree 44, LLC.  None of the other Plaintiffs are in contractual privity with Scree 44, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

38.   Defendant Screaming Eagle Properties, LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah.   As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action.  Only Plaintiffs Robert Wong, Kenneth Wong, Lions Fan, LLC and Abby Creek Investment, LLC are in contractual privity with Screaming Eagle Properties, LLC.   None of the other Plaintiffs are in contractual privity with Screaming Eagle Properties, LLC and there

is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

39. Defendant Silver Tie Homes LLC is a limited liability company organized and existing under the laws of the State of Utah with its registered office located in the State of Utah. As part of the Buying Summit Fraudulent Enterprise, it purchases and sells real property within this judicial district and is an affiliate of all of the other Defendants in this action. Only Plaintiff Lions Fan, LLC is in contractual privity with Silver Tie Homes LLC. None of the other Plaintiffs are in contractual privity with Silver Tie Homes LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

40. Defendant Insider's Financial Education, LLC is the alleged entity identified on each of the written contractual agreements of Plaintiffs Wilson, Houtz, Saenz, Dunn, Vohradnik and Hampshire as the party from whom each said Plaintiff purchased "training" and Buying Summit packages and to whom substantial consideration was paid. Plaintiffs had long been unable to identify the "corporate" or organizational registration or existence of Insider's Financial Education, LLC despite requesting such information from Defendants' attorney William Knowlton in May, 2015. Agents of Defendant BuyPD, LLC have negotiated complaints made

by purchasers of "training" and Buying Summit packages on behalf of "Insider's Financial Education, LLC". There is no such entity as "Insider's Financial Education, LLC". There was formerly a Nevada firm called "The Evolution Group, LLC" organized in Nevada in October, 2007. On or about May 12, 2009, the firm obtained authority to transact business in the State of Utah. In July, 2011, The Evolution Group, LLC filed to obtain a dba/assumed name of "Insider's Financial Education" in the State of Utah. However, Utah does not allow the use of the word "LLC" in a dba/assumed name. On June 22, 2012, The Evolution Group, LLC filed Articles of Dissolution in the State of Nevada, terminating the company's existence. Its Utah registration expired on June 26, 2012. However, it did not file an official Letter of Cancellation of Assumed Name with the State of Utah until October 30, 2013. Because the entity had been dissolved prior to entering into the contractual agreements with Plaintiffs Wilson, Houtz, Saenz, Dunn, Vohradnik and Hampshire, it is not in a position to enforce what it purports to be mandatory arbitration clauses contained within those contracts. None of the other Plaintiffs are in contractual privity with "Insider's Financial Education, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

41. Defendant "Yancey Events, LLC" does not exist but is the purported entity identified on each of the written contractual agreements of Plaintiffs Robert

Wong, Kenneth Wong and Lori Owen as the party from whom each said Plaintiff purchased "training" and Buying Summit packages and to whom substantial consideration was paid. Because it does not and has never existed, it is not in a position to enforce what it purports to be mandatory arbitration clauses contained within those contracts. None of the other Plaintiffs are in contractual privity with Yancey Events, LLC and there is thus no purported forum selection or arbitration clause upon which it might rely to avoid jurisdiction and venue in this judicial district as to the claims of those other Plaintiffs.

42. There is no such entity identified as Investor's Financial Education, LLC and its inclusion as a Defendant in the original complaint was due to a typographical error.

43. Pursuant to Fed. R. Civ. P. 20, these plaintiffs may join in this one action as plaintiffs because they assert a right to relief with respect to or arising out of the same series of transactions or occurrences and because questions of law or fact common to all plaintiffs will arise in the action.

44. Venue is proper in this judicial district pursuant to 18 US.C. §1965 and 28 US.C. §1391 as one or more of the defendants have agents, transact their affairs and conduct and have conducted their fraudulent scheme within this judicial district.

45. Pursuant to 28 US.C. §1331, this Court has original jurisdiction over the subject matter of this case because all or part of the claims arise from the defendants'

violations of the United States Code, including, inter alia, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 US.C. §1961, et. seq.

46.  At all times relevant to this Complaint, each of the Defendants was and is a "person" as that term is defined in 18 US.C. §1961 and used in 18 US.C. §1962.

47.  This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 US.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

48.  This Court has personal jurisdiction over each of the Defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) as each regularly transacts business in Michigan or has minimum contacts with Michigan, through their involvement with, management of, or receipt of funds from the Buying Summit Fraudulent Enterprise including the present ownership of hundreds of residential homes and/or the mortgages on such homes in the metropolitan Detroit area and they engage the employment of sales agents in the district such as Yancey, LLC such that it is reasonable for this Court to exercise jurisdiction over all of them.

## INTRODUCTION AND NATURE OF THE CASE

49.  Based upon the Defendants' fraudulent misrepresentations and other illegal actions in connection with Defendants' fraudulent schemes as further

described herein while operating in a number of states, including and especially within Wayne County, Oakland County and Macomb County, Michigan, Plaintiffs bring this action against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et. seq., and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

50.  These Defendants (together with additional entities and persons whose identity and function will be obtained and disclosed through discovery) comprise an enterprise (hereafter referred to as the "Buying Summit Fraudulent Enterprise") which is demonstrated by their fraudulent activities as described herein.

51.  Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise through a pattern of predicate acts indictable as mail fraud and wire fraud consisting of numerous and repeated use of interstate wires and the mails for the purpose of executing their fraudulent scheme in violation of §1962(c) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

52.  18 U.S.C. §1964(c), RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation," as pertinent here, of 18 U.S.C. §1962(c), which makes it "unlawful for any person employed by or associated with" a qualifying enterprise "to conduct or

participate….in the conduct of such enterprise's affairs through a pattern of racketeering activity," including "mail fraud" and/or "wire fraud"§1961(1)(B). Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice." §1341. The gravamen of the offense is the scheme to defraud, and any "'mailing….incident to an essential part of the scheme'……satisfies the mailing element." The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud.

53.   Acting together, over at least the past four years and to the present day, the Defendants have engaged a fraudulent multi-state real estate investment scheme as a vehicle employed to defraud unsuspecting and naïve investors of money by inducing them to purchase from these Defendants residential real estate properties sight unseen in states where the victims do not live which the victims had been led to believe were being offered at below-market prices but which were knowingly sold by Defendants to the Plaintiffs at prices significantly above market value as described in further detail, *infra.*

54.   Initially, Defendants fraudulently induced hundreds of naïve and unsophisticated investors, including these Plaintiffs, to purchase real estate investment "training" programs from and through associated entities entitled "Insider's Financial Education, LLC" "Yancey Events, LLC" and "Yancey, LLC"

with the Plaintiffs paying anywhere from $15,000.00 to over $43,000.00 for these programs. These entities will hereafter be referred to as the "Workshop Entities".

55. These Workshop Entities perform a distinct and specialized role within the fraudulent enterprise, which is to attract and sign up potential victims for the scheme. As part of their distinct role in the scheme, these entities include in their contracts a clause for mandatory arbitration of disputes which is separate and distinct from the contracts signed with the other defendants ("Property Defendants") which require alternative and contradictory forum selections regarding the same transaction or occurrence.

56. Plaintiffs submit that these clauses for mandatory arbitration are unenforceable for reasons stated, *infra*. Further, if deemed enforceable, these clauses would only apply to relationship of contractual privity between a particular Plaintiff and a particular Workshop Entity Defendant. However, each Plaintiff is not in contractual privity with the vast majority of the members of the Buying Summit Fraudulent Enterprise who are nevertheless vicariously liable to each Plaintiff for all damages incurred by each Plaintiff due to the acts of any member of the enterprise. Any such arbitration clause is therefore inapplicable to each Plaintiff's claims against those members of the enterprise with whom they are non in contractual privity.

57.   Yancey, LLC has acted as the sales agent for the fraudulent enterprise within this judicial district in April 2016 and again in November, 2016, advertising and holding free seminars to induce to new victims into the Buying Summit Fraudulent Scheme.

58.   Defendants and their Workshop Entities have fraudulently induced Plaintiffs and others to attend "private pre-auction events" by, *inter alia*, express promises via email or United State Mail promising:

A.   When you attend my private pre-auction event I will show you:

How to buy property for as low as pennies on the dollar just like to large institutional investors!

How to get the best properties before the public has access to them!

How to purchase property at rock bottom prices before they are bid up by hundreds of other investors.  See attached as Exhibit C.

B.   Now more than ever, wouldn't you like to get the best properties before the public has access to them?  Purchase real estate at all-time low prices before they are bid up by hundreds of investors?  Learn ho to general additional cash-flow month after month after month?

Topics to be discussed:

**Beginner and Experienced Opportunities:**  How do I get involved even though I've never made money in real estate?  What attracts accomplished individuals to this event?

**Pre-Approved Funding:**  Is there money to do deals? Find out how to get up to $750,000 in pre-approved real estate funding regardless of credit score.

**Monthly Cash-Flow:**  How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?

**Reduced Risk:**  Is it possible to avoid the common road blocks and avoid the risks most real estate investors eventually face?

**Self Directed IRA/401K:**  Do you understand how to use your current retirement funds to build wealth in real estate?  Exhibit D.

C.  Purchase property at rock bottom prices before they are bid up by other investors! Exhibit E.  [Hawaii 2013]

D.  **Monthly Cash-Flow:**  How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?  Exhibit F [April 2016 in Michigan]

59.  Each such email and/or mailing via United State Mail was an incidence of wire fraud pursuant to 18 U.S.C. §1341 or mail fraud pursuant to 18 U.S.C. §1343 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

60.  These "private pre-auction events" were and are held locally across the United States where attendees were subjected to rounds of motivational speakers proclaiming the ease of attaining "financial security" and "financial freedom" by paying a large fee for investment "training" packages and to attend a "Buying Summit", a large event generally put on by Defendants in Las Vegas, Nevada.  At the Buying Summit, attendees were promised the opportunity to purchase residential rental properties offered by Defendants at what Plaintiffs and the other victims were led to believe were steeply discounted prices.

61.  At these "private pre-auction events" and preliminary training sessions, and as a further fraudulent inducement to purchase additional "training" and Buying Summit packages, Plaintiffs and hundreds of other victims were continuously and fraudulently reassured by agents of Defendants that the properties offered for sale at the Buying Summit were offered at steep discounts before the public had notice of them and that the Defendants a) had performed a full investigation into the condition of each home; b) they had determined that the homes were in good condition so that that neither an inspection nor appraisal was necessary; c) that homes were in good neighborhoods with good quality schools; and d) that each property had a vetted and paying tenant.

62.  Coextensive with the fraudulent oral promises of Defendants' agents at these local events were written materials making similar false promises:

A.  Rent Ready

We find low cost and distressed properties in great neighborhoods. We then perform any repairs or rehabbing needed. By the time we sell them to our clients they are either tenanted or rent ready. Our clients are then able to get great prices without the hassle of doing repairs themselves. See Exhibit F [Brochure of Defendant Income Property USA, LLC]

B.  Buying Summit: 3-Day Asset Buying Retreat in Vegas

This 3-day retreat gives you the opportunity to buy homes from around the United States **at huge discounts** [emphasis added].  Transactions will be closed on site.  In addition, you'll be trained by some of the foremost expects in areas of real estate, tax liens, asset protection and self-directed IRAs.  See Exhibit G, Page 6 [Brochure of Defendant Yancey LLC].

25

63.  The bargained-for-consideration which Plaintiffs and thousands of other victims who purchased these "training" and "Buying Summit" packages for tens of thousands of dollars were entitled to receive was expert guidance from Defendants directing them to purchase the types of homes at steep discounts before the public had notice of them as set forth in *supra.*

64.  To the extent that an attendee at a "private pre-auction event" and/or training session did not agree to purchase a package to attend a Buying Summit, such person was subjected soon thereafter to a "hard sell" telephone call or calls from agents of the Defendants strongly urging them to purchase such a package so that they might take advantage of the allegedly steeply discounted real estate for sale at the Buying Summit.

65.  As part of the Defendants' scheme to defraud as intended by Defendants, Defendants' agents during these "hard sell" telephone calls would forcefully inquire into the state of the victim's personal finances so as to discover how much money and credit the victim might have available to invest in Defendants' fraudulent scheme.   Further, these inquiries provided the Defendants with information sufficient to determine how to completely wipe out the life savings of the victim so that a)  The victim would not have the resources to retain counsel to file suit against Defendants to recover damages for the fraudulent investment; and b) So that the victim would not have the resources with which to pay their two year 12% interest-

only "bridge loans" from Defendants where at the end of such period, Defendants would be in a position to foreclose on the purchased home while retaining all funds previously obtained from the victims. The foreclosed property would then be available for sale to a new naïve victim and the process would be repeated.

66. These aforementioned "hard sell" telephone calls are each an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

67. Defendants' agents at the local workshops and at the Buying Summit appear to be working for a number of different associated entities and it is never clear which entity such agents represent when making their fraudulent oral promises.

68. While attending local workshops put on by the Workshop Defendants, attendees are told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices. However, attendees are also told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

69. Agents of the Workshop Defendants expressly promised that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the

previous training seminars.  As such, Defendants' agents expressly promise that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing with tenants).  Further, attendees are told that a person could only purchase these properties by attending the Buying Summit.

70.  Upon purchasing a package to attend a Buying Summit, some attendees were sent emails strongly suggesting that they transfer their IRA retirement savings into a "Self Directed IRA" because "the Buying summit in Vegas is a great opportunity to acquire cash flow properties at steep discounts" and a self-directed IRA could be used to purchase and hold properties purchased at the Buying Summit. See Exhibit H.

71.  The email described in Paragraph 42 is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

72.  Prior to or at the Buying Summit, attendees were provided by Defendants with a knapsack labeled "The Buying Summit" which contained, *inter alia*, a copy of "The Buying Summit Workbook" (portions of which are attached as Exhibit I) which contained statements that reinforced and reiterated the prior fraudulent misrepresentations of the Defendants.  On page 27 of a Buying Summit Workbook, Paragraph 15 reinforced the fraudulent misrepresentation that Defendants had

performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

73.  Plaintiffs and hundreds of other victims who attended various editions of the Buying Summit were again subjected at the Buying Summit to rounds and rounds of motivational speakers extolling the real estate bargains that could be purchased from their agents in the adjacent area of the event facility.

74.  While meeting with Defendants' sales agents at the Buying Summit, homes for sale were displayed on internet monitors and generally contained a photograph of the home and a "suggested retail price" for the home.

75.  The "suggested retail price" for each such home would invariably far exceed the true cash value of such home, a fact well known in advance to Defendants and which was, in fact, an essential aspect of their scheme to defraud.

76.  Each such internet display as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as they facilitated Defendants' Buying Summit Fraudulent Scheme.

77.  These internet displays of the homes for sale would also contain a proposed "bargain" sales price which was also far in excess of the true cash value of

the home, a fact well known in advance by Defendants and which was, in fact, an essential aspect of their scheme to defraud.

78.   Virtually all of the homes offered for sale by Defendants at the Buying Summit and otherwise had invariably been recently purchased prior to resale to Plaintiffs by agents of the Defendants for Defendants' own account at below market prices and/or at distress sale prices, often by Defendant John Graham Inc., a fact well known in advance by Defendants and which was, in fact, an essential aspect of their scheme to defraud.

79.   Plaintiffs and the others victims were encouraged by Defendants' sales agents to purchase homes in states where they did not live so that they would be unlikely to view or inspect the purchased property in advance and thus be apprised in advance of its actual condition and value.  This tactic was an essential aspect of the Defendants' scheme to defraud.

80.   As a further aspect of the Defendants' scheme to defraud, Plaintiffs and the other victims were induced to purchase these overpriced homes with "loans" from Defendant Insiders Cash, LLC who has this distinct role in the fraudulent enterprise.

81.   In a typical case, Defendants' sales agents would promote via their internet monitors at the Buying Summit the purchase of a home as having a "Suggested Retail Price" of (for example) $68,000.00 but which could be purchased

from Defendants for the alleged bargain price of $60,000.00. Such a home would have an actual true cash value of between $25,000 to $35,000 while Defendants would have recently purchased the home for between $20,000.00 to $30,000.00. The Buying Summit attendee/victim would then be induced to put $13,000.00 to $19,000.00 down on the purchase of the home with the balance (plus "closing costs" of $2,050.00 and a ten percent "origination fee") being financed with a purported "bridge loan" from Defendants' alter ego/associates Defendants Insiders Cash, LLC. The sales entities and the lending entity both have distinct roles in the fraudulent enterprise.

82. Plaintiffs and the other victims were also induced to enter into these loan agreements as the proximate result of false statements made by Defendants' sales agents that these loans could be easily re-financed at much lower rates with local banks once the victims had returned home from the Buying Summit.

83. As part of the Defendants' scheme to defraud, Defendants' victims, including Plaintiffs, were told by Defendants' agents at the Buying Summit that these "bridge loans" would be easily refinanced at much lower interest rates if the borrower waited six months to seeking refinancing after completing the home purchase transactions with Defendants.

84. As part of the Defendants' scheme to defraud, Defendants' victims, including Plaintiffs, were told by Defendants' agents at the Buying Summit that

these "bridge loans" would be easily refinanced at much lower interest rates by waiting six months after completing the home purchase transactions with Defendants so that there would be a sufficient interval between each victim's purchase of a home from Defendants and the time they would discover that the homes could not be refinanced (or even sold) at all because their value was significantly lower than the outstanding balance on each "bridge loan" which would then remain owing to Defendant Insiders Cash, LLC.

85.  This behavior has been admitted to by Defendants.  The Defendants had previously posted a "youtube" video online entitled "Alex Nickle February 20th, 2015 Client Success" from Defendant "Income Property USA"[1], which could formerly be found online at:

https://www.youtube.com/watch?v=mvwgUIjaKRQ.

In the video, Defendants' agent Nickle explains how he "builds a relationship of trust" with recalcitrant and suspicious Buying Summit attendees and states:

> Hey, this is Alex Nickle, your property specialist. I just have a little story about some of my clients this past summit, or a couple of summits ago actually. They came into the thing very skeptical being that they had never done real estate before. They wanted a change in their life but they didn't know what avenue or what vehicle they should take. So they took a jump, a leap of faith and started doing these trainings with us and understanding how to invest. And when they got to the summit they were the type of clients that were arms folded, kind of I don't want to talk to anybody, I don't want to get to know anybody. Luckily, they

---

[1]  After Plaintiffs made specific reference to the video in its motion response of May 31, 2016, Defendants deleted the video.

were able to loosen up a bit, meet our staff, understand that we are here for them and their best interest. So I was able to sit down with them, go over a consultation for about an hour and half, and in that consultation we were able to **build a relationship of trust** and they'll understand that I know what I'm talking about and we were able to do two properties, two pieces of land and a trust deed to help start that path down to their goals [Emphasis added]. If you're lookin' for the same success in real estate, I'd love to hear from you. Please give me a call at the number below.

86.   As the direct and proximate result of the fraudulent inducements of Defendants created a relationship of trust and a fiduciary relationship pursuant to Michigan case law, Utah case law, Federal case law and the Restatement of Torts, Trusts and Agency as follows:

        a.  Defendants induced Plaintiffs to repose faith, confidence and trust in the Defendants' expert judgment and advice regarding the purchase of their real estate programs prior to the Buying Summit and the purchase of real property while attending the Buying Summit;

        b.  The false statements of the Defendants induced Plaintiffs to relax the care and vigilance they would ordinarily exercise in the purchase of real property;

        c.  Defendants were under a duty to act for or give advice for the benefit of Plaintiffs upon the matters which were within the scope of the relation between Defendants and Plaintiffs;

        d.  Plaintiffs' confidence in the Defendants and in the Defendants' self-proclaimed expert judgment and advice regarding the purchase of their real estate

programs prior to the Buying Summit and real property at the Buying Summit was betrayed by the Defendants

   e. In the relationship between Plaintiffs and the Defendants, there existed a condition of superiority by the Defendants over Plaintiffs;

   f. Both the bargained-for consideration of the agreements between Plaintiffs and the Defendants and the relationship between Plaintiffs and the Defendants placed the interests of Plaintiffs in finding discounted real property for them to purchase in the charge of the Defendants;

   g. In the relationship between Plaintiffs and the Defendants, there existed not only the confidence of Plaintiffs in the expert judgment and advice of the Defendants regarding the purchase of real property, but there existed a dependence and a profound inequality of business intelligence and knowledge of the facts involved giving to the Defendants an advantage over Plaintiffs.

87. As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs such that Defendants owed Plaintiffs a fiduciary duty regarding the scope the duties created by their various agreements.

88. Defendants exploited this fiduciary relationship with the false and fraudulent promises and inducements made in this Complaint.

34

89.  At numerous Buying Summit events, Blair Jackson, attorney for Invictus Law, was presented to the attendees as someone from whom the attendees should seek advice and that he was associated with Guardian Law.

90.  In every sale of property to Plaintiffs by Defendants, Guardian Law drafted the warranty deed to the selling entity and the warranty to Plaintiff with knowledge of the fraudulent mark-up process but without so informing the defrauded purchasers.

91.  Despite owing Plaintiffs a fiduciary duty to provide them with expert guidance and advice regarding the purchase of discounted and distressed priced homes and after convincing them with rounds of rounds of promises that they would "take care of everything" and that they have performed complete due diligence regarding these homes, Defendants induced Plaintiffs and the other victims to execute the most one-sided sales contracts imaginable.  These contracts contained clauses providing that the purchased homes came with no structural warranty or warranty of value whatsoever, that Plaintiffs and the other victims were allegedly "knowledgeable and sophisticated investors", capable of evaluating the merits and risks of the Property and specifically acknowledging that this was not a "consumer transaction", that all prior promises and inducements of Defendants were irrelevant and containing a clause purporting to require that all litigation regarding the contracts would be in the courts of the State of Utah (a state which had no

relationship to either the location of the Buying Summit, the Plaintiffs' states of residence or the location of the properties they had purchased).  The following are some sample clauses from these sales contracts:

> 6. **PROPERTY IS SOLD IN "AS IS" CONDITION WITH NO BROKER:** Buyer acknowledges and agrees that Seller has not made and hereby specifically disclaims any warranty, guaranty, or representation, oral or written, past, present, or future, of, as to, or concerning (i) the nature, square footage, features, condition of property including condition of mechanical equipment, built in appliances, and utilities, value, or quality of the geology, the presence of environmental hazards and the suitability thereof and the Property for any and all activities and uses which Buyer may elect to conduct thereon, (ii) the manner, construction, condition, quality, the state of repair or lack of repair of any of the Property, (iii) except for any warranties contained in the deed, the nature and extent of any right of way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise (iv) the compliance of the Property or its operation with any laws, rules, ordinances, or regulations of any government or other body, (v) the current or future performance of the Property, and, (vi) the income to be derived from the Property, Buyer hereby further acknowledges and agrees that Buyer is relying solely upon the inspection, examination, and evaluation of the Property by Buyer and that Buyer is purchasing the Property on an **"AS IS. WHERE IS"** and **"WITH ALL FAULTS"** basis and not on any information provided or to be provided by Seller. Buyer acknowledges he is buying land and any improvements thereon, if any, and accepts all damages, condemnations, hazards, debris, governmental, environmental or health related issues thereon as of the execution date of this contract.

> [From Paragraph 8]  Buyer agrees that it is purchasing the Property "AS IS" Buyer waives the opportunity to conduct an investigation to determine the presence of methamphetamine residue or byproducts on the Property. Buyer agrees that Seller will not be liable to Buyer or any third party, and Buyer hereby unconditionally releases Seller from any and all liability, based upon or related to the production of methamphetamine at any time on the Property- Buyer hereby represents

and accepts that it is Buyer's responsibility to personally inspect and examine The Property and all improvements thereon. Buyer hereby acknowledges that unless otherwise set forth in writing elsewhere in this contract neither Seller nor Seller's representatives, if any, have made any representations concerning the present or past structural condition of the improvements. Buyer agrees that he will not hold Seller or its representatives responsible or liable for any present or future structural problems or damage to the foundation or slab of said property

20**. INDEMNIFICATION**: Buyer agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from and against any and all losses, claims, demands, liabilities, costs, damages and expenses (including attorney's fees and costs) that Buyer may incur arising from the Seller's actions or failure to act on, respond to or comply with any (1) local, state or federal law, rule or ordinance affecting the Property; and (2) liabilities arising from said property from date of the contract, whether or not insured and the like. Buyer additionally agrees to indemnify and hold harmless Seller and all affiliated companies and or sales agents from any and all claims, costs, fees, liabilities, or loss incurred after title conveyance to the Buyer. Further, Buyer acknowledges that the Property may be subject to proceedings in law or equity to abate, correct, or otherwise comply with local, state or federal requirements regarding the Property and that this indemnity shall also apply in such instances.

21. **QUALIFIED INVESTOR**: Buyer acknowledges that he is a knowledgeable and sophisticated investor, capable of evaluating the merits and risks of the Property and specifically acknowledges that this is not a "consumer transaction" within the meaning of, or subject to, state or federal consumer protection laws.

22. **REPRESENTATIONS AND AGREEMENT OF PARTIES**: Seller makes no representations, express or implied, as to the fitness of the Property as of the Closing Date or that there will be no liens, assessments, or security interests against the Property. Buyer and Seller agree that no other representations have been made, verbal or otherwise, that are not outlined specifically in writing in this contract. Buyer acknowledges he is buying land and any existing improvements thereon, and is not buying a residential lease, rental agreement, or any other contract in relation to the Property. This contract contains the

entire agreement of the parties. Both parties agree that interactions regarding this contract will take place exclusively between the Buyer and the Seller.

23. **THERE ARE NO PRIOR AGREEMENTS, GUARANTEES OR WARRANTEES THAT ARE NOT SPECIFICALLY OUTLINED IN THIS CONTRACT:** This contract incorporates all prior agreements between the parties, contains the entire and final agreement of the parties, and cannot be changed except by their written consent. Neither party has relied upon any statement or representation made by the other party or any sales representative bringing the parties together.

27. **GOVERNING LAW AND JURISDICTION**: This contract shall be governed by the laws of the State of Utah. Jurisdiction shall lie exclusively with the courts within the State of Utah.

92. This language of Paragraph 27, drafted by the Defendants, does not mean what Defendants claim it means. It says that THE CONTRACT shall be governed by the laws of the state of Utah. Further, the language does not provide for venue within the State of Utah or jurisdiction in the state courts of Utah. It merely states that jurisdiction (over what?) shall lie exclusively with "the courts within the state of Utah". There are Federal courts located within the geographical confines of the State of Utah where venue is determined by Federal law and the Federal Rules of Civil Procedure. The language is unambiguous and does not require filing suit within the geographical confines of the State of Utah.

93. The Defendants inserted the aforementioned clause purporting to require litigation in Utah as an essential part of the Defendants' scheme to defraud because

a)  By the time most of the Plaintiffs/Victims realized that they might have been defrauded by Defendants, they had exhausted their life savings in purchasing the various training/Buying Summit packages and home purchases from Defendants. At such time, they no longer had the resources available to litigate these matters in their home state, much less being able hire attorneys to litigate these matters in the Courts of the State of Utah or travel to Utah; and

b)  Potential Plaintiffs were inevitably flummoxed by distinct and contradictory forum selection clauses in the numerous agreements Plaintiffs signed with various Defendants which all concern a single transaction or occurrence and which demonstrates a complete lack of a meeting of the minds regarding either forum selection or arbitration.   Further, the distinct and contradictory forum selection clauses demonstrate the distinctness of the roles played by each member of the instant fraudulent scheme.

94.  These multiple and contradictory forum selection clauses demonstrate a complete lack of a "meeting of the minds" on the topic by Plaintiffs with Defendants.

95.  Because Defendants owed Plaintiffs and the other victims of the scheme to defraud a fiduciary duty, Defendants owed Plaintiffs the opportunity to purchase the properties Defendants had purchased at discounted and distress sale prices but Defendants instead absconded with this business opportunity.

96.    As part of their scheme to defraud, Defendants induced many Plaintiffs/Victims to unwittingly sign personal guarantees of their loans which were otherwise only owing to Defendant Insiders Cash, LLC by their limited liability companies.    Such personal guarantees induced by Defendants' fraud are unenforceable.  Further, none of these personal guarantees have a forum selection or arbitration clause.

97.  As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held by in a "self-directed IRA" were also induced to pay for the creation of a Utah limited liability company.  However, there is no role for a limited liability company when real estate is held in a self-directed IRA and none of the Plaintiffs who conveyed their purchased properties into a self-directed IRA ever conveyed any property into the LLC which Defendants induced them to create.

98.  As a further part of their scheme to defraud, those Plaintiffs who were induced to use their IRA retirement savings to purchase homes at the Buying Summit to be held in a "self-directed IRA" were also induced to purchase a limited liability company protection service for in excess of $6,000.00 even though their IRAs held no assets and the homes they purchased at the Buying Summit were instead held in a self-directed IRA.

99.  Because the homes that were being purchased by the Plaintiffs at the Buying Summit were not in states where the Plaintiffs/victims lived, it was necessary to hire a property management company to oversee the properties.

100.  Once the Plaintiffs/victims/purchasers returned home from the Buying Summit, they would often discover from their property management company that a home they had purchased had serious physical defects including, for example, a bad roof or non-working furnace.

101.  When a property purchaser would complain about a physical defect or missing rents, Defendants would often provide reimbursement to Plaintiffs/victims for the cost to repair these items, often in the range of $1,500.00 to $3,500.00 as part of their pre-existing duty to provide rehabbed properties with paying tenants.  The releases usually recited the Defendants' pre-existing duty to have provided rehabbed housing and a rent guarantee.

102.  The vast number of releases executed by Defendants' victims demonstrates that Defendants were aware that the properties they sold had serious defects and bad tenants and used those features to trick their purchasers into signing releases in exchange for performing a pre-existing duty.  As such, there was no consideration to support any of these releases and they are unenforceable.

103.  The Plaintiffs/Victims who signed such a release were not aware at such time that the homes they had purchased: a) Had recently been purchased by

41

Defendants for their own account at a discounted or distress sale price; b) Were worth far less than what the victim had paid for it; c) Were worth far less that what the victim still owed on the purchase money loan and thus could be refinanced or resold. Further, at such time, the Plaintiff/victim would be unaware that they were signing a General Release. This procedure was a purposeful and pre-planned aspect of the Defendants' scheme to defraud.

104. Each release only applied to a single Defendant and not the other participants in the fraudulent scheme.

105. As a further aspect of the Defendants' scheme to defraud, the initial contractual agreements were between the Workshop Defendants, including Defendant Yancey, LLC, and the Plaintiffs and other victims regarding the purchase of a "training" and/or a Buying Summit package. Language on the back of such contractual agreements provides that all disputes must be resolved in binding arbitration with the American Arbitration Association.

106. Plaintiffs submit that the aforementioned forum selection clauses, whether for binding arbitration and/or for litigation in the courts of the State of Utah are unenforceable because *inter alia*:

> A. They were not-bargained-for and do not reflect any meeting of the minds between the Defendants and the defrauded Plaintiffs and other victims;
>
> B. These various clauses attempt to split a single RICO cause of action into at least three other claims, one regarding the fraudulent training

and Buying Summit packages (binding arbitration), the second regarding the fraudulent property sales agreements (lawsuits within the State of Utah, and the third regarding the purchase money "loans" which were in excess of the value of the properties purchased (lawsuits within the Courts State of Utah). However Plaintiffs submit that the forum selection language of their Loan Agreements is inapplicable to their instant claims. ;

C.  These various clauses are themselves a vital aspect of the Defendants' scheme to defraud and were designed to make it virtually impossible for the Plaintiffs and other victims who have lost their life savings in Defendants' fraudulent scheme to litigate these matters;

D.  Pursuant to MCL §600.745(3):

> (b) The plaintiffs cannot secure effective relief in the other state for reasons other than delay in bringing the action;
>
> (e) The agreement as to the place of the action was obtained by misrepresentation, duress, the abuse of economic power, or other unconscionable means including the breach of Defendants' fiduciary duties to the Plaintiffs;

E.  The multiplicity of forums for single transactions violates, *inter alia,* the fiduciary duties of Defendants owing to Plaintiffs; and

F.  The Plaintiffs are entitled to rescission and revocation all of agreements they have made with these Defendants *ab initio*.

107.  Plaintiffs are entitled to rescission of all contracts between themselves and the Defendants and their agents and they are entitled to a refund of all money paid to Defendants in exchange for a return of all benefits received from Defendants. As such, the various clauses in all said agreements which include, without limitation, a requirement of binding arbitration, a provision of an alleged general release of a single defendant and/or all defendants, a requirement that litigation to be brought in

the courts of the State of Utah, a personal guaranty; a provision providing that homes purchased from defendants were sold "as/is", and/or a provision providing that purchasers of homes from Defendants were sophisticated "Qualified Purchasers" are void *ab initio* and unenforceable.

108.  Plaintiffs are entitled to rescission and revocation of the entirety of each agreement containing these alleged provisions to arbitrate pursuant to 9 U.S.C. §2 *ab initio* due to Defendants' fraud thereby making these agreements unenforceable.

## COUNT I – THE CLAIMS OF REBECCA K. WILSON

The allegations of paragraphs 1 - 109 are incorporated by reference as if fully set forth herein.

109.  Plaintiff Rebecca K. Wilson ("Wilson") is sixty two years old and resides in Grosse Pointe Park, Michigan.

110.  In August, 2012, Mrs. Wilson's husband died of brain cancer and she thereafter received some life insurance proceeds as the result of her husband's death.

111.  She was interested in investing some of the insurance money into investments that would provide a higher return than what was being offered by banks.

112.  In February or March, 2013, she saw an informercial on television in the Detroit, Michigan area which advertised the alleged opportunity to invest in real estate with Dean Graziosi, Defendants' agent and spokesperson.

44

113. Mrs. Wilson thereafter inquired of Defendants' agents about this real estate investment offer.

114. Mrs. Wilson was then provided with free tickets to attend a dinner and introductory seminar in early April, 2013 at a hotel facility in Bloomfield Hills, Michigan where she heard a motivation speaker urge the attendees that signing up with the various investment and training programs that were being offered would be the gateway to financial independence.

115. Mrs. Wilson thereafter registered for another seminar which was held April 10th, 2013 at 6:00 p.m. at The Met Troy, 5500 Crooks Road Troy, MI 48098.

116. Confirmation of her registration for this seminar came via email from Dean Graziosi, self-described "Author and Millionaire Mentor" which also expressly promised that:

> When you attend my private pre-auction event I will show you:
>
> How to buy property for as low as pennies on the dollar just like to large institutional investors!
>
> How to get the best properties before the public has access to them!
>
> How to purchase property at rock bottom prices before they are bid up by hundreds of other investors. See email attached hereto as Exhibit C.

117. Relying upon the express promises of Dean Graziosi as set forth *supra*, and expecting to be provided with expert guidance in making such real estate

purchases as the result of purchasing the various training packages which were offered by Defendants, Wilson attended the aforementioned event held April 10, 2013 where she purchased from Defendant Insiders Financial Education, LLC the following packages:

A. Insider's Financial Enhance Note Network System for $197.00;

B. Insider's Financial 3-Day Real Estate Workshop Package for $1,997.00; and

C. Insider's Financial Tax Lien Program for $997.00.

118.  The email described *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

119.  While subsequently attending the aforementioned 3-Day Real Estate Workshop Package, Mrs. Wilson was induced by the express promises of Defendants' agents to purchase a "Diamond Package" from Defendant Investor's Financial Education LLC and paid $39,997.00 for said package on April 27, 2013 which included additional purported real estate investment training plus airfare to and hotel accommodations in Las Vegas, Nevada plus admittance to the "Buying Summit 3 Day Asset Buying Retreat" held in there in June, 2013.  Mrs. Wilson was expressly told that she could purchase properties at steep discounts at the Buying Summit which could not be obtained otherwise.

46

120.   Shortly before attending the aforementioned "Buying Summit", Mrs. Wilson received an email dated June 12, 2013 from "Shawn Alden", identified as "Shawn (shawn.a@deansadvancedtraining.com)" regarding "Deans Inner Circle" which stated in part:

> I tried to contact you today, I'm sorry that I missed you. I would like to explain who I am and why I'm calling. *MY* role is to support *YOU*...... think of me as your personal concierge.  My goal is to make sure you get the most out of our program. If you have any issues, concerns or if you are frustrated for any reason, I'm your goto person.

121.   The email described *supra,* was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

122.   Mrs. Wilson further relied upon the statements of "Shawn Alden" made in Paragraph 120, *supra*, to believe that agents of Defendants would at all times be providing her with expert advice and guidance in finding and purchasing real estate bargains consistent all of the numerous prior representations and promises of Defendants.

123.   Mrs. Wilson did attend the Buying Summit held in Las Vegas held June 21 to June 23, 2013 where the attendees were subjected to rounds of motivational speakers proclaiming the real estate bargains available for purchase at the Buying Summit.

124.  Upon arrival at the Buying Summit, Mrs. Wilson received a copy of a "Buying Summit Workbook" [Exhibit H] as described *supra*.

125.  Further relying upon these additional promises and representations made by Defendants' agents as set forth, *supra,* Mrs. Wilson met with a sales agent of the Defendants at the Buying Summit.

126.  While meeting with Defendants' sales agent, Mrs. Wilson was shown information on an internet screen about a house available for purchase located at 2011 Lynn Street, Cahokia, Illinois, near St. Louis, Missouri.

127.  One such internet screen display stated that the property had a "Suggested Retail Price" of $71,000.00 but could be purchased immediately at the discounted price of $53,900.00.

128.  The internet display as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1341 and thus a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

129.  Relying upon these inducements and material representations by Defendants' agent, Mrs. Wilson agreed to purchase the home for the following terms:  A purported sales price of $53,900.00, plus "closing costs" of $2,050.00 to be paid to Defendants' attorneys "Guardian Law" and a ten percent "origination fee" of $3,805.00 to be paid to one of the Defendant lenders, plus an $800.00 annual insurance premium and a $900.00 tax adjustment.  Mrs. Wilson was to put down

$19,601.00 and finance the balance of $42,400.00 for a total cost to Mrs. Wilson of $62.001.00 ($19,601.00 + $42,400.00). The $42,400.00 balance was to be financed by a "loan" from one of the Defendant lenders pursuant to an interest-only loan agreement at 12% for twenty-four months with all principle due at the end of twenty-four months. Mrs. Wilson wrote a check to Defendants in the amount of the $19,601.00 down payment.

130. As a further inducement to make the purchase, Mrs. Wilson was repeatedly told by Defendants' agents at the Buying Summit that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months.

131. Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was knowingly false when made.

132. Defendants' representation to Mrs. Wilson that that her loan would be easy to refinance at a much lower rate with a local bank once she got home from the Buying Summit after waiting a few months was made with the specific bad intent by Defendants of precluding Mrs. Wilson as purchaser from learning from such a local bank that the property she had purchased at the Buying Summit was worth far less than even the outstanding loan balance owing to one of the Defendant Lenders until it was too late cancel said fraudulent transaction.

133.  At the Buying Summit, Mrs. Wilson was also induced to create a Utah limited liability company to which the purchased property was to be directly conveyed by Defendants.

134.  At the Buying Summit, Mrs. Wilson was also induced to purchase a lot in Florida, a tax deed in Florida, and a promissory note for $50,000.00 regarding a home in Redford Township.  Mrs. Wilson wrote an additional check to Defendants in the amount of $50,000.00 to purchase the promissory note.

135.  As a further inducement to make the purchase of these properties, Mrs. Wilson was told by representatives of Defendants that there was no need for an inspection or appraisal of the subject properties because "We [Defendants] take care of everything".

136.  Within days of returning home from the Buying Summit, Mrs. Wilson decided that she no longer trusted the advice she had received from Defendants regarding her purchases at the Buying Summit and stopped payment on all checks she had written to Defendants for these purchases effectively cancelling these transactions.

137.  Mrs. Wilson has been demanding a refund of all funds which she has paid to Defendants for "training" and to attend the Buying Summit ever since. Defendants have failed to respond to these demands.

138.  Mrs. Wilson has demanded of Defendant BuyPD that it identify the legal entity described as Insider's Financial Education LLC (to whom she paid all of the fees for "training" and to attend the Buying Summit) including state of registration of said entity, but such demand has been ignored by Defendant BuyPD and its counsel.

139.  Many months after cancelling the purchase transactions that she had made at the Buying Summit, Mrs. Wilson discovered that the property located at 2011 Lynn Street, Cahokia, Illinois had an assessed value of only $24,510.00 for the year 2013.

140.  Mrs. Wilson subsequently learned for the first time that on June 18, 2013 (just days before the Buying Summit) that the property located at 2011 Lynn Street, Cahokia, Illinois had been conveyed to Defendant Screaming Eagle Properties LLC by Warranty Deed for the consideration of only $37,800.00.  This conveyance was part of the ubiquitous fraudulent markup process of the Buying Summit Fraudulent Scheme employed by these Defendants regarding all purchasers of properties at the Buying Summit.

141.  The fraudulent markup process of the Buying Summit Fraudulent Scheme was known to Defendants and their attorneys who participated in and facilitated all stages of said fraudulent scheme.

142.  The Utah limited liability company created on behalf of Mrs. Wilson, *supra* has never held any assets and is not a party to this action.

143.  As set forth *supra*, Defendants conducted the affairs of the Buying Summit Fraudulent Enterprise in part to fraudulently obtain money from Plaintiff Wilson who was fraudulently induced to pay Defendants in excess of $43,000.00 in exchange for expert advice and guidance in purchasing real estate bargains while the actual purpose of the Buying Summit was to defraud the naïve attendees by misleading and guiding them to purchase grossly overpriced real estate from Defendants.

144.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Wilson such that Defendants owed Mrs. Wilson a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

145.  Plaintiff Wilson has incurred damages in excess of $43,000.00 as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

146.  Mrs. Wilson is entitled to restitution from all of these Defendants of all money she has paid to Insider's Financial Education LLC which is but an alter ego and member of the Buying Summit Fraudulent Enterprise.

147.   Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Wilson for her damages.

**COUNT II –THE CLAIMS OF PLAINTIFF DENNIS HOUTZ**

The allegations of paragraphs 1 - 147 are incorporated by reference as if fully set forth herein.

148.   In January, 2013 while living in Richboro, Pennsylvania, Plaintiff Dennis Houtz viewed an infomercial playing on television featuring Dean Graziosi which promoted a free seminar concerning real estate investing such that the attendees would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

149.  The aforementioned infomercial suggested that interested people fill out an online form to obtain further information which Mr. Houtz did.  This online form was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

150.  In response to the aforementioned online form, Mr. Houtz received a postcard in the U.S. Mail as an entrance ticket for Mr. Houtz to attend a free seminar on how to purchase real estate at discounted prices to be later sold for a profit.  This postcard was a use of the mails by Defendants that was incident to an essential part

of their scheme to defraud and was thus an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

151.  On March 2, 2013, Mr. Houtz attended the aforementioned seminar which was held at the Four Points Sheraton Hotel in Philadelphia, Pennsylvania where he purchased the "Insider's Financial Tax Lien Program" for $997.00 and the "Insider's Financial Real Estate Workshop Package" for $1997.00, described as a 3-day real estate investing workshop where the attendees would be taught how to purchase real estate properties at deep discounts.

152.  At the free seminar held on March 2, 2013, Defendants had the attendees, including Mr. Houtz fill out a financial questionnaire which sought detailed information concerning, *inter alia*, the income, debt, credit card balances, 401k, IRA Retirement account balances of the attendees.

153.  Defendants subsequently used this information to their advantage when persuading the attendees, including Mr. Houtz, to buy their Advanced Training Products.

154.  At the seminar held on March 2, 2013, Defendants instructed the attendees, including Mr. Houtz to call all of their credit card companies and seek a credit limit increase. There was actually a script in the training material on what to say verbatim.

155.   Mr. Houtz had purchased the Insider's Financial 3 day Real Estate Workshop Package and paid $1,997.00 on March 2, 2013 with a credit card which was held March 8, 9 & 10 2013 at the Sonesta Hotel at 1800 Market Street Philadelphia, PA 19103.

156.   At the aforementioned "workshop" held March 8, 9 & 10 2013, Mr. Houtz and the other attendees were subjected to rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale to attendees of the Buying Summit.

157.   As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the opportunities to purchase deeply discounted real estate properties at the Buying Summit, on March 10, 2013, Mr. Houtz purchased "Deans Insider's Financial Advanced Training Diamond Package" for $39,997 ($5,000.00 paid on March 10, 2013 with a credit card and $34,502.00 with a check on March 18, 2013) which included attendance at a Buying Summit.  Mr. Houtz took out a $39,850.00 loan from his 401k account to reimburse himself for these expenditure which he is still paying off at the present time.

158.   The aforementioned "training" and Buying Summit packages were purchased by Mr. Houtz from a purported entity entitled "Insider's Financial Education LLC".

55

159.  The written contractual agreements between Mr. Houtz and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

160.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity.

161.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz at the aforementioned seminar regarding the alleged necessity of conveying any properties he might purchase from Defendants to a limited liability entity, on March 12, 2013, Mr. Houtz purchased the Veil Corporate Single Entity Setup (for a Utah LLC) for $495.00 with a credit card.  This Utah limited liability company has never held any property or assets because Mr. Houtz eventually conveyed the properties he purchased from Defendants to a self-directed individual retirement account, a procedure which does not utilize a limited liability company.

162.  On March 11, 2013, Mr. Houtz received an email from Defendants' agent Julie Garfield (julie.g@deansadvancedtraining.com) which stated:

> (By the way, the Buying summit in Vegas is a great opportunity to acquire cash flow properties **AT STEEP DISCOUNTS** [emphasis added].  A lot of our clients get to the Buying Summit wishing they had moved their retirement funds into a self-directed IRA so they can use it to invest in real estate. Please contact me if you be interested in learning how to do that.). [See email attached as Exhibit I]

163.  The email described *supra*, is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud and there were no properties offered at the Buying Summit at steep discounts to the attendees.

164.  In the middle of April, 2013, Mr. Houtz received a telephone phone call at home from an agent of the Defendants asking if he was planning on converting his 401k plan over to a Self -Directed IRA so that Mr. Houtz would have purchasing power at the Buying Summit.   During this telephone call, Defendants' agent expressly stated that so many people that attend the Buying Summit wish that they would have done this before arriving.

165.   The telephone call described *supra,* is an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it was incident to an essential part of Defendants' scheme to defraud..

166.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants made to Mr. Houtz as set forth in the email described *supra*, and the telephone call described *supra*, and throughout the entire relationship with Defendants, Mr. Houtz:

A.  On May 31, 2013 forwarded a check from his 401k account in the amount of $73,627.35 payable to American Estate and Trust as the first step in setting up a Self-Directed IRA;

B.  Purchased three properties in Macomb County, Michigan from Defendants at the Buying Summit using funds from his Self-Directed IRA further described *infra*;

C.  Was fraudulently led to believe that these properties were being offered for sale at steep discounts;

D.  Had the properties he purchased from Defendants conveyed to his Self -Directed IRA.

167.  Mr. Houtz attended the Buying Summit Event # 130530 held in Las Vegas, Nevada at the Mirage Hotel & Casino from May 30, 2013 to June 1, 2013.

168.  Upon arriving at the Buying Summit, Mr. Houtz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [Exhibit H].

169.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Houtz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not

be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections. [See Exhibit H]

170.  Mr. Houtz relied to his detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

171.  Mr. Houtz relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

172.  At the Buying Summit, Mr. Houtz and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

173.  As the result of the promises, inducements, relationships and agreements between Mr. Houtz and Defendants, Defendants owed Mr. Houtz a fiduciary duty during their relationship concerning the subject matter of their various contractual agreements.

174.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Houtz was induced to attend a sales session with an agent of Defendants at the Buying Summit.

175.  At a sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11055 Jewett Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $67,000.00.  The purported bargain contract price offered by Defendants for this home was $65,000.00 as displayed on this internet monitor.

176.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

177.  While attending the Buying Summit in Las Vegas, Mr. Houtz was also induced by the fraudulent statements and represenations of Defendants' agents to purchase from Defendants a worthless "Veil Corporate" protection package for $6,495.00 for the purpose of "protecting" the LLC the was created as described *supra* and which has never held any assets or conducted any business because an LLC is not utilized with the conveyance of properties to a self-directed IRA.

178.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Jewett Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $64,000.00.   However, with various add-ons, including a $3,386.10 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $71,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

179.   The aforementioned Buying Summit Workbook had announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT").   This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Mr. Houtz, the false impression that the homes he was purchasing were worth in excess of the amount of any "bridge loans" from Defendants when, in fact, the homes he purchased were worth less than the amount of his "bridge loan" and thus could not be refinanced or sold.

180.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $33,861.00 from his IRA savings regarding his purchase of the Jewett Ave. home and his IRA management company signed  a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $37,247.00 with interest-only payments of $378.00 per month for 24 months and the balance of $37,247.00 being due August 20, 2015.

181.  At the aforementioned sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 22533 Hillock, Warren, Michigan of $63,000.00.  The purported bargain contract price offered by Defendants for this home was $61,000.00 as displayed on this internet monitor.

182.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

183.    Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Hillock Ave. property and

the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $60,000.00. However, with various add-ons, including a $4,233.50 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $67,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

184. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr Houtz made a down payment of $20,044.00 from his IRA savings regarding his purchase of the Hillock Ave. home and his IRA management company signed  a "Non-Recourse Commercial Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $47,100.00 with interest-only payments of $465.69 per month for 24 months and the balance of $47,100.00 being due July 31, 2015.

185. At the aforementioned sales session attended by Mr. Houtz with an agent of Defendants at the Buying Summit, Defendants' internet monitor also displayed a "Suggested Retail Price for a home located at 23061 Peters St., Warren, Michigan

of $53,200.00. The purported bargain contract price offered by Defendants for this home was $45,000.00 as displayed on this internet monitor.

186. Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

187. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Peters St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Houtz purchased the property from Defendant Frontline Properties, LLC for $44,300.00. However, with various add-ons, including a $3,191.60 "loan origination fee" and "closing costs" of $1,850.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $51,000.00 and the property was conveyed by Warranty Deed dated June 28, 2013 to "American Estate and Trust FBO Dennis Houtz IRA".

188. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Houtz made a down payment of $16,858.24 from his IRA savings regarding his purchase of the Peters Ave. home and his IRA administrator signed a "Non-Recourse Commercial

Loan Agreement" on behalf American Estate and Trust FBO Dennis Houtz IRA with Defendant American Cash Funding to pay the "loan" balance of $35,700.00 with interest-only payments of $351.08 per month for 24 months and the balance of 35,700.00 being due September 11, 2105.

189. Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Jewett Ave. home had been available for sale at the distressed sale price of $21,675.00 in September, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on September 6, 2012 for $21,675.00.

190. Thereafter, in a series of step transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported 35,000.00; John Graham, Inc. then sold it on May 28, 2013 to defendant Frontside Properties, LLC for a purported $54,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $71,000.00.

191. Unbeknownst to Mr. Houtz but known to Defendants at the time of purchase, the Hillock Ave. home had been available for sale at the distressed sale price of $16,900.00 in October, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Rio Vista Farms Real Estate LLC on October 23, 2012 for $16,900.00.

192.  Thereafter, in a series of step transactions, Rio Vista Farms Real Estate LLC sold the Jewett Ave. property to John Graham Inc. on April 24, 2013 for a purported $33,000.00; John Graham, Inc. sold it on May 29, 2013 to defendant Frontside Properties, LLC for a purported $49,500.00 and Frontside Properties, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $67,000.00.

193.  Unbeknownst to Mr Houtz but known to Defendants at the time of purchase, the Peters Ave. home had been available for sale at the distressed sale price of $25,000 in January, 2012 and was purchased on behalf of Defendants own account by Defendants' agent, Buy Right Properties LLC on January 9, 2012 for $25,000.00.

194.  Thereafter, in a series of step transactions, Buy Right Properties LLC sold the Peters Ave. property to Defendant Max Ultra LLC on October 18, 2012 for a purported $33,956 and Max Ultra LLC, LLC sold it to Mr. Houtz on June 28, 2013 for in excess of $51,000.00.

195.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Houtz such that Defendants owed Mr. Houtz a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

196.  Defendants had a contractual and fiduciary duty owing to Mr. Houtz to locate the properties he purchased at such the promised discounted prices, inform

him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

197.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Houtz at a prices greatly in excess of their fair market value or true cash value.

198.  Plaintiff Houtz has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

199.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Houtz for his damages.

## COUNT III – THE CLAIMS OF PLAINTIFFS
## ROBERT WONG AND KENNETH WONG

200.  The allegations of paragraphs 1 to 199 are incorporated by reference as if fully set forth herein.

201.  Plaintiff Robert Wong received a flyer in the United States Mail at his place of business in New York state in April 2013 which advertised a free seminar

with special guest speakers Scott & Aime Yancey from the TV show "Flipping Vegas".

202.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

203.  The advertisement provided multiple locations for the seminar within the New York City area.  Mr. Wong called to register for an event at "Terrace On The Park" in Flushing Meadows Park, Queens, NY, and attended on May 19, 2013. He was allowed and encouraged to bring a guest, so he brought along his brother Defendant Kenneth Wong.

204.  At the seminar which Robert and Kenneth Wong attended on May 19, 2013, both of the Yanceys appeared, but only spoke briefly about the "life-changing benefits" of making money through real estate

205.  At the free May 19, 2013 event, the attendees were told by Defendants' agents that in order to receive further training, they should attend the next level seminar, at a cost of $1,997.00 for two attendees.  The written agreement for this package suggests that the entity providing the training services was "Yancey Events LLC", a "Utah DBA of Edge 2 Real Estate LLC", a purported Utah based limited liability company whose registration in Utah has expired.

68

206.  Robert Wong paid the aforementioned $1,997.00 fee with a credit card, and he and Kenneth attended the seminar from May 29, 2103 through May 31, 2013 at the Brooklyn Marriott Hotel.  This seminar consisted of 3 days of training for 8 hours each day, and led by a trainer named Mark Gonsalves who had a staff of 4 others who were also trained in Defendants' system, but mostly handled the logistics of the seminar.  Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments (title liens, tax deeds, etc).

207.  At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

208.  Robert and Kenneth Wong chose to purchase the Diamond package and Robert Wong charged $3,000 on his credit card towards the full fee of $39,997.00 and paid the balance through a wire transfer on June 25, 2013.  The written agreement for this package also suggests that the entity providing the training services was "Yancey Events LLC", a Utah DBA of "Edge 2 Real Estate LLC", a purported Utah based limited liability company whose registration in Utah has expired.

69

209.  Defendants' agents convinced Robert Wong to purchase the Diamond Package by stating that it included further one-on-one training, as well as attendance at the Buying Summit for both brothers.  Further, Defendants' agents expressly stated to Robert Wong that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Mr. Wong that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing with tenants that had at least 1 year left on their lease).  Further, Robert Wong was told that a person could only purchase these properties by attending the Buying Summit.  Attendees could also purchase legal services, insurance, wealth and estate planning and other financial services at the Buying Summit.

210.  Robert and Kenneth Wong relied to their detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

211.  Robert and Kenneth Wong relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

214.  At the Buying Summit, Robert and Kenneth Wong and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

215.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Robert and Kenneth Wong were induced by Defendants to convey any properties they purchased at the Buying Summit to a Self-Directed IRA.

216.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Robert Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

217.  At a sales session attended by Robert Wong with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 11808 Rossiter, Detroit Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $55,000.00.  The purported bargain contract price offered by Defendants for this home was $46,350.00 as displayed on this internet monitor.

71

218.   Defendants knew at the time of the events described *supra*, that the Rossiter home was not worth $55,000.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

219.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

220.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rossiter property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Robert Wong purchased the property from Defendant Screaming Eagle Properties, LLC for $45,350.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $1,850.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $50,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Robert Wong's self directed IRA by Warranty Deed dated August 22, 2013 (Attached as Exhibit K).

221.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Robert Wong made a down payment of

$21,459.93 regarding his purchase of the Rossiter St. home and a Non-Recourse loan agreement between Robert Wong and Defendant Insiders Cash was executed by Mr. Wong's IRA service provider to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

222.  Unbeknownst to Robert Wong but known to Defendants at the time of purchase, the Rossiter St. home had been available for sale at the distressed sale price of $24,000.00 on June 18, 2013 and was purchased on behalf of Defendants own account by Defendants' agent Metro Detroit Home Solutions, LLC on said date (see Warranty Deed attached as Exhibit L).  The June 18, 2013 Warranty Deed had been drafted by Defendants' own attorneys in Utah, "Guardian Law, LLC".

223.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Rossiter St. property to Defendant Screaming Eagle Properties LLC for a purported $31,000.00 by Warranty Deed dated June 19, 2013 prepared by Defendants' attorneys Guardian Law (see Warranty Deed attached as Exhibit L).

224.  Defendant Screaming Eagle Properties, LLC then conveyed the Rossiter St. property to Robert Wong's IRA on November 7, 2013 for the aforementioned effective price of in excess of $50,000.00 (see Warranty Deed attached as Exhibit J).

225.  Defendants had a contractual and fiduciary duty owing to Robert Wong to locate the Rossiter St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Wong at such a discounted price.

226.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Rossiter St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Robert Wong at a price greatly in excess of its fair market value or true cash value

227.  In further breach of their contractual and fiduciary duties, Defendants induced Robert Wong to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced contrary to what Mr. Wong had been informed by Defendants at the Buying Summit.

228.  On August 23, 2013, Robert Wong also purchased the property located at 2724 Central Ave., Anderson, Indiana from Defendant DLS Properties, LLC pursuant to the Defendants' Buying Summit Fraudulent Scheme.

229.  Further, and as the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff

Kenneth Wong was induced to attend a sales session with an agent of Defendants at the Buying Summit.

230.   At a sales session attended by Kenneth Wong with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.   For one such home located at 22020 Cushing, Eastpointe, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $61,000.00. The purported bargain contract price offered by Defendants for this home was $55,950.00 as displayed on this internet monitor.

231.   Defendants knew at the time of the events described *supra*, that the Cushing St. home was not worth $61,000.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

232.   Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

233.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Cushing St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Kenneth Wong purchased the property from Defendant

75

Screaming Eagle Properties, LLC for $54,950.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $2,050.00 (described as mostly being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $61,000.00 and the property was subsequently conveyed by Defendant Screaming Eagle Properties, LLC to Mr. Kenneth Wong's self directed IRA by Warranty Deed dated September 10, 2013.

234.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Kenneth Wong made a down payment of $29,464.00 regarding his purchase of the Cushing St. home and a Non-Recourse loan agreement  between Kenneth Wong and Defendant Insiders Cash was executed by Mr. Wong's IRA service provider to pay the "loan" balance of $32,464.00 with interest-only payments of $324.00 per month for 24 months and the balance of $32,464.00  being due in 2015.

235.  Unbeknownst to Kenneth Wong but known to Defendants at the time of purchase, the Cushing St. home had been available for sale at a distressed sale price in January, 2013 and was purchased on behalf of Defendants own account by Defendants' agent Buy Right Properties, LLC for $13,000.00 on February 8, 2013. The property was subsequently conveyed to Kenneth Wong's IRA by Defendant Screaming Eagle Properties, LLC for in excess of $61,928 on September 10, 2013.

236.  Defendants had a contractual and fiduciary duty owing to Kenneth Wong to locate the Cushing St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Kenneth Wong at such a discounted price.

237.  Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Cushing St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Kenneth Wong at a price greatly in excess of its fair market value or true cash value

238.  The City of Eastpointe, Michigan assessed the True Cash Value of the Cushing St. property at $31,740.00 for the year 2013, at 31,400.00 for the year 2014 and at $33,320.00 for the year 2015.

239.  While attending the Buying Summit, Robert and Kenneth Wong were also induced by the fraudulent statements of Defendants' agents to also purchase from Defendants a worthless "Veil Corporate" protection package.  This package included the cost of creating a limited liability company in Utah ("Skyhigh Developments LLC") to which the houses Robert and Kenneth Wong purchased at the Buying Summit would be conveyed along with a corporate "protection package" to "protect" those entities and homes.  However, because the purchased homes were instead conveyed by Defendants to a Self-Directed IRA each on behalf of Robert

and Kenneth Wong, no assets have ever been conveyed to "Skyhigh Developments LLC" and the "protection package" was totally unnecessary.

240.    Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Robert and Kenneth Wong by Defendants and their agents to engender their unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra.*

241.  Both Robert and Kenneth Wong were unaware that the sales agreements they executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

242.    Both Robert and Kenneth Wong were thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

243.  Both Robert and Kenneth Wong were unaware that the training and Buying Summit agreements they signed provided for binding arbitration of disputes.

244.   Both Robert and Kenneth Wong were unaware that the Commercial Loan Agreements they signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

245.   There was and is no relationship whatsoever between either Robert and/or Kenneth Wong, their attendance at the Buying Summit in Nevada nor any aspect of their agreements to purchase the aforementioned properties from Defendants that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

246.   Plaintiffs Robert Wong and Kenneth Wong have each incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

247.   Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Robert Wong and Kenneth Wong for their damages.

## COUNT IV – THE CLAIMS OF PLAINTIFFS MIKE HAMPSHIRE AND LIONS FAN, LLC

The allegations of paragraphs 1 - 247 are incorporated by reference as if fully set forth herein.

248.  In late January/early February, 2013 while living in Murphy, Texas, Plaintiff Mike Hampshire received a postcard-type piece of mail featuring Dean Graziosi inviting him to a free ½ day seminar on Friday, February 15, 2013 at a hotel in Plano, Texas concerning real estate investing such that the attendees would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

249.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

250.   Mr. Hampshire called the telephone phone number on the aforementioned postcard sometime in early February, 2013 and reserved a spot at the ½ day seminar

251.  Mr. Hampshire attended the ½ day event on February 15, 2013 and while attending he purchased 3 packages from Defendants:

a) Insider's Financial Enhance Note Network System at a cost of $497.00;

b) Insider's Financial Tax Lien Program at a cost of $997.00; and

c) Insider's Financial Real Estate Workshop Package at a cost of $1997.00.

252.  Mr. Hampshire then attended the 3-day "Real Estate Workshop" (@ $1997.00) which took place on February 22-24, 2013 at a hotel in Dallas, Texas.

253. At the aforementioned 3-day "Real Estate Workshop", the attendees, including Mr. Hampshire, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

254. At the aforementioned 3-day "Real Estate Workshop", agents of the Defendants pushed very hard for the attendees, including Mr. Hampshire to purchase one of their "Insider's Financial Deans Advanced Training.com Continuing Education" packages which consisted of the Diamond package (Retail Price $60,000.00; Workshop Price $39,997.00), the Platinum package (Retail Price $43,000.00); Workshop Price $24,997.00) and the Gold package (Retail Price $26,000.00; Workshop Price $18,997.00).

255.  The pressure to buy a package was more subtle the first 2 days. However, if an attendee had not bought a package by the 3rd day, then the pressure was noticeably firmer.  Mr. Hampshire observed the woman sitting next to him at the "workshop" gamely trying to hold out and she was being harangued strongly by one of the Defendants' agents pushing the packages.

256.  Mr. Hampshire ultimately succumbed to the pressure and bought the Platinum package for $24,997.00 which he paid via credit card.

257.  The day immediately after the 3-day workshop (Monday, February 25, 2013), an agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and harangued him for over an hour about buying an additional $25,000 training program from Dean.  Mr. Hampshire tried to resist and told the caller that he had just spent $25,000.00 two days ago and was in no mood and in no position to spend another $25,000.00.

258.  The very next day a different agent of Defendants from "Dean's Inner Circle" made a telephone call to Mr. Hampshire and again harangued him for over an hour about purchasing additional real estate training packages from Defendants.

259.  Again, Mr. Hampshire succumbed and agreed to buy a program called the "PMI (Professional Marketing Institute) Real Estate Success Academy" for another $8,000.00.

260.  Each of these telephone calls to Mr. Hampshire and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

261.  At the "Boots on the Ground" workshop which Mr. Hampshire attended in March, 2013, each of the attendees with which Mr. Hampshire spoke on the topic indicated that they had received the same type of phone call as described *supra*.

262.  The aforementioned "training" and Buying Summit packages were purchased by Mr. Hampshire from a purported entity entitled "Insider's Financial Education LLC".

263.  The written contractual agreements between Mr. Hampshire and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

264.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity.  Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Insider's Financial Education LLC" which is nothing other than an alter ego of the Defendants.

265.  Mr. Hampshire attended The Buying Summit in Las Vegas May 29-June 1, 2013 where the attendees, including Mr. Hampshire, were expressly told that the houses offered for sale there by Defendants were already rehabbed, tenanted, under the care of a property management company and that they were available at well below market value.  These same express promises and representations were also

made at the prior ½ day seminar and the 3-day workshop which Mr. Hampshire attended as described *supra*.

266.  Upon arriving at the Buying Summit, Mr. Hampshire was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [Exhibit H].

267.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Mr. Hampshire and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".   The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

268.  Mr. Hampshire relied to his detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

269.  Mr. Hampshire relied to his detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

270.  Mr. Hampshire relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale had been fully rehabbed and had paying tenants.

271.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Hampshire was induced to attend a sales session with an agent of Defendants at the Buying Summit.

272.  At the Buying Summit, Mr. Hampshire and the other attendees were not given the option of whether or not they wanted to speak to one of Defendants' sales representatives.   Instead, Defendants' agents came into the seminar room and escorted different people at different times out to the lobby to sit down and look at some of the properties Defendants were selling.

273.  The agent of Defendants' who delivered the seminar presentation each day at the Buying Summit repeatedly and expressly stated to Mr. Hampshire and the other attendees to not try to negotiate with the Defendants' sales representatives because they had already marked down the prices of each property to accommodate the attendees of the Buying Summit.

274.  At the Buying Summit, Defendants' agents also pushed hard to sell to Mr. Hampshire and the other attendees the "Veil Corporate Asset Protection/Tax Plan" and the "Safeguard Business Advantage program.

275.   Relying upon the false and fraudulent statements and representations of Defendants' agents at the Buying Summit, Mr. Hampshire purchased the Veil Corporate plan for $6,095.00 which he was told was a price discount of $400.00 because it was purchased it at the Buying Summit.

276.   Defendants' agents also convinced Mr. Hampshire to purchase the "Safeguard Platinum Tax Package (Veil Corporation)" for $3,795.00.

277.   At a sales session attended by Mr. Hampshire with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 17681 Lenore, Detroit, Michigan 48219, the purported bargain contract price offered by Defendants for this home was $46,600.00 as displayed on this internet monitor.

278.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Lenore property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $46,600.00.   However, with various add-ons, including a $3,362.40 "loan origination fee" and "closing costs" of $4,858.60, the actual sales price was $54,821 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 13, 2013.

279.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $$23,159 regarding his purchase of the Lenore St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay the "loan" balance of $50,000.00 with interest-only payments of $500.00 per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

280.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Lenore St. home.

281.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Lenore St. home had been available for sale at the distressed sale price in May, 2013 and was conveyed directly by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 31, 2013.   Defendant FrontSide Properties, LLC then sold the Lenore St. property to Lions Fan, LLC as described *supra*.

282.   At the aforementioned sales session attended by Mr. Hampshire with an agent of Defendants at the Buying Summit, Defendants' internet monitor displayed

various homes for sale including one such home located at 13591 Riverview Street, Detroit, Michigan for which Defendants' internet monitor displayed a "Suggested Retail Price of $59,000.00. The purported bargain contract price offered by Defendants for this home was $44,800.00 as displayed on this internet monitor.

283. Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

284. Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Riverview St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $44,800.00. However, with various add-ons, including a $3,257.00 "loan origination fee" and "closing costs" of $5,124.00, the actual sales price was $53,181 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated July 8, 2013.

285. Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $16,781.00 regarding his purchase of the Riverview St.

home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant American Cash Funding to pay the "loan" balance of $36,400.00 with interest-only payments of $358.31per per month for 24 months and the balance of 36,400.00 being due July 16, 2015.

286.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Riverview St. home.

287.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Riverview St. home had been available for sale at the distressed sale price in June, 2013 and had been conveyed by Metro Detroit Home Solutions LLC to Defendant FrontSide Properties LLC for a purported $31,850 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 31, 2013.  Defendant FrontSide Properties, LLC then sold the Riverview St. property to Lions Fan, LLC as described *supra*.

288.   Upon returning home from the Buying Summit, Mr. Hampshire continued to purchase homes from Defendants by using the internet.  Defendants' internet website displayed various homes for sale including one such home located at 10031 Fielding Street, Detroit, Michigan, Michigan for which Defendants' internet website displayed a "Suggested Retail Price of $56,000.00.  The purported

bargain contract price offered by Defendants for this home was $50,950.00 as displayed on this internet monitor.

289.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

290.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Fielding St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $$50,950.00. However, with various add-ons, including a $3,624.80 "loan origination fee" and "closing costs" of $4,498.20, the actual sales price was $59,073.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 11, 2013.

291.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,673.00 regarding his purchase of the Fielding St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders

Cash to pay the "loan" balance of $40,400.00 with interest-only payments of $404.00 per per month for 24 months and the balance of $40,400.00 being due September 27, 2015.

292. Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Fielding St. home.

293. Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Fielding Street property had been available for sale at the distressed sale price of $25,000.00 in June, 2013 and was purchased on behalf of Defendants own account by Defendants' agent, Metro Detroit Home Solutions, LLC on June 19, 2013 for $25,000.00. The deed had been drafted by Defendants attorneys, Guardian Law.

294. Metro Detroit Home Solutions, LLC soon thereafter conveyed the Fielding St. property directly to Defendant Screaming Eagle Properties LLC for a purported $33,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013. Defendant Screaming Eagle Properties, LLC then sold the Fielding St. property to Lions Fan, LLC as described *supra*.

295. Defendants' internet website also displayed a home located at 12053 Laing Street, Detroit, Michigan, Michigan for which Defendants' internet website

displayed a "Suggested Retail Price of $51,500.00.  The purported bargain contract price offered by Defendants for this home was $37,000.00 as displayed on this internet monitor.

296.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

297.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Laing St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $37,000.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $4,666.00, the actual sales price was $44,666.00 and the property was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 4, 2013.

298.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $13,966.00 regarding his purchase of the Laing St. home

and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $30,700.00 with interest-only payments of $307.00 per per month for 24 months and the balance of $30,700.00 being due September 18, 2015.

299.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

300.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Laing Street property had been the subject of a tax forfeiture to the Wayne County Treasurer on April 8, 2013 and was conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on June 6, 2013.

301.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Laing St. property directly to Defendant FrontSide Properties LLC for a purported $26,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 28, 2013.  Defendant FrontSide Properties, LLC then sold the Laing St. property to Lions Fan, LLC as described *supra*.

302.  Metro Detroit Home Solutions, LLC subsequently contracted with Lions Fan, LLC to provide property management services for various homes purchased by Lions Fan, LLC in the Detroit metropolitan area without disclosing their prior role

in purchasing properties at distress sale prices for later sale to victims of the Buying Summit.

303.  Defendants' internet website also displayed a home located at 18740 Glenhurst Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.  The purported bargain contract price offered by Defendants for this home was $49,600.00 as displayed on this internet monitor.

304.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

305.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Glenhurst St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant FrontSide Properties, LLC for $49,600.00.  However, with various add-ons, including a $3,613.80 "loan origination fee" and "closing costs" of $5,702.20, the actual sales price was $58,916.00 and the property

was conveyed by Defendant FrontSide Properties, LLC to Lions Fan, LLC by Warranty Deed dated September 25, 2013.

306.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,616.00 regarding his purchase of the Glenhurst St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $40,300.00 with interest-only payments of $403.00 per per month for 24 months and the balance of $40.300.00 being due October 11, 2015.

307.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Glenhurst St. home.

308.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Glenhurst Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $19,900.00 on May 9, 2013.

309.    Metro Detroit Home Solutions, LLC soon thereafter conveyed the Glenhurst St. property directly to Defendant FrontSide Properties LLC for a purported $31,000.00 by Warranty Deed prepared by Defendants attorneys Guardian

Law on May 24, 2013.  Defendant FrontSide Properties, LLC then sold the Glenhurst St. property to Lions Fan, LLC as described *supra*.

310.  Defendants' internet website also displayed a home located at 20519 Rosemont Avenue, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,800.00.  The purported bargain contract price offered by Defendants for this home was $53,200.00 as displayed on this internet monitor.

311.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

312.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rosemont St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $53,200.00.  However, with various add-ons, including a $3,789.70 "loan origination fee" and "closing costs" of $4,733.30, the actual sales price was $61,723.00 and the property

was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 7, 2013.

313.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $19,523.00 regarding his purchase of the Rosemont St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $42,200.00 with interest-only payments of $422.00 per per month for 24 months and the balance of $42,200.00 being due October 29, 2015.

314.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rosemont St. home.

315.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rosemont Street property had been conveyed to Defendant Silver Tie Homes, LLC for a purported $33,700.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 6, 2013.  Defendant FrontSide Properties, LLC then sold the Rosemont St. property to Lions Fan, LLC as described *supra*.

316.  Defendants' internet website also displayed a home located at 7666 Vaughan Street, Detroit, Michigan, for which Defendants' internet website

displayed a "Suggested Retail Price" of $68,000.00.  The purported bargain contract price offered by Defendants for this home was $50,400.00 as displayed on this internet monitor.

317.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

318.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Vaughan St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $50,400.00. However, with various add-ons, including a $3,581.70 "loan origination fee" and "closing costs" of $4,369.30, the actual sales price was $58,351.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 7, 2013.

319.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,451.00 regarding his purchase of the Vaughan St.

home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $39,900.00 with interest-only payments of $399.00 per per month for 24 months and the balance of $39,999.00 being due November 4, 2015.

320. Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

321. Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Vaughan Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $24,750.00 on August 9, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

322. Metro Detroit Home Solutions, LLC soon thereafter conveyed the Vaughan St. property directly to Defendant Silver Tie Homes LLC for a purported $33,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Silver Tie Homes, LLC then sold the Vaughan St. property to Lions Fan, LLC as described *supra*.

323. Defendants' internet website also displayed a home located at 18500 Dequindre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $48,000.00. The purported bargain contract

price offered by Defendants for this home was $41,300.00 as displayed on this internet monitor.

324.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

325.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Dequindre St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $41,300.00. However, with various add-ons, including a $3,011.70 "loan origination fee" and "closing costs" of $4,903.30, the actual sales price was $49,215.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

326.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $15,515.00 regarding his purchase of the Laign St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders

Cash to pay the "loan" balance of $33,700.00 with interest-only payments of $337.00 per per month for 24 months and the balance of $33.700.00 being due November 21, 2015.

327.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Dequindre St. home.

328.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Dequindre Street property had been conveyed to Sycamore Homes, LLC at a distress sale price on September 5, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie Homes LLC for a purported $28,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 13, 2013.  Defendant Silver Tie Homes, LLC then sold the Dequindre St. property to Lions Fan, LLC as described *supra*.

329.  Defendants' internet website also displayed a home located at 6906 Longacre Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $52,000.00.  The purported bargain contract price offered by Defendants for this home was $38,900.00 as displayed on this internet monitor.

330.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

331.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Longacre St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $38,900.00.   However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $5,507.00, the actual sales price was $47,407.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

332.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $14,907.00 regarding his purchase of the Longacre St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $32,500.00 with interest-only payments

of $325.00 per per month for 24 months and the balance of $32,500.00 being due November 22, 2015.

333.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Longacre St. home.

334.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Longacre Street property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price of $25,000.00 on June 19, 2013 pursuant to a Warranty Deed drafted by Guardian Law.

335.  Metro Detroit Home Solutions, LLC soon thereafter conveyed the Longacre St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $27,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on June 19, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Longacre St. property to Lions Fan, LLC as described *supra*.

336.  Defendants' internet website also displayed a home located at 17511 Westmoreland Road, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $64,500.00.  The purported bargain contract price offered by Defendants for this home was $50,500.00 as displayed on this internet monitor.

337.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

338.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Westmoreland Road property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $50.500.00.   However, with various add-ons, including a $3,624.00 "loan origination fee" and "closing costs" of $4,945.00, the actual sales price was $59,069.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated October 29, 2013.

339.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $18,669.00 regarding his purchase of the Westmoreland home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $40,400.00 with interest-only payments

of $404.00 per per month for 24 months and the balance of $40,400.00 being due November 21, 2015.

340.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Westmoreland Road home.

341.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Westmoreland Road property had been conveyed to Metro Detroit Home Solutions, LLC at a distress sale price on July 31, 2013 who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $31,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.   Defendant Screaming Eagle Properties, LLC then sold the Westmoreland Road property to Lions Fan, LLC as described *supra*.

342.  Defendants' internet website also displayed a home located at 6906 Pierson Street, Detroit, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $56,100.00.   The purported bargain contract price offered by Defendants for this home was $48,000.00 as displayed on this internet monitor.

343.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an

incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

344.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Pierson St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Silver Tie Homes, LLC for $48,000.00.  However, with various add-ons, including a $3,448.30 "loan origination fee" and "closing costs" of $4,815.70, the actual sales price was $56,264.00 and the property was conveyed by Defendant Silver Tie Homes, LLC to Lions Fan, LLC by Warranty Deed dated November 19, 2013.

345.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $17,764.00 regarding his purchase of the Pierson St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $38,500.00 with interest-only payments of $385.00 per per month for 24 months and the balance of $38,500.00 being due December 11, 2015.

346.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Laing St. home.

347.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Pierson Street property had been conveyed to [Defendant?] GLS Props, LLC at a distress sale price on September 21, 2013 pursuant to a Warranty Deed drafted by Guardian Law who soon thereafter conveyed the property directly to Defendant Silver Tie Homes, LLC for a purported $29,200.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on September 21, 2013.  Defendant Silver Tie Homes, LLC then sold the Pierson St. property to Lions Fan, LLC as described *supra*.

348.  Defendants' internet website also displayed a home located at 3435 Wasmund Avenue, Warren, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $64,000.00.  The purported bargain contract price offered by Defendants for this home was $59,400.00 as displayed on this internet website.

349.  Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of

racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

350.    Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Wasmund St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Patriot Homes, LLC for $59,400.00. However, with various add-ons, including a $4,178.70 "loan origination fee" and "closing costs" of $4,447.30, the actual sales price was $68,026.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed dated December 5, 2013.

351.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,526.00 regarding his purchase of the Wasmund St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,500.00 with interest-only payments of $465.00 per per month for 24 months and the balance of $46,500.00 being due December 20, 2015.

352.    Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a

personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Wasmund St. home.

353.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Wasmund Street property had been conveyed to by the Federal Home Loan Mortgage Corp. (Freddie Mac) to John Graham, Inc. at a distress sale price of $35,000.00 on June 7, 2013..

354.  John Graham, Inc., soon thereafter conveyed the Wasmund St. property directly to Defendant Patriot Homes, LLC for a purported $51,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Patriot Homes, LLC then sold the Wasmund St. property to Lions Fan, LLC as described *supra*.

355.  Defendants' internet website also displayed a home located at 19960 Kenosha Street, Harper Woods, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $65,000.00.  The purported bargain contract price offered by Defendants for this home was $58,500.00 as displayed on this internet website.

356. Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of

racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

357.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Kenosha St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Patriot Homes, LLC for $58,500.00.   However, with various add-ons, including a $4,146.60 "loan origination fee" and "closing costs" of $4,914.40, the actual sales price was $67,561.00 and the property was conveyed by Defendant Patriot Homes, LLC to Lions Fan, LLC by Warranty Deed dated December 12, 2013.

358.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,361.00 regarding his purchase of the Kenosha St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,200.00 with interest-only payments of $462.00 per per month for 24 months and the balance of $46,500.00 being due January 7, 2016.

359.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a

personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Kenosha St. home.

360.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Kenosha Street property had been conveyed to John Graham, Inc. at a distress sale price of $32,000.00 on June 7, 2013.

361.  John Graham, Inc., soon thereafter conveyed the Kenosha St. property directly to Defendant Patriot Homes, LLC for a purported $48,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013. Defendant Patriot Homes, LLC then sold the Kenosha St. property to Lions Fan, LLC as described *supra*.

362.  Defendants' internet website also displayed a home located at 15324 Semrau Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a "Suggested Retail Price" of $69,000.00.  The purported bargain contract price offered by Defendants for this home was $64,250.00 as displayed on this internet website.

363. Defendants' internet website display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

364.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Semrau St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Screaming Eagle Properties, LLC for $64,250.00. However, with various add-ons, including a $4,495.70 "loan origination fee" and "closing costs" of $4,413.30, the actual sales price was $73,159.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Lions Fan, LLC by Warranty Deed dated January 8, 2014.

365.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,159.00 regarding his purchase of the Semrau St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $50,000.00 with interest-only payments of $500.00 per per month for 24 months and the balance of $50,000.00 being due January 14, 2016.

366.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Semrau St. home.

367.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Semrau Street property had been conveyed to John Graham, Inc. at a distress sale price of $27,000.00 on June 5, 2013..

368.  John Graham, Inc., soon thereafter conveyed the Semrau St. property directly to Defendant Screaming Eagle Properties, LLC for a purported $53,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on August 9, 2013.  Defendant Screaming Eagle Properties, LLC then sold the Semrau St. property to Lions Fan, LLC as described *supra*.

369.  Defendants' internet website also displayed a home located at 11036 Packard Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home was $61,150.00 as displayed on this internet website.

370.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

371.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Semrau St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the

property from Defendant EZ Street Properties, LLC for $61,150.00. However, with various add-ons, including a $4,269.30 "loan origination fee" and "closing costs" of $4,073.70, the actual sales price was $69,493.00 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 3, 2014.

372.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $21,993.00 regarding his purchase of the Packard Avenue home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $47,500.00 with interest-only payments of $475.00 per per month for 24 months and the balance of $47,500.00 being due June 23, 2017. .

373.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Packard Avenue home.

374.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Packard Avenue property had been conveyed to by the Secretary of Veterans Affairs to Benjamin Soloman at a distress sale price of $7,000.00 on July 19, 2013.

375.  On August 19, 2013, Benjamin Soloman conveyed the property to A Plus Technologies for $100.00.

376.  On January 10, 2014, the property was conveyed to John Graham, Inc. for a purported $26,000.00

377.  John Graham, Inc., soon thereafter conveyed the Packard Avenue St. property directly to Defendant EZ Street Properties, LLC for a purported 49,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12 2014.  Defendant EZ Street Properties, LLC then sold the Packard Avenue St. property to Lions Fan, LLC as described *supra*.

378.  Defendants' internet website also displayed a home located at 22126 Hayes Avenue, Eastpointe, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $63,350.00.

379.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

380.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Hayes St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased

from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,350.00. However, with various add-ons, including a $4,468.70 "loan origination fee" and "closing costs" of $4,901.30, the actual sales price was $72,720 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 4, 2014.

381.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,020.00 regarding his purchase of the Hayes St. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $49,700.00 with interest-only payments of $597.00 per per month for 24 months and the balance of $50,000.00 being due June 23, 2017.

382.   Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Hayes St. home.

383.   Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Hayes Street property had been conveyed to John Graham, Inc. at a distress sale price of $30,000.00 on December 27, 2013.

384.   John Graham, Inc., soon thereafter conveyed the Otis Ave. property directly to Defendant EZ Street Properties, LLC for a purported $52,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on February 12, 2014.  Defendant EZ Street Properties, LLC then sold the Otis Ave. property to Lions Fan, LLC as described *supra*.

385.  Defendants' internet website also displayed a home located at 2152 Otis Avenue, Warren, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $61,650.00.

386.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

387.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Otis Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $61,650.00.  However, with various add-ons, including a $4,326.80 "loan origination fee" and "closing costs" of $4,413.20, the actual sales price was $70,390 and the property was conveyed by

117

Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 25, 2014.

388.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $22,290.00 regarding his purchase of the Otis Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $48,100.00 with interest-only payments of $481.00 per per month for 24 months and the balance of $48,100.00 being due June 15, 2017.

389.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Otis Ave. home.

390.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Otis Ave. property had been conveyed to John Graham, Inc. at a distress sale price of $28,000.00 on March 20, 2014.

391.  John Graham, Inc., soon thereafter conveyed the Otis Ave. property directly to Defendant EZ Street Properties, LLC for a purported $48,500.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on March 31, 2014.

Defendant EZ Street Properties, LLC then sold the Otis Ave. property to Lions Fan, LLC as described *supra*.

392.  Defendants' internet website also displayed a home located at 22809 Rein Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $63,950.00.

393.  Defendants' internet website display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

394.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Rein Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant EZ Street Properties, LLC for $63,950.00.  However, with various add-ons, including a $4,509.10 "loan origination fee" and "closing costs" of $4,969.90, the actual sales price was $73,429 and the property was conveyed by Defendant EZ Street Properties, LLC to Lions Fan, LLC by Warranty Deed dated August 1, 2014.

395.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Hampshire made a down payment of $23,229.00 regarding his purchase of the Rein Ave. home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant Insiders Cash to pay the "loan" balance of $50,200.00 with interest-only payments of $502.00 per per month for 24 months and the balance of $50,200.00 being due July 21, 2017.

396.  Unbeknownst to him and due only to Defendants' successful attempts to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Lions Fan, LLC for the purchase of the Rein Ave. home.

397.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of purchase, the Rein Ave. property had been conveyed on January 24, 2014 at the distress sale price of $29,000.00 by the Veterans Administration to G-USA, LLC.

398.   On May 30, 2014 G-USA, LLC conveyed the property to GWH Properties, LLC by quit claim deed drafted by Guardian Law for a recited consideration of $10.00.

399.  GWH Properties, LLC soon thereafter conveyed the Rein Ave. property directly to Defendant EZ Street Properties, LLC for a purported $51,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on May 30, 2014.

2:16-cv-10659-RHC-MKM    Doc # 37    Filed 11/18/16    Pg 121 of 223    Pg ID 2068

Defendant EZ Street Properties, LLC then sold the Rein Ave. property to Lions Fan, LLC as described *supra*.

400.  Defendants' internet website also displayed a home located at 23106 Lambrecht Avenue, Eastpointe, Michigan 48021, Michigan, for which Defendants' internet website displayed a purported bargain contract price offered by Defendants for this home of $67,450.00.

401.  Defendants' internet website display of the fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

402.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Lambrecht Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased from Defendants as promised at the Buying Summit, Mr. Hampshire purchased the property from Defendant Malibu Breeze Properties, LLC for $67,450.00.    However, with various add-ons, including a $4,704.50 "loan origination fee" and "closing costs" of $4,381.50, the actual sales price was $76,536.00 and the property was conveyed by Defendant Malibu Breeze Properties, LLC to Lions Fan, LLC by Warranty Deed dated June 4, 2014.

403.     Relying upon the aforementioned the aforementioned false and
fraudulent statements, promises and inducements of Defendants, Mr. Hampshire
made a down payment of $24,236.00 regarding his purchase of the Lambrecht Ave.
home and a signed a loan agreement on behalf of Lions Fan, LLC with Defendant
Insiders Cash to pay the "loan" balance of $52,300.00 with interest-only payments
of $523.00 per per month for 24 months and the balance of $52,300.00 being due
June 23, 2017.

404.  Unbeknownst to him and due only to Defendants' successful attempts
to engender the unqualified trust of Mr. Hampshire, Mr. Hampshire also signed a
personal guaranty drafted by Defendants counsel for said purchase money "loan"
obligation of Lions Fan, LLC for the purchase of the Lambrecht Ave. home.

405.  Unbeknownst to Mr. Hampshire but known to Defendants at the time of
purchase, the Lambrecht Ave. property had been conveyed on December 12, 2013
at the distress sale price of $33,000.00 to John Graham, Inc.

406.     John Graham, Inc.soon thereafter conveyed the Lambrecht Ave.
property directly to Defendant Malibu Breeze Properties, LLC for a purported
$55,000.00 by Warranty Deed prepared by Defendants attorneys Guardian Law on
January 22, 2014.   Defendant Malibu Breeze Properties, LLC then sold the
Lambrecht Ave. property to Lions Fan, LLC as described *supra*.

407.  On December 2, 2013, Mr. Hampshire purchased the property located at 5877 Buck Street, Taylor, Michigan 48180 from Defendant Silver Tie Homes, LLC for $68,620.00 pursuant to Defendants' fraudulent scheme as described *supra.*

408.  On July 26, 2013, Mr. Hampshire purchased the property located at 4186 N Toronto Street, Milwaukee, Wisconsin 53216 from Defendant Screaming Eagle Properties, LLC for $62,134.00 pursuant to Defendants' fraudulent scheme as described *supra.*  Also on July 26, 2013, Mr. Hampshire purchased the property located at 2037 N 40th Street, Milwaukee, Wisconsin from Defendant Screaming Eagle Properties, LLC for $64,796.00 pursuant to Defendants' fraudulent scheme as described *supra.*

409.  On August 1, 2014, Mr. Hampshire purchased the property located at 3803 Wayne Avenue, Kansas City, Missouri 64109 from Defendant EZ Street Properties, LLC for $58,905.00 pursuant to Defendants' fraudulent scheme as described *supra.*.

410.  On September 4, 2014, Mr. Hampshire purchased the property located at 909 Maurice Avenue, Ferguson, Missouri 63135 from Defendant Green Apple Homes, LLC for $55,993.00 pursuant to Defendants' fraudulent scheme as described *supra.*.

411.  On September 4, 2014, Mr. Hampshire purchased the property located at 6912 E 114th Street, Kansas City, Missouri 64134 from Defendant Green Apple

Homes, LLC for $63,749.00 pursuant to Defendants' fraudulent scheme as described *supra.*

412.  On October 7, 2014, Mr. Hampshire purchased the property located at 153 Bascom Drive, Ferguson, Missouri 63135 from Defendant Green Apple Homes, LLC for $70,958.00 pursuant to Defendants' fraudulent scheme as described *supra.*

413.  On December 30, 2014, Mr. Hampshire purchased the property located at 2352 Gardner Drive, Saint Louis, Missouri 63136 from Defendant 5 Choices, LLC for $64,497.00 pursuant to Defendants' fraudulent scheme as described *supra.*

414.  Mr. Hampshire was unaware that the sales agreements he signed contained language describing the purchased properties as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

415.  Mr. Hampshire was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

416.  Mr. Hampshire was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.  The inclusion of

such language in these agreements was an essential aspect of Defendants' scheme to defraud.

417.  Mr. Hampshire was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements or litigation of disputes in the courts of the State of Utah.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

418.  There was and is no relationship whatsoever between Mr. Hampshire, Lions Fan, LLC, and/or his attendance at the Buying Summit in Nevada with the State of Utah nor did any aspect of his agreements to purchase the aforementioned properties in Michigan and other states have any relationship whatsoever with the State of Utah except that all of the Defendant entities are registered in the State of Utah.

419.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs Mike Hampshire and Lions Fan LLC such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

420.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Mike Hampshire and Lions Fan LLC to locate the properties they purchased at the

promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

421.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Hampshire and his company at a prices greatly in excess of their fair market value or true cash value.

422.  Plaintiffs Mike Hampshire and Lions Fan LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise

423.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Hampshire and Lions Fan, LLF for their damages.

## COUNT V –THE CLAIMS OF LINDA SAENZ AND ABBY CREEK INVESTMENT LLC

The allegations of paragraphs 1 - 423 are incorporated by reference as if fully set forth herein.

424.  In March, 2013 while living in Houston, Texas, Plaintiff Linda Saenz viewed an infomercial playing on television featuring Dean Graziosi which

promoted a free seminar concerning real estate investing promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

425.  The aforementioned television advertisement was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

426.  In response to the aforementioned March 2013 television infomercial, Ms. Saenz called the advertised telephone number and spoke with an agent of the Defendants during which her attendance at such a free seminar was scheduled for April 28, 2013 at a nearby hotel.

427.  At the free seminar held on April 28, 2013, Ms. Saenz was induced by agents of Defendants to purchase the "Insider's Financial 3-Day Real Estate Workshop Package" for $1,997.00 and the "Insider's Financial Tax Lien Program" for $997.00 based upon express promises and inducements that by taking these courses, she would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

428.  The "Insider's Financial 3-Day Real Estate Workshop" was held May 3-5, 2013 at the Techniplex Conference Center, Stafford, Texas.   At this "workshop", the attendees, including Ms. Saenz, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their

credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

429.  Ms. Saenz did as instructed and called her credit card company and obtained an increase in her credit limit.

430.   At the aforementioned "Insider's Financial 3-Day Real Estate Workshop", Ms. Saenz was induced by the fraudulent statements of Defendants agents on May 5, 2013 to purchase "Dean's Advanced Training – silver package – Boots on the Ground" for $11,997.00 but which did not include attending the Buying Summit.   The purported purpose of this course as repeatedly expressed by Defendants' agent was so that Ms. Saenz could obtain expert training and guidance from Defendants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

431.  While at home on June 4, 2013, Ms. Saenz received a telephone call from an agent of Defendants identified as a member of "Dean's Inner Circle" who forcefully and relentlessly inquired about Ms. Saenz' financial status.  During this "hard sell" telephone call, Ms. Saenz was promised, *inter alia*, the opportunity to purchase rental housing properties at steeply discounted prices if she would purchase the Buying Summit package and attend the Buying Summit.

432.   When Defendants' agent discovered during the aforementioned telephone call how much credit was available on Ms. Saenz' credit cards, she was

induced on June 4, 2013 by the various aforementioned promises and inducements of Defendants to purchase "Dean's Advanced Training Inner Circle" package (which included attendance at the Buying Summit) for an additional $15,075.00.

433.  Each of these telephone calls made Defendants' agents to Ms. Saenz and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

434.  The aforementioned "training" and Buying Summit packages were purchased by Ms. Saenz from a purported entity entitled "Insider's Financial Education LLC".

435.  The written contractual agreements between Ms. Saenz and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association.

436.  None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity.  Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Insider's Financial Education LLC" which is nothing other than an alter ego of the Defendants.

437.  Ms. Saenz attended a Buying Summit in Las Vegas, Nevada from July 11, 2013 to July 13, 2013.

438.   Upon arriving at the Buying Summit, Ms. Saenz was provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [Exhibit H].

439.   On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to Ms. Saenz and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".   The Workbook stated:

**15.  What resources to you use to complete the due-diligence?**
We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections. [Exhibit H]

440.  Ms. Saenz relied to her detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

441.  Ms. Saenz relied to her detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

442.  At the Buying Summit, Ms. Saenz and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

443.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Ms. Saenz was induced to attend a sales session with an agent of Defendants at the Buying Summit.

444.  At a sales session attended by Ms. Saenz with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 21920 Elroy Ave., Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price of $75,000.00.  The purported bargain contract price offered by Defendants for this home was $60,350.00 as displayed on this internet monitor.

445.  Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

446.  Defendant's agents attempted to induce Ms. Saenz to create a Utah based limited liability company ("LLC") and to which the homes she purchased at the

2:16-cv-10659-RHC-MKM   Doc # 37   Filed 11/18/16   Pg 132 of 223   Pg ID 2079

Buying Summit were to be conveyed. However, Ms. Saenz instead created a Texas-based LLC entitled "Abby Creek Investment, LLC" for such purpose.

447.    Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Elroy Ave. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $59,350.00. However, with various add-ons, including a $4,203.00 "loan origination fee" and "closing costs" of $2,050.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $68,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed dated October 29, 2013.

448.    The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Saenz, the false impression that the homes she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased

was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

449.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $21,459.93 regarding her purchase of the Elroy Ave. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $46,800.00 with interest-only payments of $480.00 per month for 24 months and the balance of $46,800.00 being due November 14, 2015.

450.   Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC for the purchase of the Elroy St. home.

451.   Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Elroy Ave. home had been available for sale at the distressed sale price of $26,000.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent, John Graham Inc. on June 6, 2013 for $26,000.00.

452.   John Graham Inc. soon thereafter conveyed the Elroy Ave. property directly to Defendant Screaming Eagle Properties LLC by Warranty Deed prepared by Defendants attorneys Guardian Law on July 3, 2013.  Defendant Screaming Eagle

Properties, LLC then sold the Elroy Ave. property to Abby Creek Investment, LLC on November 7, 2013 for the aforementioned effective price of in excess of $68,000.00.

453.  Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Elroy Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

454.  Instead, Defendants breached its duties as described *supra*, and absconded with the opportunity to purchase the Elroy Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

455.  In further breach of their contractual and fiduciary duties, Defendants induced Ms. Saenz to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Ms. Saenz had been informed by Defendants at the Buying Summit.

456.  The City of Warren, Michigan assessed the Elroy Ave. property as having a True Cash Value of $ 37,820.00 for the year 2013 and a True Cash Value of $35,000.00 for the year 2014.

457.  In 2015, Ms. Saenz ordered a professional appraisal of the Elroy Ave. property and the property was appraised at $44,000.00.

458.  In 2015, Ms. Saenz attempted to find a local lender to refinance the $46,800.00 "bridge loan" with Insiders Cash but was unable to do so because the property was worth less than what she owed on the loan.

459.  Ms. Saenz is and has been unable to sell the Elroy Ave. property because the property is not worth what she owes on said bridge loan.

460.  Also at the aforementioned sales session at the Buying Summit, Defendants' internet monitor displayed a home located at 3901 49th Way, Birmingham, AL.  For this home, Defendants' internet monitor displayed a "Suggested Retail Price" of $45,000.00.  The purported bargain contract price offered by Defendants for this home was $36,800.00 as displayed on this internet monitor.

461.  Defendants' internet screen display of the fraudulent "Suggested Retail Price" and fraudulent purported bargain sales price as described in *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

462.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Birmingham, AL property

and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Ms. Saenz purchased the property from Defendant Screaming Eagle Properties, LLC for $35,800.00. However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $1,850.00, the actual sales price was in excess of $42,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to Abby Creek Investment, LLC by Warranty Deed dated September 6, 2013.

463.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Saenz made a down payment of $19,494.00 regarding her purchase of the Birmingham, AL. home and a signed a loan agreement on behalf of Abby Creek Investment, LLC with Defendant Insiders Cash to pay the "loan" balance of $23,000.00 with interest-only payments of $230.00 per month for 24 months and the balance of $23,000.00 being due October 8, 2015.

464.  Unbeknownst to her and due only to Defendants' successful attempts to engender the unqualified trust of Ms Saenz, Ms. Saenz also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of Abby Creek Investment, LLC.

465.  Unbeknownst to Ms. Saenz but known to Defendants at the time of purchase, the Birmingham, AL home had been available for sale at the distressed

sale price of $24,000.00 in June 2013 and was purchased by Defendant Screaming Eagle Properties, LLC on June 27, 2013 for $24,000.00 pursuant to a Warranty Deed drafted by Defendants' counsel, Jeff R. Palmer.   Defendant Screaming Eagle Properties, LLC thereafter sold the property to Abby Creek Investment, LLC on September 6, 2013 for the aforementioned effective price of in excess of $42,000.00.

466.  Defendants had a contractual and fiduciary duty owing to Ms. Saenz to locate the Elroy Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Saenz and/or her company at such a discounted price.

467.   Instead, Defendants breached its duties as described in *supra*, and absconded with the opportunity to purchase the Elroy Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Ms. Saenz and her company at a price greatly in excess of its fair market value or true cash value

468.  In 2015, Ms. Saenz ordered a professional appraisal of the Birmingham, AL property and the property was appraised at $28,000.00.

469.   The aforementioned professional appraisal of the Birmingham, AL property states that "ROTTEN WOOD WAS OBSERVED IN NUMEROUS PLACES ON THE EXTERIOR OF THE DWELLING".

470.   Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Ms. Saenz by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts Ms. Saenz executed to purchase the Elroy St. and Birmingham, AL properties contained language identical and/or similar to that described in *supra*.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

471.  Ms. Saenz was unaware that the sales agreements she signed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

472.  Ms. Saenz was thus unaware that the sales agreements contained a Utah forum selection clause and/or a Utah choice of law clause.  The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

473.  Ms. Saenz was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.  The inclusion of such

language in these agreements was an essential aspect of Defendants' scheme to defraud.

474.   Ms. Saenz was unaware that the Commercial Loan Agreements she signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.   The inclusion of such language in these agreements was an essential aspect of Defendants' scheme to defraud.

475.   There was and is no relationship whatsoever between Ms. Saenz, Abby Creek Investment, LLC, her attendance at the Buying Summit in Nevada with the State of Utah nor did any aspect of her agreement to purchase the aforementioned properties in Michigan and Alabama have any relationship whatsoever with the State of Utah except that all of the Defendant entities are registered in the State of Utah.

476.   While attending the Buying Summit in Las Vegas on July 13, 2013, Ms. Saenz was also induced to also purchase from Defendants a worthless "Veil Corporate" protection package for $6,495.00 and a worthless "Safe Guard Tax Program" for $2,295.00 based upon Defendants fraudulent statements that these purchases were necessary to protect the real estate investments of Ms. Saenz.

477.   As the direct and proximate result of Ms. Saenz investing in Defendants' fraudulent scheme, her life savings have been completely wiped out.

478.   As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiffs Saenz/Abby Creek Investment LLC

such that Defendants owed them a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

479.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Saenz/Abby Creek Investment LLC to locate the properties they purchased at the promised discounted prices, inform them of both their existence and availability and to facilitate their purchase by them at such a discounted prices.

480.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Ms. Saenz and her company at a prices greatly in excess of their fair market value or true cash value.

481.  Plaintiffs Linda Saenz and Abby Creek Investment LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by them to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

482.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Saenz and Abby Creek Investment, LLC for their damages.

## COUNT VI – THE CLAIMS OF PLAINTIFF JAMES DUNN

The allegations of paragraphs 1 - 482 are incorporated by reference as if fully set forth herein.

483.  Plaintiff James Dunn received a flyer in the United States Mail in the State of Georgia in May, 2013 which advertised a free seminar on how to purchase real estate at deeply discounted prices.  Mr. Dunn and his wife attended this seminar in May 2013.

484.  At this free seminar, was induced by the statements and promises of Defendants to purchase a three day training course for $1997.00 where the attendees would allegedly be taught how to purchase real estate at deeply discounted prices.

485.  Mr. Dunn then attended the seminar which consisted of 3 days of training for 8 hours each day where Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments.

486.  At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for an addition training package which were designated "Diamond, Platinum and Gold".

487.  Mr. Dunn chose to purchase the Diamond package which included more "training" and attendance at the Buying Summit.  On June 2, 2013, Mr. Dunn charged $22,000 on his credit card and took $12,997.00 from his 401k account towards the full fee of $39,502.00 and subsequently paid the balance due.  The written agreement for this package also suggests that the entity providing the training services was "Insider's Financial Education, LLC".

488.  Mr. Dunn agreed to attend the Buying Summit because Defendants' agents expressly stated to Mr. Dunn that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Mr. Dunn that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and were presently income-producing with tenants that had at least 1 year left on their lease. Further, Mr. Dunn was told that a person could only purchase these properties by attending the Buying Summit.

489.  Mr. Dunn relied to his detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

490. Mr. Dunn relied to his detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

491. At the Buying Summit, Mr. Dunn and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

492. As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced by Defendants to convey any properties he purchased at the Buying Summit to a Self-Directed IRA.

493. As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Mr. Dunn was induced to attend a sales session with an agent of Defendants at the Buying Summit.

494. At a sales session attended by Mr. Dunn with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale. For one such home located at 8030 Studebaker, Warren, Michigan, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $50,500.00.

495.   Defendants knew at the time of the events described in *supra*, that the Studebaker St. home was not worth $50,500.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit.

496.   Defendants' internet screen display of the fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme..

497.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Studebaker property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Red List Homes, LLC for $50,500.00.  However, with various add-ons, including a $3,572.00 "loan origination fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $58,000.00 and the property was conveyed by Defendant Red List Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed dated October 25, 2013..

498.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $18,406.00 regarding his purchase of the Studebaker St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by

Mr. Dunn's IRA service provider to pay the "loan" balance of $39,900.00 with interest-only payments of $399.00 per month for 24 months and the balance of $39,900.00 being due November 14, 2015.

499.   Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Studebaker St. home had been available for sale at the distressed sale price shortly before he purchased it.  On November 2, 2012, Melissa Allor and Kenneth Honkanen sold the property to Fast Cash for Homes LLC for $5,000.00. On October 24, 2013, Fast Cash for Homes LLC sold the property to Buy Right Properties LLC for $7,506.00 (note that the chain of title is not in chronological order - - also note that this is one day prior to the sale of the property to Mr. Dunn for $58,000.00).  On January 4, 2013, Buy Right Properties LLC sold the property to defendant Red List Homes, LLC for $36,076.00, a conveyance made by a Warranty Deed drafted by Guardian Law.

500.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Studebaker St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

501.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Studebaker property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme

proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value

502.  In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

503.  At the aforementioned sales session attended by Mr. Dunn with an agent of Defendants at the Buying Summit, an internet monitor displayed a home for sale located at 2001 Woodlawn, Middletown, Ohio, Defendants' internet monitor displayed a purported bargain contract price offered by Defendants for this home of $62,135.00.

504.  Defendants knew at the time of the events described in *supra*, that the Woodlawn St. home was not worth $62,135.00 and they knew that it had been purchased on their account at a distressed sale price prior to the Buying Summit so that it could be resold to unaware victim at a Buying Summit for a price far in excess of its Fair Market Value or True Cash Value.

505.  Defendants' internet screen display of the fraudulent purported bargain sales price as described in Paragraph 468, *supra*, was an incidence of wire fraud

pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme..

506.    Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Woodlawn property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Mr. Dunn purchased the property from Defendant Patriot Homes, LLC for $62,135.00.  However, with various add-ons, including a $4,379.50 "loan origination fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $70,000.00 and the property was conveyed by Defendant Red List Homes, LLC to Mr. Dunn's self directed IRA by Warranty Deed dated October 25, 2013, 2013. .

507.    Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Mr. Dunn made a down payment of $22,575.00 regarding his purchase of the Woodlawn St. home and a Non-Recourse loan agreement between Mr. Dunn and Defendant Insiders Cash was executed by Mr. Dunn's IRA service provider to pay the "loan" balance of $38,612.16 with interest-only payments of $386.00 per month for 24 months and the balance of $38,612.16 being due October 7, 2015.

508.    Unbeknownst to Mr. Dunn but known to Defendants at the time of purchase, the Woodlawn St. home had been purchased by Patriot Homes, LLC on

August 29, 2013 for $38,000.00 but was resold to Mr. Dunn in October, 2013 for in excess of $70,000.00. The "Statement of Value" was executed by Roger Reynolds, CPA, Butler County, Ohio auditor and listed the "Total Value" of the Woodlawn St. property as $20,660.00.

509. Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the Woodlawn St. property at such a discounted price, inform him of its existence and availability and to facilitate its purchase by Mr. Dunn at such a discounted price.

510. Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Woodlawn St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Mr. Dunn at a price greatly in excess of its fair market value or true cash value

511. In further breach of their contractual and fiduciary duties, Defendants induced Mr. Dunn to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as Mr. Dunn had been informed by Defendants at the Buying Summit.

512. While attending the Buying Summit, Mr. Dunn was also induced by the fraudulent statements of Defendants' agents to also purchase from Defendants a

148

worthless "Veil Corporate" protection package.  This package included the cost of creating a limited liability company in Utah to which the houses Mr. Dunn purchased at the Buying Summit would be conveyed along with a corporate "protection package" to "protect" those entities and homes.  However, because the purchased homes were instead conveyed by Defendants to a Self-Directed IRA on behalf of Mr. Dunn , no assets have ever been conveyed to this LLC and the "protection package" was totally unnecessary.

513.    Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Mr. Dunn by Defendants and their agents to engender his unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contract contained language identical and/or similar to that described *supra*.

514.  Mr. Dunn was unaware that the sales agreement he signed contained language describing the purchased property as being sold "AS IS", and/or that it repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

515.  Mr. Dunn was thus unaware that the sales agreement contained a Utah forum selection clause and/or a Utah choice of law clause.

516.  Mr. Dunn was unaware that the training and Buying Summit agreements he signed provided for binding arbitration of disputes.

517.  Mr. Dunn was unaware that the Commercial Loan Agreements he signed provided for binding arbitration within the State of Utah of disputes regarding said agreements.

518.  There was and is no relationship whatsoever between Mr. Dunn, his attendance at the Buying Summit in Nevada nor any aspect of his agreement to purchase the aforementioned properties that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

519.  As the result of the facts alleged *supra,* there existed a fiduciary relationship between Defendants and Plaintiff Dunn such that Defendants owed Mr. Dunn a fiduciary duty regarding the scope the duties created by their various agreements which they have repeatedly breached as set forth herein.

520.  Defendants had a contractual and fiduciary duty owing to Mr. Dunn to locate the properties he purchased at such the promised discounted prices, inform him of both their existence and availability and to facilitate their purchase by him at such a discounted prices.

521.  Instead, Defendants breached their fiduciary and contractual duties and absconded with the opportunity to purchase these properties at discounted prices and

then purposefully and pursuant to their fraudulent Buying Summit Fraudulent Scheme proceeded to resell the properties to Mr. Dunn at a prices greatly in excess of their fair market value or true cash value.

522.  Plaintiff Dunn has incurred and is entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid by him to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

523.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Dunn for his damages.

## COUNT VII – THE CLAIMS OF PLAINTIFF JOANNE BELDOTTI

524.  The allegations of paragraphs 1 - 523 are incorporated by reference as if fully set forth herein.

525.  Plaintiff Joanne Beldotti received an invitation in the United States Mail at her residence in Connecticut in October 2014 which advertised a free seminar with special guest speakers Scott & Aime Yancey from the TV show "Flipping Vegas".

526.  The mailing described *supra*, was an incidence of mail fraud pursuant to 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

527.   The advertisement was for the seminar in Stamford, CT.  Plaintiff Beldotti called to register for the event at The Crowne Plaza in Stamford and attended the event.

528.   At the free October, 2014 event, the attendees were told by Defendants' agents that in order to receive further training, they should attend the next level seminar, at a cost of $1,997.00.  The written agreement for this package suggests that the entity providing the training services was "Yancey LLC", a Utah based limited liability company.

529.   Plaintiff Beldotti paid the aforementioned $1,997.00 fee with a credit card, and attended the seminar in November 2014 at the Stamford Hilton.  This seminar consisted of 3 days of training for 8 hours each day.  Defendants' agents explained to the attendees their method of how to buy houses far below market value, as well as other real estate investments (title liens, tax deeds, etc).

530.   At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold".

531.   Plaintiff Beldotti chose to purchase the Diamond package. She signed up for the Buying Summit but left no payment on the day of the workshop. She was

advised that the $29,997 could be paid by credit card. At the second workshop, the sales representative Rob Oborn met with Plaintiff Beldotti at a private table outside of the training room within the Stamford, CT hotel. The attendees were assigned a sales person and called out by name at the beginning of the workshop. When it was time to meet with Mr. Oborn, he used many high pressure techniques to convince her that the Buying Summit was worthwhile and offered her lifetime education and support for her to be a successful real estate investor. She advised Mr. Oborn that she could not afford such an investment. He advised that if she had good credit then she could pay these costs with various credit cards. He expressly stated to her: "You can't afford not to do this" and stressed that the return on your investment would be great. He specifically promised that his company would assist with the sales deals in Plaintiff Beldotti's community and that the cost of the Buying Summit would pay for itself.

532.    Defendants' agents convinced Plaintiff Beldotti to purchase the Diamond Package by stating that it included further one-on-one training as well as attendance at the Buying Summit and "boots on the ground" training before and after the Buying Summit called Inner Circle Training.  Further, Defendants' agents expressly stated to Plaintiff Beldotti that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply

discounted prices as taught to the attendees of the previous training seminars.  As such, Defendants' agents expressly stated to Plaintiff Beldotti that these properties had already been "vetted" (evaluated using their method) by the Buy PD group, and "seasoned" (were presently income-producing homes with tenants that had at new annual lease).  Further, Plaintiff Beldotti was told that a person could only purchase these properties by attending the Buying Summit.

533.  Plaintiff Beldotti relied to her detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

534.  Plaintiff Beldotti relied to her detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

535.  At the Buying Summit, Plaintiff Beldotti and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

536.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Beldotti was induced by Defendants to convey any properties they purchased at the Buying Summit to a Self-Directed IRA.

537.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Beldotti was induced to attend a sales session with an agent of Defendants at the Buying Summit named Jesse Harrison.

538.   At a sales session attended by Plaintiff Beldotti with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 12442 Colleen Ave, Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $67,500.00. The purported bargain contract price offered by Defendants for this home was $64,450.00 as displayed on this internet monitor.

539.  Defendants knew at the time of the events described *supra*, that the Colleen Ave. home was not worth $64,500.00 and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

540.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

541.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Warren, Michigan property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Plaintiff Beldotti purchased the property from Defendant Five Choices, LLC for a purported $64,450.00.  However, with various add-ons, including a $3,000.00 "loan origination fee" and "closing costs" of $2,050.00 (described as being mostly paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $72,000.00 and the property was conveyed by Defendant 5 Choices, LLC to Plaintiff Beldotti's self directed IRA by Warranty Deed dated March 4, 2015.

542.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants, Plaintiff Beldotti made a down payment of $23,209.00 regarding her purchase of the Coleen Ave. home and a Non-Recourse loan agreement between Plaintiff Beldotti and Defendant Insiders Cash was executed by Plaintiff Beldotti's IRA service provider to pay the "loan" balance of $49,100 with interest-only payments of $491.00 per month for 36 months and the balance of $49,100.00 being due April 22, 2018.

543.  Unbeknownst to Plaintiff Beldotti but known to Defendants at the time of purchase, the Coleen Ave. home had been available for sale at the distressed sale

price of $25,000.00 on November 10, 2014 and was purchased on behalf of Defendants own account by Defendants' agent RDG Fund-5 RCR, LLC on said date.

544.   RDG Fund-5 RCR, LLC soon thereafter conveyed the Coleen Ave. property to Defendant 5 Choices, LLC for a purported $44,000.00 by Warranty Deed dated December 12, 2014 prepared by Defendants' attorneys Guardian Law.

545.   Defendant5 Choices, LLC then conveyed the Coleen Ave. property to Plaintiff Beldotti's IRA on March 4, 2015 for the aforementioned effective price of in excess of $72,000.00.

546.   Defendants had a contractual and fiduciary duty owing to Plaintiff Beldotti to locate the Coleen Ave. property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Plaintiff Beldotti at such a discounted price.

547.   Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Coleen Ave. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Beldotti at a price greatly in excess of its fair market value or true cash value

548.   In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Beldotti to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the

subject property knowing that therefore the loan could not be refinanced contrary to what Plaintiff Beldotti had been informed by Defendants at the Buying Summit.

549.  Further, in the year 2015, Plaintiff Beldotti also purchased the property located at 10408 Durness, St. Louis, Missouri from Defendant 5 Choices, LLC through the same fraudulent pattern as that for the Coleen Ave. property pursuant to the Defendants' Buying Summit Fraudulent Scheme.  She has been advised by her property manager that because the Durness property is located in such a bad and dangerous neighborhood, she should consider installing a $500.00 cage to protect the outdoor A/C unit.

550.  Plaintiff Beldotti also purchased from Defendants several vacant lots in other states through the same fraudulent pattern as that for the Coleen Ave. property pursuant to the Defendants' Buying Summit Fraudulent Scheme.

551.   Contrary  to  all  of  the  prior  aforementioned  false  and  fraudulent statements, promises and inducements made to Plaintiff Beldotti by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra.*

552.  Plaintiff Beldotti was unaware that the sales agreements she executed contained language describing the purchased property as being sold "AS IS", and/or

that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

553.  Plaintiff Beldotti was thus unaware that the sales agreement contained an alleged Utah forum selection clause and/or a Utah choice of law clause.

554.  Plaintiff Beldotti was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.

555.  There was and is no relationship whatsoever between Plaintiff Beldotti, her attendance at the Buying Summit in Nevada nor any aspect of her agreements to purchase the aforementioned properties from Defendants that had any relationship whatsoever to the State of Utah except that all of the Defendant entities are registered in the State of Utah.

556.  Plaintiffs Plaintiff Beldotti has incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

.   557.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Beldotti for her damages.

## COUNT VII – THE CLAIMS OF PLAINTIFFS RAMONA LORRAINE SOLANO-OWEN, GREINER 11831, LLC, <u>COYLE 12071, LLC AND SARSFIELD 12460, LLC</u>

558.  The allegations of paragraphs 1 – 557 are incorporated by reference as if fully set forth herein.

559.  Plaintiff Ramona Lorraine Solano-Owen aka "Lori Owen" is a 65 year old woman living in Hawaii.  She received a flyer in the mail to attend a local free seminar with Scott Yancey and his wife Amie in April, 2013.

560.  The flyer stated in part:

Are you ready to get the best properties before the rest of the public has access to them?

Find properties in your area before they're made available to the general public.

Properties can be available for as low as pennies on the dollar.

Purchase property at rock bottom prices before they are bid up by other investors.  [Exhibit E]

561.  Relying upon the inducements of the aforementioned flier, Ms.. Owen attended the free seminar.

562. Scott Yancey did not appear at the seminar but Ms. Owen was told that he would personally be teaching at the three-day workshop that was being offered where they would teach you literally everything one needed to know in order to be a successful real estate investor.  Ms. Owen asked Defendants' representative for and received specific reassurance that this three day workshop was all one needed

and that there was no necessity to expend additional money or to attend additional classes after attending this workshop in order to be a successful real estate investor.

563.   Relying upon these assurances, Ms. Owen purchased the three day workshop for $ 1,997.00 and the tax lien program for $ 997.00 and attended the workshop.

564.   At the three day workshop, Ms. Owen's "one-on-one" sales representative induced her to purchase the $24,997.00 package to attend The Buying Summit from Yancey Events, LLC.   This agent of the Workshop Defendants expressly promised Ms. Owen that she would save so much on buying properties way below market value that she would make back the cost of the Buying Summit by investing in a few houses.   Further, Ms. Owen was promised that Defendants would provide pre-approved financing for these purchases.   However, one could not get access to these bargain houses without attending the Buying Summit.

565.   Once at the Buying Summit, Ms. Owen and the other attendees were told that the properties for sale had been fully rehabbed because the Defendants had done all the work for the purchasers.   Attendees were told that because the properties were being sold below market that this would provide instant equity in the properties which would allow a refinancing once one returned home from the Buying Summit at a very low rate.   The Defendants urged that the attendees get down payment

money from either their IRA or from an increase in the credit limit on their credit cards.

566.  Plaintiff Owen relied to her detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

567.  Plaintiff Owen relied to her detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

568.  At the Buying Summit, Plaintiff Owen and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

569.   At a sales session attended by Plaintiff Owen with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 12460 SARSFIELD, Warren, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $60,000.00. The purported bargain contract price offered by Defendants for this home was $57,200.00 as displayed on this internet monitor.  Defendants knew at the time that the Sarsfield home was not worth and they knew that it had been purchased on their account at a distressed sale price not long prior to the Buying Summit.

570.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

571.  Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Sarsfield property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, Plaintiff Owen purchased the property from Defendant Patriot Homes, LLC for $54,500.00 plus closing costs and the property was conveyed at her direction to Sarsfield 12460, LLC, her wholly owned limited liability company.

572.  Unbeknownst to Plaintiff Owen but known to Defendants at the time of purchase, the Sarsfield. home had been available for sale at the distressed sale price of $24,999.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent John Graham, Inc. for that sum on June 25, 2013.

573.  Thereafter, in a series of step transactions, John Graham Inc. sold the Sarsfield property to Defendant Patriot Homes, LLC on August 9, 2013 for $46,500.00. On November 6, 2013, Patriot Homes sold the property to Sarsfield 12460, LLC for $54,200.00 plus closing costs.

574.   Defendants fraudulent induced Ms. Owen to purchase two additional properties located in the City of Detroit pursuant to the same fraudulent scheme. These were conveyed directly to her wholly owned companies Greiner 11831, LLC, and Coyle 12071, LLC.

575.   For each of the three purchased properties, the LLC executed a loan agreement.  The Sarsfield loan agreement states the following:

> This Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Utah without regard to its conflict of laws rules.  This Agreement has been accepted and funded by Lender in the State of Utah.  As for venue, **ANY ACTION OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS AGREEMENT** shall be brought against any of the parties in the courts of the State of Utah, or alternatively, **IN THE COURT OF THE STATE AND COUNTY WHERE THE REAL PROPERTY SECURING THE LOAN IS LOCATED**, at the sole discretion of the Lender. And Borrower hereby waives any objection to the venue laid therein and agrees no to plead or claim in any such courts that such proceeding brought therein has been brought in any inconvenient forum [emphasis added].  Emphasis added.

Plaintiffs submit that the instant action is not an action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement. Therefore, this forum selection clause inapplicable to the instant case.

576.   Unbeknownst to Ms. Owen, she executed a personal guarantee for each of the three loan agreements made with her three limited liability companies.  For the reasons stated above for the other Plaintiffs in the same situation, these personal

164

guarantees are uneforceable and/or void and/or must be rescinded.    Further, they also contain no forum selection clause.

577.  Defendants had a contractual and fiduciary duty owing to Plaintiff Owen to locate the Sarsfield. property at a discounted price, inform her of its existence and availability and to facilitate its purchase by Plaintiff Owen at such a discounted price.

578.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Sarsfield property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Owen at a price greatly in excess of its fair market value or true cash value.

579.  Defendant Owen was also fraudulently induced to purchase a property located at 11831 Greiner, Detroit, Michigan.  The first step in Defendants' fraudulent mark-up procedure regarding the Greiner property was a sale from MJ Income Property, LLC to Evergreen Investment Properties, LLC of Orem, Utah for $25,000.00 on June 12, 2012.  The second step was the sale of the property to Defendant Scree 44, LLC for $33,720.73 on September 11, 2012 pursuant to a Warranty Deed drafted by Defendants attorneys, Guardian Law.  Finally, Scree 44, LLC sold the property to Lori Owen for $50,375.00 on October 22, 2013 pursuant to a Warranty Deed executed by Blair Poelman or Rob Lewis, its  Manager(s) and

prepared by Guardian Law.  The Greiner property was conveyed by Scree 44. LLC to a newly created Utah limited liability company, Plaintiff Greiner 11831, LLC.

580.    Each of the three properties which Lori Owen purchased from Defendants was conveyed to a separate newly registered Utah limited liability company based upon what was perceived as Defendants' expert advice.

581.  The Greiner transaction is reflected in a Settlement Statement prepared by Guardian Law. It shows a total cost to the purchaser of $59,061.00, a down payment of $18,661.00 and a loan amount of $40,400.00.  At the time of the property purchase, Ms. Owen signed a loan agreement between her new LLC and Insider's Cash and which is a two year interest-only-loan in the amount of $40,400.00.  On page six of the loan agreement is a purported arbitration clause. 582.    Ms.  Owen was also fraudulently induced by Defendants to execute a personal guaranty which Ms.  Owen and many other victims of Defendants' fraudulent scheme signed without notice or understanding. The personal guaranty does not contain an arbitration or forum selection clause.

583.  Defendant Owen was also fraudulently induced to purchase a property located at 12071 Coyle, Detroit, Michigan.  The first step in Defendants' fraudulent mark-up procedure regarding the Coyle property was a Default Judgment of Quiet Title to Real Property in favor of G-USA, LLC on September 17, 2013.  G-USA, LLC then quit claimed the property to GWH Properties, LLC for $10 on January 17,

2014  pursuant to a deed drafted by Defendants' attorneys, Guardian Law.  The next step was the sale of the property to Defendant Red Apple for $35,069.14 on January 17, 2014 pursuant to a Warranty Deed also drafted by Defendants' attorneys, Guardian Law.  The final step was the sale of the property by Red Apple to Ms. Owen's new Utah limited liability company, Coyle 12071, LLC for $49,950.00 on April 23, 2014 pursuant to a Warranty Deed executed by Blair Poelman or Rob Lewis, its Manager(s) and prepared by Defendants' attorneys Guardian Law.

584.   The transaction is reflected in a Settlement Statement prepared by Guardian Law.  It shows a total cost to the purchaser of $57,785.13, a down payment of $18,690.00 and a loan amount of $39,900.00.

585.  At the time of the property purchase, Ms. Owen signed a loan agreement regarding the Coyle property between her new LLC and Insider's Cash and which is a three year interest-only loan in the amount of $39,900.00. On page  six of the agreement is what purports to be a forum selection clause.   Like the Sarsfield property loan agreement, the Coyle loan agreement states the following:

> This Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Utah without regard to its conflict of laws rules. This Agreement has been accepted and funded by Lender in the State of Utah. As for venue**, ANY ACTION OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY RIGHT ARISING OUT OF, THIS AGREEMENT** shall be brought against any of the parties in the courts of the State of Utah, or alternatively, **IN THE COURT OF THE STATE AND COUNTY WHERE THE REAL PROPERTY SECURING THE LOAN IS LOCATED**, at the sole discretion of the

Lender. And Borrower hereby waives any objection to the venue laid therein and agrees no to plead or claim in any such courts that such proceeding brought therein has been brought in any inconvenient forum [emphasis added].

Plaintiffs submit that the instant action is not an action or proceeding seeking to enforce any provision of, or based on any right arising out of, this agreement. Therefore, the forum selection clauses of both the Sarsfield and Coyle property loan agreements are inapplicable to the instant case EVEN IF VALID, and do not preclude the instant lawsuit for RICO and/or rescission of the fraudulently induced agreement.

586.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Owen to execute the aforementioned loan agreements for a principle amount which exceeded the fair market value or true cash value of the subject properties knowing that therefore the loan could not be refinanced contrary to what Plaintiff Owen had been informed by Defendants at the Buying Summit.

587.   Contrary to all of the prior aforementioned false and fraudulent statements, promises and inducements made to Plaintiff Owen by Defendants and their agents to engender her unqualified trust and that they were selling real estate at discounted prices and upon which they had performed due diligence upon which a purchaser could rely, the sales contracts they executed contained language identical and/or similar to that described *supra*.

588.   Plaintiff Owen was unaware that the sales agreements she executed contained language describing the purchased property as being sold "AS IS", and/or that they repudiated all of the prior express statements, promises and inducements made by Defendants regarding said properties being offered by Defendants for sale.

589.  Plaintiff Owen was thus unaware that the sales agreement contained an alleged Utah forum selection clause and/or a Utah choice of law clause.

590.   Plaintiff Owen was unaware that the training and Buying Summit agreements she signed provided for binding arbitration of disputes.

591.  Plaintiffs Plaintiff Owen, Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460 have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

.   592.   Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Owen, Greiner 11831, LLC, Coyle 12071, LLC and Sarsfield 12460, LLC for their damages.

## COUNT IX – THE CLAIMS OF PLAINTIFFS PASCAL VOHRADNIK, SIMONE VOHRADNIK AND 13607 VIRGIL, LLC

The allegations of paragraphs 1 - 592 are incorporated by reference as if fully set forth herein.

593.  In March, 2013 while living in Manhattan, New York, Plaintiffs Pascal & Simone Vohradnik viewed an infomercial playing on television featuring Dean Graziosi which promoted a free seminar concerning real estate investing promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

594.  The aforementioned television advertisement was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

595.  In response to the aforementioned March 2013 television infomercial, Mr. Vohradnik called the advertised telephone number and spoke with an agent of the Defendants during which the attendance of both Pascal & Simone Vohradnik at such a free seminar was scheduled for March 10, 2013 at a nearby hotel.

596.  At the free seminar held on March 10, 2013, the Plaintiffs were induced by agents of Defendants to purchase from Insider's Financial Education, LLC the "Insider's Financial 3-Day Real Estate Workshop Package" for $1,997.00 and the "Insider's Financial Tax Lien Program" for $997.00 based upon express promises and inducements that by taking these courses, they would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

597.  The "Insider's Financial 3-Day Real Estate Workshop" was held March 15-17, 2013 at the Dream Hotel, Manhattan, New York.  At this "workshop", the attendees, including the Vohradniks, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real estate purchases and other purchases from Defendants.

598.  The Vohradniks did as instructed and called their credit card companies and obtained an increase to all their credit limits.

599.   At the aforementioned "Insider's Financial 3-Day Real Estate Workshop", the Vohradnik's were induced by the fraudulent statements of Defendants agents on March 16, 2013 to purchase "Dean's Advanced Training – Diamond Package – Boots on the Ground" for $39,997.00.  The purported purpose of this course as repeatedly expressed by Defendants' agent was so that the Vohradniks could obtain expert training and guidance from Defendants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

600.  At the end of the seminar described *supra,* the attendees were told by Defendants' agents that they now had sufficient information necessary to start buying properties at steeply discounted prices.  However, attendees were told that if they wanted to get further training, it would be necessary to sign up for another

training package which were called "Diamond, Platinum and Gold". Defendants'
agents convinced the Vohradniks to purchase the Diamond Package by stating that
it included further one-on-one training, as well as attendance at the Buying Summit
for both of them.   Further, Defendants' agents expressly stated to them that
attendance at The Buying Summit would give the attendees the opportunity to
purchase investment properties that had been purchased by Defendants using the
methods of purchasing properties at steeply discounted prices as taught to the
attendees of the previous training seminars.  As such, Defendants' agents expressly
stated to the Vohradniks that these properties had already been "vetted" (evaluated
using their methods) by the Buy PD group, and were presently income-producing
with tenants that had at least 1 year left on their lease.  Further, they were told that a
person could only purchase these properties by attending the Buying Summit.
Attendees could also purchase legal services, insurance, wealth and estate planning
and other financial services at the Buying Summit.

601.  The Vohradniks relied to their detriment upon the Defendants' repeated
material misrepresentations that Defendants had performed a rigorous due diligence
regarding each property they offered for sale and about which the Plaintiffs need not
be concerned.

602. The Vohradniks relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

603. The Vohradniks relied to their detriment upon the Defendants repeated material misrepresentations that the properties they offered for sale had vetted and paying tenants.

604. The written contractual agreements between the Vohradniks and "Insider's Financial Education LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association. This clause was included in the documents without the knowledge or understanding of the Vohradniks. Further, this forum selection clause provided for a separate and distinct forum than other clauses surreptitiously inserted in the other documents by the Defendants which the Vohradniks executed but which concerned the same transaction and occurrence.

605. None of the instant Plaintiffs have been able to locate or identify the "corporate existence" of "Insider's Financial Education LLC" and Defendants have refused and neglected to so identify said entity. Thus, is has been impossible for any of the Plaintiffs to initiate an arbitration proceeding against "Investor's Financial Education LLC" which is nothing other than an alter ego of the Defendants.

606.  The Vohradnik's attended a Buying Summit in Las Vegas, Nevada from May 30, 2013 to June 1, 2013.

607.  Upon arriving at the Buying Summit, The Vohradnik's were provided by Defendants with a backpack which included numerous written materials including a "Buying Summit Workbook" [Exhibit H].

608.  On page 27 of the Buying Summit Workbook, Paragraph 15 reinforced the multiple prior and subsequent fraudulent misrepresentations made to The Vohradnik's and the other attendees that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned because Defendants "had taken care of everything".  The Workbook stated:

> **15.  What resources to you use to complete the due-diligence?**
> We use some, if not all, of the following:  Corelogic reports, traditional comparable sales, title searches contractor reviews, 3rd party inspectors, property management inspections.

609.  The Vohradnik's relied to their detriment upon the Defendants 'repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

610.  The Vohradnik's relied to their detriment upon the Defendants 'repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

611.  At the Buying Summit, The Vohradnik's and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

612.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, The Vohradnik's were induced to attend a sales session with an agent of Defendants at the Buying Summit.

613.   At a sales session attended by The Vohradnik's with an agent of Defendants at the Buying Summit, an internet monitor displayed various homes for sale.  For one such home located at 13607 Virgil, Michigan, Defendants' internet monitor displayed a "Suggested Retail Price" of $59,000.00.  The purported bargain contract price offered by Defendants for this home was $46,595.00 as displayed on this internet monitor.

614.  Defendants' internet screen display of the fraudulent "Suggest Retail Price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

615.  Defendant's agents induced The Vohradniks to create a Utah based limited liability company ("LLC") and to which the Virgil St. property was to be

conveyed. "13607 Virgil St., LLC" was created for this purpose. They were also induced to purchase through Veil Corp. also another package for $6500.

616.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Virgil Street. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased at the Buying Summit, The Vohradnik's purchased the property from Defendant Screaming Eagle Properties, LLC for $46,595.00. However, with various add-ons, including a $3,314.00 "loan origination fee" and "closing costs" of $1,850.00 (mostly described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $55,000.00 and the property was conveyed by Defendant Screaming Eagle Properties, LLC to 13607 Virgil , LLC by Warranty Deed dated August 23, 2013.

617.   The aforementioned Buying Summit Workbook announced that 24 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendants American Cash Funding and Insiders Cash in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including The Vohradniks, the false impression that the homes they were purchasing were worth in excess of the amount of their "bridge loans" from Defendants when, in fact, the

home they purchased was worth less than the amount of their "bridge loan" and thus could not be refinanced or sold.

618.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, The Vohradnik's made a down payment of $17,073.00 regarding their purchase of the Virgil Street home and a signed a loan agreement on behalf of 13607 Virgil LLC with Defendant Insiders Cash to pay the "loan" balance of $37,000.00 with interest-only payments of $370.00 per month for 24 months and the balance of $37,000.00 being due October 4, 2018.

619.   Unbeknownst to them and due only to Defendants' successful attempts to engender the unqualified trust of The Vohradnik's, they also signed a personal guaranty drafted by Defendants counsel for said purchase money "loan" obligation of 13607 Virgil, LLC for the purchase of the Virgil Street home.

620.   Unbeknownst to The Vohradnik's but known to Defendants at the time of purchase, the Virgil Street home had been available for sale at the distressed sale price of $24,000.00 in June 2013 and was purchased on behalf of Defendants own account by Defendants' agent, Metro Detroit Home Solutions, LLC. on June 28, 2013 for $24,000.00.

621.   Metro Detroit Home Solutions, LLC soon thereafter conveyed the Virgil Street. property directly to Defendant Screaming Eagle Properties LLC by Warranty

Deed prepared by Defendants attorneys Guardian Law dated June 27, 2013 for $34,000.00. Defendant Screaming Eagle Properties, LLC then sold the Virgil Street. property to 13607 Virgil , LLC on August 23, 2013 for the aforementioned effective price of in excess of $55,000.00.

622.   Defendants had a contractual and fiduciary duty owing to the Vohradniks to locate the 13607 Virgil Street property at such a discounted price, inform them of its existence and availability and to facilitate its purchase by the Vohradniks and/or their company at such a discounted price.

623.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Virgil Street property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to the Vohradniks and their company at a price greatly in excess of its fair market value or true cash value

624.   In further breach of their contractual and fiduciary duties, Defendants induced the Vohradniks to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months as the Vohradniks had been informed by Defendants at the Buying Summit.

625.   The Vohradniks are and have been unable to sell the Virgil Street. property because the property is not worth what they owe on said bridge loan.

626.  Further, in the year 2013, Plaintiff Pascal Vohradnik also purchased two properties located in East St. Louis, Illinois from Defendant FrontSide Properties, LLC and conveyed them to his self-directed IRA as induced by Defendants through the same fraudulent pattern as that for the Virgil Street property pursuant to the Defendants' Buying Summit Fraudulent Scheme.

627.  Plaintiffs Pascal Vohradnik, Simone Vohradnik and 13607 Virgil, LLC have incurred and are entitled to damages in excess of $75,000.00 including, but not limited to restitution of all money paid to these defendants as the proximate result of Defendants' scheme to defraud which was perpetuated through conducting the affairs of the Buying Summit Fraudulent Enterprise.

.  628.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Pascal Vohradnik, Simone Vohradnik and 13607 Virgil, LLC for their damages.

## COUNT X –THE CLAIMS OF PLAINTIFF EVA THODE

The allegations of paragraphs 1 - 628 are incorporated by reference as if fully set forth herein.

629.  In January, 2015 while living in Myrtle Beach, Plaintiff Eva Thode received a promotional flyer in the United States Mails which promoted a free local seminar and dinner concerning real estate investing by celebrity Scott Yancey promising that the attendees of this seminar would be taught how to purchase real

estate properties at deeply discounted prices for investment purposes.  The flyer promised access to "the best properties before the public has access to them", how to "Purchase real estate at all-time low prices before they are bid up by hundreds of investors" and "How do I get hold of pre-market and tax deed auction properties and turn them into cash or hold them for long-term monthly income?"  See Exhibit D.

630.  The aforementioned promotional flyer was an incidence of mail fraud pursuant 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

631.  In response to the aforementioned flyer, Ms. Thode attended the local seminar/dinner where she was induced by agents of Defendants to purchase a local workshop package based upon the express promises and inducements of Defendants' agents that by taking these courses, she would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

632.  While attending a local workshop put on by the Yancey, LLC, Plaintiff Thode was told by Defendants' agents that the attendees now had sufficient information necessary to start buying properties at steeply discounted prices. However, attendees are also told that if they wanted to get further training, it would be necessary to sign up for another training package which were called "Diamond, Platinum and Gold" which included attendance at the Buying Summit.

633.   Agents of the Yancey, LLC expressly promised that attendance at The Buying Summit would give the attendees the opportunity to purchase investment properties that had been purchased by Defendants using the methods of purchasing properties at steeply discounted prices as taught to the attendees of the previous training seminars.   Further, attendees were told that a person could only purchase these specially discounted properties by attending the Buying Summit.

634.   Ms. Thode also relied upon a promotional flyer wherein Defendant Income Property USA, LLC expressly represented and promised:

> Rent Ready.
> We find low cost and distressed properties in great neighborhoods.  We then perform any repairs or rehabbing needed. By the time we sell them to our clients they are either tenanted or rent ready.  Our clients are then able to get great prices without the hassle of doing repairs themselves. [See Exhibit F]

635.    Based upon the aforementioned fraudulent inducements of the Defendants, Plaintiff Eva Thode purchased a package from Defendants for the purposes of attending a Buying Summit.

636.   Plaintiff Thode attended a Buying Summit in Las Vegas, Nevada in March, 2015.

637.   Plaintiff Thode relied to her detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

2:16-cv-10659-RHC-MKM   Doc # 37   Filed 11/18/16   Pg 182 of 223   Pg ID 2129

638.  Plaintiffs Thode relied to her detriment upon the Defendants' repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

639.  At the Buying Summit, Plaintiffs Thode and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

640.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiff Thode was induced to attend a sales session with an agent of Defendants at the Buying Summit.

641.  At such a sales session attended by Ms. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase 1058 Garfield, Lincoln Park, Michigan from Defendant Green Apple Homes, LLC for $66,350.00.  However, with various add-ons, including a $3,662.20 "loan origination fee" and "closing costs" of $2,050.00  (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $74,817.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed May 5, 2015 and recorded May 26, 2015.

642.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge

loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

643.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,009.00 regarding her purchase of the Garfield (Lincoln Park) property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $50,800.00 with interest-only payments of $508.00 per month for 36 months and the balance of $50,800.00 being due at the end of said 36 month period.

644.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Garfield (Lincoln Park) property had been available for sale at the distressed sale price of $36,000.00 and was purchased by Defendants' agent, Defendant John Graham, Inc. on August 22, 2014 for $36,000.00.

645.   Defendant John Graham, Inc. soon thereafter conveyed the Garfield (Lincoln Park) property directly to Defendant Green Apple Homes, LLC by

Warranty Deed prepared by Defendants' attorneys Guardian Law on October 3, 2014 for a purported $55,500.00. Defendant Green Apple Homes, LLC then sold the Garfield (Lincoln Park) property to Ms. Thode on May 5, 2015 for the aforementioned effective price of $74,817.00.

646. Defendants had a contractual and fiduciary duty owing to Plaintiff Thode to locate the Garfield (Lincoln Park) property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

647. Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Garfield (Lincoln Park) property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

648. In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

649.   Also at said sales session attended by Ms. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 19229 Garfield, Redford, MI 48240 from Defendant 5 Choices, LLC for $75.750.00.   However, with various add-ons, including a $4,301.20 "loan origination fee" and "closing costs" of $2,250.00  (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $85,208.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded May 26, 2015.

650.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

651.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a

down payment of $18,654.00 regarding her purchase of the Garfield (Redford) property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $57,900.00 with interest-only payments of $579.00 per month for 36 months and the balance of $57,900.00 being due at the end of said 36 month period.

652.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Garfield (Redford) property had been available for sale at the distressed sale price of $31,696.00 and was purchased by Defendants' agent, GWH Properties, LLC from Fannie Mae on August 28, 2014 for $31,696.00.

653. GWH Properties, LLC soon thereafter conveyed the Garfield (Redford) property directly to Defendant 5 Choices, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 31, 2014 for a purported $58,500.00.  Defendant 5 Choices, LLC then sold the Garfield (Redford) property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $85,208.00.

654.   Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Garfield (Redford) property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

655.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the Garfield (Redford) property at a

discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

656.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

657.  Also at said sales session attended by Mr. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 21541 Jean Ave., Eastpointe, MI 48021 from Defendant Green Apple Homes, LLC for $72,450.00.   However, with various add-ons, including a $4,096.90 "loan origination fee" and "closing costs" of $2,250.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $81,856.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded June 25, 2015.

658.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

659.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,128.00 regarding her purchase of the Jean property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $55,600.00 with interest-only payments of $556.00 per month for 36 months and the balance of $55,600.00 being due at the end of said 36 month period.

660.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Jean property had been available for sale at the distressed sale price of $31,000.00 and was purchased by Defendants' agent, John Graham, Inc. on July 22, 2014 for $31,000.

661. Defendant John Graham, Inc. soon thereafter conveyed the Jean property directly to Defendant Green Apple Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 3, 2014 for a purported $63,500.00. Defendant Green Apple Homes, LLC then sold the Jean property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $81,856.00.

662. Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Jean property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

663. Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Jean property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

664. In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

665.   Also at said sales session attended by Mr. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 23050 Majestic St., Oak Park, Michigan from Defendant Expansion Properties, LLC for $79,550.00.   However, with various add-ons, including a $4,592.40 "loan origination fee" and "closing costs" of $2,250.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $89,908.00 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 30, 2015 and recorded July 23, 2015.

666.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

667.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $18,404.00 regarding her purchase of the Majestic property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $61,100.00 with interest-only payments of $611.00 per month for 36 months and the balance of $41,100.00 being due at the end of said 36 month period.

668.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Majestic St. home had been available for sale at the distressed sale price of $55,000.00 and was purchased by Defendants' agent, John Graham, Inc. on January 22, 2015 for $55,000.

669.   Defendant John Graham, Inc. soon thereafter conveyed the Majestic property directly to Defendant Expansion Properties, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on March 27, 2015 for a purported $69,500.00.  Defendant Expansion Properties, LLC then sold the Majestic property to Ms. Thode on April 30, 2015 for the aforementioned effective price of $89,908.00

670.   The City of Oak Park, Michigan assessed value of the Majestic at an S.E.V.of $24,700.00 for 2012 and $26,900.00 for 2015.

671.   Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Majestic property at such a discounted price, inform her of its

existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

672.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Majestic property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

673.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

674.  Also at said sales session attended by Mr. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 20427 Wakenden, Redford, Michigan 48240 from Defendant 5 Choices, LLC for $63.700.00   However, with various add-ons, including a $3,478.10 "loan origination fee" and "closing costs" of $2,050.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was

$71,888.90 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed April 27, 2015 and recorded June 4, 2015.

675.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT"). This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

676.  Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $16,535.00 regarding her purchase of the Wakenden property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the "loan" balance of $48,800.00 with interest-only payments of $488.00 per month for 36 months and the balance of 48,800.00 being due at the end of said 36 month period.

677.  Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the Wakenden property had been available for sale at the distressed sale

price of $28,500.00 and was purchased by Defendants' agent, GWH Properties, LLC on May 23, 2014 for $28,500.00.

678.  GWH Properties, LLC soon thereafter conveyed the Wakenden property directly to Defendant 5 Choices, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on October 31, 2014 for a purported $55,250.00.  Defendant 5 Choices, LLC then sold the Wakenden property to Ms. Thode on April 27, 2015 for the aforementioned effective price of $71,888.90.

679.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the Wakenden property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

680.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the Wakenden property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

681.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six

194

months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

682.   Also at said sales session attended by Ms. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 11 167th Street, Calumet City, Illinois from Defendant Improvement Homes, LLC for $85,150.00.   However, with various add-ons, including a $3,537.60 "loan origination fee" and "closing costs" of $2,250.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $95,679.51 and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed

683.   Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").   This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

684.    Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $15,428.00 and paid an additional $29,948.00 from her IRA regarding her purchase of the Wakenden property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the loan balance of $49,500.00 with interest-only payments of $495.00 per month for 36 months and the balance of 49,500.00 being due at the end of said 36 month period.

685.    Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 167th Street property had been available for sale at the distressed sale price of $33,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. on February 2, 2015 for $33,000.00.

686.    Defendant John Graham Inc. soon thereafter conveyed the 167th Street property directly to Defendant Improvement Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on May 5, 2015 (which was subsequent to the "Settlement date" for the purchase by Ms. Thode) for a purported $65,500.00. Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode on April 21, 2015 for the aforementioned effective price of $95,679.51.

687.  The city of Calumet City, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

688.  The property located at 11 167th Street, Calumet City, Illinois and purchased by Ms. Thode did not pass the aforementioned city inspection due to physical defects.

689.  Because the purchased property cannot pass the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

690.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the 167th Street property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

691.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the 167th Street property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

692.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the

subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

693.   Also at said sales session attended by Ms. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 2849 225th St., Sauk Village, Illinois from Defendant Improvement Homes, LLC for $84,550.00.   However, with various add-ons, including "closing costs" of $2,000.00   (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $90,516.66 which Ms. Thode paid in full with funds from her IRA and a deed purporting to convey the property to American Estate and Trust f/b/o Eva Thode was executed May 7, 2015.

694.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 225th St Street property had been available for sale at the distressed sale price of $21,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. from Fannie Mae, a/k/a Federal National Mortgage Association by special Warranty Deed dated January 8, 2015.

695.  Defendant John Graham Inc. soon thereafter conveyed the 225th Street property directly to Defendant Improvement Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on May 12, 2015 (which was

subsequent to the "Settlement date" and "proration date" for the purchase by Ms. Thode) for a purported $65,500.00. Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode on April 21, 2015 for the aforementioned effective price of $90,516.66.

696.   Defendants had a contractual and fiduciary duty owing to Plaintiff Thode to locate the 225th Street property at such a discounted price, inform her of its existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

697.   Instead, Defendants breached their duties as described *supra*, and absconded with the opportunity to purchase the 225th Street property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value

698.   Also at said sales session attended by Ms. Thode with an agent of Defendants at the Buying Summit and relying upon the repeated promises that the properties for sale were being sold at deep discount prices, Ms. Thode agreed to purchase a property at 31 164th Pl., Calumet City, Illinois 60409 from Defendant Improvement Homes, LLC for $82,750.00. However, with various add-ons, including a $4,837.70 "loan origination fee" and "closing costs" of $2,250.00

(described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was $95,358.95.  Ms. Thode has never received a deed for this property.

699.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans and which were described as "bridge loans" were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give the Buying Summit victims, including Ms. Thode, the false impression that the home she was purchasing were worth in excess of the amount of her "bridge loans" from Defendants when, in fact, the home she purchased was worth less than the amount of her "bridge loan" and thus could not be refinanced or sold.

700.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Ms. Thode made a down payment of $19,037.00 and paid an additional $11,036.00 from her IRA regarding her purchase of the 164th Pl. property and her IRA custodian signed a non-recourse loan agreement on her behalf with Defendant Insiders Cash, LLC to pay the loan balance of $63,800.00 with interest-only payments of $638.00 per month for 36 months and the balance of 63,800.00 being due at the end of said 36 month period.

701.   Unbeknownst to Ms. Thode but known to Defendants at the time of purchase, the 164th Pl. property had been available for sale at the distressed sale price of $31,000.00 and was purchased by Defendants' agent, Defendant John Graham Inc. on December 11, 2015 for $31,000.00.  Defendant Improvement Homes, LLC had agreed to sell the property to Ms. Thode as of April 21, 2015 for the aforementioned effective price of $95,679.51.  No deed regarding the subject property from Defendant John Graham Inc. to Defendant Improvement Homes, LLC has been recorded.  No deed regarding the subject property from Defendant Improvement Homes, LLC to Eva Thode has been either delivered or recorded.

702.  The city of Calumet City, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

703.  The property located at 31 164th Pl., Calumet City, Illinois and purchased by Ms. Thode did not pass the aforementioned city inspection due to physical defects.

704.   Because the purchased property cannot pass the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

705.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Thode to locate the 164th Pl. property at such a discounted price, inform her of its

existence and availability and to facilitate its purchase by Ms. Thode at such a discounted price.

706.  Instead, Defendants breached their fiduciary duties as described *supra*, and absconded with the opportunity to purchase the 164th Pl. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to Plaintiff Thode at a price greatly in excess of its fair market value or true cash value.

707.  In further breach of their contractual and fiduciary duties, Defendants induced Plaintiff Thode to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Ms. Thode had been informed and promised by Defendants at the Buying Summit.

708.  Ms. Thode was also induced by the fraudulent representations of the Defendants to purchase ten undeveloped lots in Florida from Defendants, all at prices significantly above fair market value.

709.   Ms. Thode also purchased two loans with mortgages secured by properties located in suburban Detroit relying upon the rounds and rounds of Defendants' motivational speakers fraudulently extolling these as great investments.

In fact, Defendants were selling at face value prior uncollectable loans previously made to other Buying Summit victims.

710.  Both properties which secured the aforementioned loans had previously been sold to a victim of the Buying Summit Fraudulent Scheme who had borrowed the purchase money from Defendant Insider's Cash, LLC and thus, the balance on each loan was in excess of the fair market value of the property.

711.  Each of the two loans is an interest-only loan with a balloon payment of the full balance due after 36 months.

712.  Further, in both cases, the borrower of each of these loans was a self-directed IRA so that each loan is a non-recourse loan.  Therefore, Ms. Thode cannot enforce either loan and can only collect on each loan by way of foreclosure.

713.  Ms. Thode paid cash from her IRA to Defendant Income Property USA, LLC in the amount $43,100.00 (the amount of the principle balance due) for an assignment of a loan secured by 6768 Republic, Warren, Michigan immediately after it had been assigned to Income Property USA, LLC by Insider's Cash, LLC.

714.  Ms. Thode has never received either the original assignments nor the note and mortgage for either property.

715.  Defendants John Graham Inc., Insider's Cash, LLC and Income Property USA, LLC were well aware that the property at 6768 Republic was not worth the aforementioned note balance and that the loan agreement was non-recourse.

716.  On April 11, 2014, Defendant John Graham Inc. had purchased the subject property for $24,000.00 from Fannie Mae, the Federal National Mortgage Association.  On July 15, 2014, Defendant John Graham Inc. sold the property to Defendant Green Apple Homes, LLC for a purported $49,500.00.  On February 3, 2015, Defendant Green Apple Homes sold the property to its Buying Summit victim, the Annamarie Butterworth IRA of Colonial Heights, Virginia for $56,350.00 plus the usual "closing costs".

717.  For 2016, the S.E.V. for the property is $17,030.

718.  Ms. Thode paid cash from her IRA to Defendant Income Property USA, LLC in the amount $45,800.00 (the amount of the principle balance due) for an assignment of a loan secured by 20049 Elkhart St., Harper Woods, Michigan immediately after it had been assigned to Income Property USA, LLC by Insider's Cash, LLC.

719.  Ms. Thode has never received either the original assignments nor the note and mortgage for either property.

720.  Defendants Insider's Cash, LLC and Income Property USA, LLC were well aware that the property at 20049 Elkhart St. was not worth the aforementioned note balance and that the loan agreement was non-recourse.

721.  On September 15, 2014, GWH Properties LLC had purchased the subject property for $33,850.  On September 25, 2014 , GWH Properties LLC sold

the property to Defendant Green Apple Homes, LLC for a purported $50,000.00. On February 6, 2015, Defendant Green Apple Homes sold the property to its Buying Summit victim, the Richard Rounsborg IRA of Minden, NE for $58,650.00 plus the usual "closing costs".

722.  For 2016, the S.E.V. for the property is $20,100.

723.  None of the applicable assignment documents has a "forum selection" clause and venue in this judicial district against Insider's Cash, LLC, Income Property USA, LLC and all of the other Defendants is proper.

724.  Plaintiff Eva Thode has expended thousands of dollars to repair the properties she has purchased from these Defendants due to significant structural defects existing at the time of contracting.

725.  Plaintiff Eva Thode expended over $6,000.00 to the Defendants' associate Veil Corporate, LLC for the creation of a limited liability company and limited liability company services although her properties were conveyed to her Self Directed IRA and not to a limited liability company due to the fraudulent inducements of Defendants' agents.

726.  Due to the aforementioned fraud of these Defendants, Plaintiff Eva Thode is entitled to rescission and revocation of all agreements made with any and all of the Defendants and restitution of all amounts previously paid to them.

727.  As a direct and proximate result of the conduct of these Defendants as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent Enterprise by the Defendants identified in this Complaint, Plaintiff Eva Thode was injured in her business and property and continues to suffer injuries, including the amounts of their investments and legal expenses.

728.  Pursuant to 18 US.C. §1964(c), Plaintiff Eva Thode is entitled to recover from each of the Defendants identified in this Complaint (and from other members of the fraudulent scheme to be identified) treble damages, her costs and reasonable attorney fees.

729.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiff Eva Thode for her damages.

## COUNT XI - THE CLAIMS OF LAYNE LUNDSTROM, AUDREY LUNDSTROM AND INVICTA LEGATO INVESTMENTS, LLC

The allegations of paragraphs 1 - 729 are incorporated by reference as if fully set forth herein.

730.  In March or April 2014 while living in Cedar Park, Texas, Plaintiffs Layne Lundstrom and Audrey Lundstrom received in the United States Mail a promotional flyer featuring Spike TV celebrity Doug Clark of the TV show "Flip Men" inviting them to a attend a free seminar concerning real estate investing and

promising that the attendees of this seminar would be taught how to purchase real estate properties at deeply discounted prices for investment purposes.

731.   The aforementioned promotional flyer was an incidence of mail fraud pursuant 18 U.S.C. §1341 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

732.   In response to the aforementioned promotional flyer, Layne Lundstrom called the advertised telephone number and spoke with an agent of the Defendants during which his attendance along with Audrey Lundstrom at such a free seminar was scheduled for April 16, 2014 at a nearby hotel in Round Rock, Texas.

733.   At the free seminar held on April 16, 2014, Plaintiffs Lundstrom were induced by agents of Defendants to purchase the "Yancey 3-Day Real Estate Workshop Package" for $1,997.00 based upon express promises and inducements that by taking these courses, they would be taught the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties.

734.   The "Yancey Real Estate 3-Day Real Estate Workshop" was held October 17, 18 and 19, 2014 at a hotel in Dallas, Texas.  At this "workshop", the attendees, including Plaintiffs Lundstrom, were instructed by Defendants' agents to call their credit card companies for the purpose of attempting to raise their credit card limits so that they would have this as an additional source of funding for real

estate purchases and other purchases from Defendants. Plaintiffs Lundstrom declined to do so.

735.   At the aforementioned "Yancey 3-Day Real Estate Workshop", Plaintiffs Lundstrom were induced by the fraudulent statements of Defendants agents on October 19, 2014 to purchase the "Yancey Continuing Education Diamond Lifetime Membership" for $27,000.00 which included unlimited lifetime attendance at all Buying Summits. The purported purpose of this course as repeatedly expressed by Defendants' agents was so that Plaintiffs Lundstrom could obtain expert training and guidance from Defendants in order to obtain the skills and knowledge necessary to locate and invest in deeply discounted and below market real estate investment properties. This included express promises by Defendants' agents of unlimited Yancey Platinum and Diamond membership-only opportunities to purchase deeply discounted investment properties through Buying Summit agent Defendant BuyPD, LLC at prices far below those available to the general public.

736.   While at home at the end of November 2014, Plaintiffs Lundstrom received a telephone call from agents of Defendants, Van Beere and Justin Labrum who identified themselves as members of "Dean's Inner Circle". They forcefully and relentlessly inquired about the Lundstroms' financial status. During this "hard sell" telephone call, the Lundstroms were promised, *inter alia*, the opportunity to

become a member of the "Inner Circle" personal mentorship two-year program for $18,000. The Lundstroms declined this offer.

737. Nevertheless, Plaintiffs Lundstrom received two more rounds of "hard sell" telephone calls from Defendants' agents urging them to purchase an "Inner Circle" mentorship membership program while continuously lowering the price. Plaintiffs Lundstrom finally agreed to purchase the membership for $2,795.00 on January 22, 2015.

738. Each of these telephone calls made Defendants' agents to Plaintiffs Lundstrom and to any of the other recipients of such calls was an incidence of wire fraud pursuant 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

739. The aforementioned "training" and Buying Summit packages were purchased by Plaintiffs Lundstrom from an entity entitled "Yancey, LLC".

740. The written contractual agreements between Plaintiffs Lundstrom and "Yancey, LLC" provided that all disputes would be resolved via binding arbitration with the American Arbitration Association which is unenforceable for the reasons stated *supra*.

741. Plaintiffs Lundstrom attended a Buying Summit in Las Vegas January 8-10, 2015.

742.  As the direct and proximate result of the false and fraudulent statements, promises and inducements of Defendants, described *supra*, Plaintiffs Lundstrom were induced to attend a sales session with an agent of Defendants at the Buying Summit.

743.  Plaintiffs Lundstrom were also induced to make a property purchase from Defendants based upon this fraudulent representation set forth in a BuyPD brochure:

> Our specialized team works closely with a legal team to ensure that all purchases and properties are bought, renovated, obtained, and sold following the highest compliance principles and ethics.  [See Exhibit M.]

744.  Plaintiffs Lundstrom relied to their detriment upon the Defendants' repeated material misrepresentations that Defendants had performed a rigorous due diligence regarding each property they offered for sale and about which the Plaintiffs need not be concerned.

745.  Plaintiffs Lundstrom relied to their detriment upon the Defendants' repeated material misrepresentations that the properties they offered for sale were being offered at large discounts below fair market value or true cash value.

746.  At the Buying Summit, Plaintiffs Lundstrom and the other attendees were subjected to additional rounds and rounds of "motivational speakers" proclaiming the great real estate bargains that Defendants were offering for sale there.

747.   At a sales session attended by Plaintiffs Lundstrom with an agent of Defendants at the Buying Summit identified as Taylor Warburton of Defendant BuyPD, an internet monitor displayed various homes for sale.  For one such home located at 2016 Salu St., Alton, IL 62002, Defendants' internet monitor displayed a suggested retail price of $55,000.00.  The purported bargain contract price offered by Defendants for this home was $54,450.00

748.   Defendants' internet screen display of the fraudulent suggested retail price" and fraudulent purported bargain sales price as described *supra*, was an incidence of wire fraud pursuant to 18 U.S.C. §1343 and a predicate act of racketeering pursuant to 18 U.S.C. §1961(B) as it facilitated Defendants' Buying Summit Fraudulent Scheme.

749.   Relying exclusively upon their purported expertise, Defendant's agents had previously induced Plaintiffs Lundstrom to create a Utah based limited liability company ("LLC") and to which the home they purchased at the Buying Summit was to be conveyed, to wit:  Plaintiff Invicta Legato Investments, LLC.  Plaintiff Layne Lundstrom and Audrey Lundstrom are the sole owners and managers of Plaintiff Invicta Legato Investments, LLC.

750.   Relying upon the aforementioned false and fraudulent statements, promises and inducements of Defendants regarding the Salu St. property and the rounds and rounds of motivational speakers extolling the bargains to be purchased

at the Buying Summit, Plaintiffs Lundstrom agreed to purchase the property from Defendant Interactive Homes, LLC.  However, with various add-ons, including a $3,321.30 "loan origination fee" and "closing costs" of $2,050.00 (described as being paid to Defendants' attorneys, "Guardian Law"), the actual sales price was in excess of $61,000.00 and a deed purporting to convey the property from Interactive Homes, LLC to Plaintiff Invicta Legato Investments, LLC was executed and dated February 24, 2015 by the Grantor.

751.  The city of Alton, Illinois has a local ordinance that requires a home that has been sold to pass a city inspection before the deed evidencing said sale can be recorded.

752.  The property located at 2016 Salu St., Alton, IL 62002 and purchased by Plaintiff Invicta Legato Investments, Inc. has not passed the aforementioned city inspection.

753.  Because the purchased property has not passed the mandatory city inspection, the deed cannot be recorded and the property cannot be leased to a tenant.

754.  Defendants' agents at the Buying Summit announced that 36 month interest-only 12% purchase-money loans (described as "bridge loans") were being offered as available to attendees at the Buying Summit from Defendant Insiders Cash, LLC in amounts described as 50% "loan to purchase price" ("LPT").  This description was part of the Defendants' scheme to defraud and was intended to give

the Buying Summit victims, including Plaintiffs Lundstrom, the false impression that the home they were purchasing was worth in excess of the amount of his "bridge loan" from Defendants when, in fact, the home he purchased was worth less than the amount of his "bridge loan" and thus could not be refinanced or sold.

755.   Relying upon the aforementioned the aforementioned false and fraudulent statements, promises and inducements of Defendants, Plaintiffs Lundstrom made a down payment of $19,685.00 regarding their purchase of the Salu St. home and a signed a loan agreement on behalf of Invicta Legato Investments, LLC with Defendant Insiders Cash, LLC to pay the loan balance of $42,100.00 with interest-only payments of $421.00 per month for 36 months and the balance of $42,100.00 being due at the end of said 36 months.

756.   Unbeknownst to the Lundstroms and as the result of Defendants' successful attempts to engender their unqualified trust, Mr. and Mrs. Lundstrom also signed a personal guaranty for said purchase money loan obligation of Invicta Legato Investments, LLC for the purchase of the Salu St. home.  This loan agreement and the Personal Guaranty were both drafted by Defendants' attorneys, Guardian Law who claimed to be acting as a mere neutral escrow agent in the transaction.

757.  Unbeknownst to Mr. Lundstrom but known to Defendants at the time of purchase, the Salu St. home had been available for sale at the distressed sale price of

$22,500.00 and was purchased by CR Investments, LLC on December 23, 2014 for $22,500.00.

758.  CR Investments, LLC soon thereafter conveyed the Salu St. property directly to Defendant Interactive Homes, LLC by Warranty Deed prepared by Defendants' attorneys Guardian Law on January 8, 2015 for a purported $39.000.00. Defendant Interactive Homes, LLC then sold the Salu St. property to Invicta Legato Investments, LLC on February 24, 2015 for the aforementioned effective price of in excess of $61,000.00.

759.  Defendants had a contractual and fiduciary duty owing to Plaintiffs Lundstrom to locate the Salu St. property at such a discounted price, inform them of its existence and availability and to facilitate its purchase by Mr. Lundstrom and/or his company at such a discounted price.

760.  Instead, Defendants breached fiduciary their duties as described *supra*, and absconded with the opportunity to purchase the Salu St. property at a discounted price and then purposefully and pursuant to their fraudulent Buying Summit Scheme proceeded to resell the property to the Lundstroms and their company at a price greatly in excess of its fair market value or true cash value

761.  In further breach of their contractual and fiduciary duties, Defendants induced the Lundstroms to execute the aforementioned loan agreement for a principle amount which exceeded the fair market value or true cash value of the

subject property knowing that therefore the loan could not be refinanced within six months (or at all) as Mr. Lundstrom had been informed by Defendants at the Buying Summit.

762.  Due to the aforementioned fraud of these Defendants, Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC are entitled to rescission and vacation of all agreements made with any and all of the Defendants and restitution of all amounts they have previously paid to them.

763.  As a direct and proximate result of the conduct of these Defendants as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent Enterprise by the Defendants identified in this Complaint, Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC were injured in their business and property and continues to suffer injuries, including the amounts of their investments and legal expenses.

764. Pursuant to 18 US.C. §1964(c), Plaintiffs Layne Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC are entitled to recover from each of the Defendants identified in this Complaint (and from other members of the fraudulent scheme to be identified) treble damages, their costs and reasonable attorney fees.

765.  Each Defendant has a distinct role in perpetuating the Defendants' fraudulent scheme and they are each individually liable to Plaintiffs Plaintiffs Layne

Lundstrom, Audrey Lundstrom and Invicta Legato Investments, LLC for their damages.

## COUNT XII
## VIOLATIONS OF 18 US.C. §1962(A), (C) AND (D) IN CONNECTION WITH THE BUYING SUMMIT FRAUDULENT ENTERPRISE

The allegations of paragraphs 1 - 765 are incorporated by reference as if fully set forth herein.

766.  At all times relevant to the Complaint, all of the defendants and various agents of those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 US.C. §1961(4) and used in 18 US.C. §1962 (hereinafter the "Buying Summit Fraudulent Enterprise").  The Buying Summit Fraudulent Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

767. Each of the defendants identified in this Complaint was associated with or employed by the Buying Summit Fraudulent Enterprise and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of the Buying Summit Fraudulent Enterprise through engaging in a pattern of racketeering activity.  Such conduct constituted a violation of 18 US.C. §1962(c) and (d).

768.  Each of the defendants identified in this Complaint conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the Buying Summit Fraudulent Enterprise, enabling the Buying Summit Fraudulent Enterprise to defraud plaintiffs as set forth herein.  Such conduct constituted a violation of 18 US.C. §1962(a) and (d).

769.  As a whole, the defendants identified in this Complaint acted in concert, with specific, well-defined roles in the Buying Summit Fraudulent Enterprise, as described in the preceding allegations, to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the misrepresented "training" and residential property purchase programs.  Further, these defendants consensually engaged in decision making relating to the programs, through the roles described herein. Further detail about their specific roles in perpetuating the fraudulent scheme will be disclosed through discovery.

770.  These acts, including the conduct of the affairs of the Buying Summit Fraudulent Enterprise through a pattern of racketeering activity, took place over a period of at least three years and included multiple acts of mail and wire fraud.

771.  The defendants identified in this Complaint have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme and as a regular part of the conduct of the business of the

enterprise for at least three years and will continue indefinitely unless prevented as evidenced by their past and continued activities.

772. This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 US.C. §1961(5).

773. Through their conduct of the Buying Summit Fraudulent Enterprise, the defendants identified in this Complaint have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding their training and sales programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described throughout the preceding paragraphs.

774. By virtue of these and similar communications occurring over at least the past three years, the defendants identified in this Complaint have engaged in, and are continuing to engage an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

775. As a direct and proximate result of these defendants' conduct as set forth herein, including the conduct of the affairs of and investment in the Buying Summit Fraudulent Enterprise by the defendants identified in this Complaint, Plaintiffs were

injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

776. Pursuant to 18 US.C. §1964(c), Plaintiffs are entitled to recover from the defendants identified in this Complaint treble damages, their costs and reasonable attorney fees.

## COUNT XIII
## REQUEST FOR INJUNCTIVE RELIEF

The allegations of paragraphs 1 - 776 are incorporated by reference as if fully set forth herein.

777.  Since the filing of the original Complaint in this action on February 23, 2016, Defendants have nevertheless continued unabated to carry on inducing new victims into their fraudulent scheme.

778.  Most of the Plaintiffs in this action have ceased paying their loans to Defendants American Cash Fund and Insider's Cash, LLC

779.  Plaintiffs have offered in March 2016 to deed back to Defendants the properties associated with such unpaid loans.

780.  Defendants have refused to accept such a conveyance back of these properties.

781.  Nevertheless, Defendants have continued to communicate with various individual Plaintiffs after the commencement of this action and without notice to Plaintiffs' counsel offering to agree to a reconveyance of the subject properties

pursuant to a deed in lieu of foreclosure pursuant to documents to be drafted by Defendants' counsel, Guardian Law upon payment of a fee to Guardian Law.

782.  These documents invariably contain global release language wherein the Plaintiff/borrower would release all of the various members of the Buying Summit Fraudulent Enterprise from any and all claims.

783.   Further, Defendants have continued to communicate with various individual Plaintiffs after the commencement of this action and without notice to Plaintiffs' counsel offering to agree to refinance their loans which this action seeks to rescind pursuant to documents to be drafted by Defendants' counsel, Guardian Law upon payment of a fee to Guardian Law.

784.  These documents invariably contain global release language wherein the Plaintiff/borrower would release all of the various members of the Buying Summit Fraudulent Enterprise from any and all claims.

785.  Today, November 18, 2016, Guardian Law charged the credit card of Plaintiffs Pascal Vohradnik and Simone Vohradnik for preparation of such refinancing documents without notice to or permission from Plaintiffs' counsel.

786.  In many instances, upon inducing a Buying Summit victim/borrower to refinance their non-recourse loan, the new loan is not non-recourse which may likely result in the termination of the special tax status of the victims' IRA.

787.  Even though Defendants refuse to accept a reconveyance of properties regarding which the loan payments have ceased, Defendants nevertheless commence foreclosure proceedings against these very same properties which are otherwise abandoned, causing blight in the neighborhood and small city fines from the local municipalities against the Plaintiff/owners who cannot afford to maintain these properties and who reside out-of-state.

788.  Defendants continue to sell the loan agreements which are the subject of this action and which Plaintiffs seek to rescind to new victims of the Buying Summit Fraudulent Enterprise at full face value without notice to the new buyer of the note of the instant litigation or notice to the respective Plaintiff.

789.  Plaintiffs request that this court enjoin the Defendants and their attorneys from contacting Plaintiffs regarding any matter which is the subject of this litigation, to enjoin the Defendants from selling any of the loan agreements which are the subject of this litigation, and to compel Defendants to accept a reconveyance of all properties purchased by the Plaintiffs from Defendants if such Plaintiffs so chooses.

790.  (1) There is a likelihood of success on the merits of Plaintiffs' claims; (2) Plaintiffs will suffer irreparable harm if injunctive relief is not granted; (3) That the balance of harms weighs in favor of granting the injunctive relief; and (4) That the public's interest supports injunctive relief.

WHEREAS, Plaintiffs respectfully demand as follows:

1.    Judgment upon their complaint against all defendants;

2.    Compensatory damages;

3.    Rescission and revocation of all agreements between Plaintiffs and Defendants and restitution to Plaintiffs of all benefits paid by Plaintiffs to Defendants;

4.    Punitive damages;

5.    Treble damages and attorney fees where authorized;

6.    Injunctive relief;

7.    A constructive trust of assets traceable to payment by Plaintiffs for benefit of Plaintiffs; plead elements

8.    Trial by jury on all issues so triable; and

9.    Any and all other relief to which Plaintiffs appear entitled.

/s/ Robert W. Roddis
424 Madison
Grosse Pointe Farms, MI 48236
(313) 319-5045
bobroddis@gmail.com

November 18, 2016                              P32145

## **PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties in the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on November 18, 2016.

By:            ☒ ECF

I declare that the statements above are true to the best of my information, knowledge, and belief.

By: _/s/ Robert W. Roddis_____